UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DAVID WALDING, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | Civil Action No: SA-08-CA-124-XR |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

On this date, the Court considered the Memorandum and Recommendation of Magistrate

Judge Primomo on "Defendants Carey D. Cockrell, Dianna Spiser and Joyce James' Motion to

Dismiss" (docket no. 92) and the objections thereto (docket no. 103).  After careful consideration,

the Court will ACCEPT the recommendation and will GRANT the Motion to Dismiss (docket no.

59).

**I. Background**

Plaintiffs are twelve young men born in Central America who were detained in the United

States by federal agents as undocumented and placed in federal custody pending their immigration

court proceedings.  Am. Compl. ¶ 1.  Each of the Plaintiffs was a minor at the time of his detention,

and each was placed at private facility, the "Away From Home, Inc." facility located in Nixon, Texas

("the Nixon Facility"), to await the final adjudication of his immigration status.  *Id.*  Plaintiffs allege

that they suffered "grave and repeated sexual, physical and emotional abuse" at the hands of facility

employees.  As a result of the abuse, Defendant Belinda Leal, an AFH employee, was criminally

charged and is now serving a prison sentence.  The Nixon Facility was closed in the Spring of 2007.

1

The Nixon Facility was licensed by the Texas Department of Family and Protective Services ("TDFPS"). The TDFPS Defendants are Carey D. Cockrell, Commissioner of the Texas Department of Family and Protective Services, Dianna Spiser, Assistant Commissioner for Child Care Licensing at TDFPS, and Joyce James, Assistant Commissioner for Child Protective Services at TDFPS. They are sued in Plaintiffs' Ninth Cause of Action, which alleges that Plaintiffs have a Fourteenth Amendment right to be provided with a safe and reasonable environment at all times during their detention, that the TDFPS Defendants violated this right by licensing and providing a dangerous facility to the federal defendants for use in detaining the Plaintiffs and other unaccompanied minors, by failing to properly monitor or correct such dangers, by directly placing the Plaintiffs at risk and/or making them vulnerable to the abuses, and by acting recklessly and/or with deliberate indifference to the rights of the Plaintiffs and the ongoing abuses and violations at the Nixon Facility. Second Am. Compl. ¶¶ 222-225. The Texas Department of Family and Protective Services ("TDFPS") Defendants, Carey Cockerell, Dianna Spiser, and Joyce James, move to dismiss all claims against them pursuant to Rules 12(b)(1) and (b)(6). Docket no. 59.

## A. TDFPS's Motion to Dismiss and Related Briefing

Plaintiffs sue these Defendants in their Ninth Cause of Action, which is a § 1983 claim by all Plaintiffs for damages and injunctive relief against Cockrell, Spiser and James for violation of their Fourteenth Amendment rights. The TDFPS Defendants argue that: (1) the § 1983 claim against them in their official capacities is barred by sovereign immunity; (2) Plaintiffs' Complaint fails to meet the pleading standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); and (3) they are entitled to qualified immunity on the claims brought against them in their individual capacities. In their response (docket no. 65), Plaintiffs: (1) stipulate that the § 1983 claims against

these Defendants for damages and injunctive relief should be brought in their personal/individual capacities only; (2) argue that their pleadings are sufficient to satisfy *Twombly*; and (3) dispute the Defendants' entitlement to qualified immunity, arguing that both the state-created danger and special relationship doctrines apply.  In their reply (docket no. 67), Defendants: (1) argue that the claims for prospective injunctive relief against these Defendants must be against them in their official capacities, but that there is no basis for such relief because Plaintiffs no longer reside in a facility associated in any way with TDFPS; and (2) re-assert their entitlement to qualified immunity for the claims against them in their individual capacities.  In their sur-reply (docket no. 70), Plaintiffs state they will pursue their damages claims against the TDFPS Defendants in their individual capacities only and will pursue their request for injunctive relief against the TDFPS Defendants in their official capacities only.

### B. Magistrate Judge Primomo's memorandum and recommendation

Magistrate Judge Primomo recommends that the TDFPS Defendants' motion to dismiss be granted.  With regard to the claim for injunctive relief against the TDFPS Defendants in their official capacities, Magistrate Judge Primomo concludes that this claim is moot in light of the closing of the Nixon Facility.  MNR at 3 n.2.  Turning to the issue of qualified immunity, Magistrate Judge Primomo concludes that the TDFPS individual defendants are entitled to qualified immunity because there was no constitutional violation and the right was not clearly established at the time.  Specifically, Magistrate Judge Primomo determined that the State Defendants did not have a constitutional duty to protect Plaintiffs from the private violence that occurred here, and that neither the "special relationship" nor the "state-created danger" exceptions apply.  Magistrate Judge Primomo noted that Plaintiffs were never in state custody or control, but rather were in the joint

3

custody of ICE and the Division of Unaccompanied Children's Services of the Office of Refugee Rights ("ORR"), and thus "the State Defendants did not impose any limitations on the Plaintiffs' freedom to act on their own behalf." Because the State merely licensed the facility where Plaintiffs were housed and had no involvement in Plaintiffs' detention or placement in this case, Magistrate Judge Primomo concluded, no special relationship was created. Further, Magistrate Judge Primomo concluded that the state-created danger exception does not apply because the allegations "do not establish affirmative conduct on the part of the State Defendants that created or increased the danger to Plaintiffs." Moreover, Magistrate Judge Primomo reasoned, the state-created danger theory was not clearly established at the time of the alleged acts such that it would be clear to a reasonable state officer that his or her conduct was unlawful.

## C. Plaintiffs' Objections

Plaintiffs raise three objections to the Magistrate Judge's Memorandum and Recommendation, all of which relate "to the Magistrate's findings of law with regard to the state created danger doctrine and the resulting dismissal of Plaintiffs' claims against Defendants Carey D. Cockrell, Dianna Spiser and Joyce James." First, Plaintiffs argue that the Memorandum and Recommendation fails to apply proper legal standards for determining qualified immunity. Specifically, they contend that "not only was the state created danger doctrine the law of the Fifth Circuit at the time of the alleged violations by the Defendants, but it was also the clear and nearly universal law of the other circuits." Further, Plaintiff state, "[i]f there was any uncertainty as to the doctrine within the Fifth Circuit itself, then the Court must look to the consensus of persuasive authority in other circuits in order to determine whether or not the Defendants were fairly on notice that their actions were unlawful." Thus, because "the state created danger jurisprudence in

2006-2007 was full, clear and well settled," "[th]e Magistrate [Judge] in this case erred in failing to review the current 'consensus of cases of persuasive authority' from other circuits in determining qualified immunity."

Second, Plaintiffs challenge the Magistrate Judge's conclusion that Plaintiffs's allegations are insufficient to satisfy the state-created danger exception. Plaintiffs contend that the TDFPS Defendants created or increased the risk to the Plaintiffs by licensing the Nixon Facility, continuing to license the facility despite reports of abuse and other violations, and by refusing to take any other reasonable measures to halt or prevent the abuse. They assert that "[t]he TDFPS Defendants thus helped to create the dangerous environment at the Nixon facility." They argue that, "[b]ut for the acts of the TDFPS Defendants, Plaintiffs would never have been placed in the dangerous environment of the Nixon facility in the first place, much less forced to continue residing there" and "[h]ad the TDFPS Defendants denied or revoked the Away From Home, Inc., license earlier, or taken any other reasonable steps, Plaintiffs might have been spared the sexual and physical assaults and other violations that occurred."

Third, Plaintiffs argue that application of *Pearson v. Callahan*, ___ U.S. ___ (2009) is not warranted. *Pearson* permits district courts in certain circumstances to decide the second prong of the well-established qualified immunity test – whether a right was clearly established – without deciding the first prong – whether there was a constitutional violation.

**D. Standard of Review**

Because the Plaintiffs have filed objections, the Court will conduct a de novo review of those portions of the Memorandum and Recommendation to which Plaintiffs have objected. 28 U.S.C. § 636(b)(1). This review requires examination of the entire record and independent assessment of

the law.  Those portions of the Memorandum and Recommendation that have not been objected to are reviewed for plain error.

## II. Analysis

The undisputed facts are that Plaintiffs were apprehended and detained by federal law enforcement officers, and that the federal defendants placed them at the Nixon Facility, a private facility staffed by non-state employees.[1]  The issue presented is whether the TDFPS Defendants are entitled to qualified immunity on Plaintiffs' claims under section 1983.  Plaintiffs contend that these Defendants created or increased the risk to Plaintiffs because they licensed the Nixon Facility,[2] thus making it available to the federal defendants as a place to house the Plaintiffs, and they failed in their duty under state law to ensure the welfare of children in such licensed facilities.[3]  Plaintiffs allege

---

[1]  Plaintiffs' Second Am. Compl. ¶ 118 ("The Nixon facility is owned and operated by Defendant Away From Home, Inc. doing business as Southwest Initiative Inc., a for-profit corporation also doing business as 'Texas Sheltered Care.'").

[2]  Plaintiffs allege that "Defendant Away From Home Inc. was licensed by the TDFPS to house and provide care to children." Second Am. Compl. ¶ 118.  There are no allegations concerning when Away From Home was initially licensed by TDFPS.  Plaintiffs further allege that "TDFPS and its officers and employees, including Defendants Cockrell, Spiser and James had a duty to screen all applications for licensing with due care in order to assure the safety of children placed in their licensed facilities." *Id.* ¶ 130.  Plaintiffs allege that "TDFPS Defendants Cockrell, Spiser and James knowingly, intentionally, and/or with willful indifference and/or recklessly and/or negligently refused and failed to use the requisite level of care in screening, investigation and licensing process of all applications (persons and/or organizations) seeking to house and care for unaccompanied minors in the State of Texas ...." *Id.* ¶ 146.  Plaintiffs allege that the TDFPS Defendants "intended and/or knew or should have known of the risks involved in licensing Defendant Away From Home, Inc." *Id.* ¶ 149.

[3]  Plaintiffs allege that "TDFPS and its officers and employees, including Defendants Cockrell, Spiser and James, also had a duty to select, monitor, train, and correct any abuses by their licensees." Second Am. Compl. ¶ 131.  Plaintiffs allege that the TDFPS Defendants "knowingly, intentionally and/or with willful indifference and/or recklessly and/or negligently refused and failed ... in properly monitoring, supervising, guiding and controlling such persons and/or facilities once licensed; in properly investigating any and all reported abuses and taking proper steps to prevent any recurring abuses or retaliation; and in revoking licenses where necessary." *Id.* ¶ 146.  Plaintiffs allege that the TDFPS Defendants "knowingly, intentionally, willfully or with willful indifference and/or negligently, failed and refused to take any reasonable steps to correct the rampant abuses at the Nixon facility." *Id.* ¶ 150.

that the "intent and/or deliberate indifference and/or negligence by the TDFPS Defendants created the danger of, and heightened Plaintiffs' vulnerabilities to, precisely the abuses and violations" described.[4]  Plaintiffs appear to have been placed at the Nixon Facility in 2006,[5] and the facility was closed in the Spring of 2007.[6]  Plaintiffs allege that the abuses and violations at the Nixon Facility were "repeatedly reported to local law enforcement officers and the investigators at the Texas Department of Family and Protective Services."[7]  They further allege that Defendants "failed to take any reasonable steps to correct the situation at the Nixon facility or to protect or assist the Plaintiffs, but rather acquiesced to and fostered such ongoing abuses."[8]

Plaintiffs acknowledge that there is generally no constitutional duty on the part of the state to protect individuals from private harm.  They contend, however, that the state-created danger exception to that rule permits liability in this case.  Specifically, Plaintiffs allege TDFPS was required by law to monitor, supervise, and correct any dangerous conditions at the Nixon Facility, and that despite the reports of abuse, Defendants did not revoke its license or correct the problems. Plaintiffs argue that ORR could only place the minors in a licensed facility, and thus the TDFPS Defendants' deliberate indifference, which led to the licensing and continued licensing of the Nixon

---

[4] Second Am. Compl. ¶ 152.

[5] There are no specific allegations concerning when the Plaintiffs were placed at the Nixon Facility. However, it is reasonable to infer that they were placed there shortly after their detention by federal law enforcement.  The Second Amended Complaint asserts that Plaintiff D.A.E.F. was apprehended by Border Patrol agents in December 2006.  Second Am. Compl. ¶ 61.  Plaintiff L.M.V.F. was apprehended by Border Patrol agents in August 2006.  *Id.* ¶ 76.  Plaintiff W.O.G. was apprehended in August 2006.  *Id.* ¶ 80.  There are no specific allegations regarding when the other Plaintiffs were detained.

[6] Second Am. Compl. ¶ 107.

[7] Second Am. Compl. ¶ 103.

[8] Second Am. Compl. ¶ 102.

Facility, created a dangerous condition and drew the victims into a dangerous situation. Thus, Plaintiffs contend, the TDFPS Defendants did more than simply fail to act or protect; their actions were a but-for cause of the harms sufficient to invoke the state-created danger exception.

It is clearly established that individuals have a substantive due process right to be free from state-occasioned bodily harm, but it is equally clear that the Constitution does not, as a general rule, impose upon state officials a duty of care to protect individuals from any and all private harms. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 196-97 (1989) ("As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."). The *DeShaney* court recognized two possible exceptions to this general rule. The Court recognized the "special relationship" exception, which holds that the Constitution imposes upon the state a duty of care towards individuals who are in its custody. *Id*. at 200 ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and well-being."). Second, courts have recognized that state officials have a duty to protect individuals from harm when their actions created or exacerbated a danger to the individual. *See id.* at 201 (noting that, although the state may have been aware of the dangers faced by the plaintiff, "it played no part in their creation, nor did it do anything to render him more vulnerable to them"). The Magistrate Judge found that neither exception applied. Plaintiffs did not object to the Magistrate Judge's Memorandum and Recommendation with regard to the "special relationship" exception, and the Court finds his conclusion that no special relationship exists because Plaintiffs were at all times in federal custody to be not clearly erroneous. The sole issue for *de novo* review, therefore, is the applicability of the state-created danger exception.

**A. Whether Magistrate Judge Primomo bypassed the first prong of the qualified immunity analysis?**

Contrary to Plaintiffs' arguments, the Magistrate Judge does not appear to have applied *Pearson* to bypass the first step of the qualified immunity analysis. Rather, he concluded that the state-created danger theory did not apply on the facts alleged, which would result in no constitutional violation. He then concluded that the state-created danger theory was not clearly established. Thus, though he made no express conclusion that no constitutional violation was established, he did engage in the analysis required by the first prong of the traditional qualified immunity test before proceeding to the determination that the law was not clearly established. Accordingly, the Court finds that Plaintiffs' third objection regarding the Magistrate Judge's application of *Pearson* is without merit.

**B. Whether Plaintiffs have pled a constitutional violation?**

The Court thus turns to the issue of whether there was a constitutional violation. In assessing whether the facts alleged demonstrate a constitutional violation, the Court must analyze the law using "the currently applicable ... standards." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). However, because the Fifth Circuit still has not expressly adopted the state-created danger doctrine as a theory of liability and there is some variation among the circuits that have adopted it, it is difficult to determine precisely what the "currently applicable standards" are. The Court thus concludes that a discussion of the state-created danger cases in this Circuit is relevant and necessary for it to decide both prongs of the qualified immunity analysis.

**1. Discussion of Fifth Circuit precedents**

The Fifth Circuit has been reluctant to expressly adopt the state-created danger exception, often refusing to adopt the doctrine outright, but nevertheless discussing its requirements. In 1997,

the Fifth Circuit noted that "[t]he state-created danger theory has not been adopted in this Circuit," but concluded that "even if we were to adopt this theory, [the plaintiff] could not recover." *Randolph v. Cervantes*, 130 F.3d 727, 731 (5th Cir. 1997). The Court stated that,

> To prevail under the state-created danger theory, "[t]he environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur." *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994). "The key to the state-created danger cases ... lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid." *Id.*

In 1999, the Fifth Circuit again noted that it had not accepted the state-created danger theory. *Saenz v. Heldenfels Bros. Inc.*, 183 F.3d 389, 392 (5th Cir. 1999) ("Other than the factually inapplicable state-created danger cases cited above-which reflect a theory that this court has not yet accepted-appellants cite no case, and we have found none, that upholds such an ephemeral distinction."). And it did so again in early 2001. *Piotrowski v. City of Houston*, 237 F.3d 567, 584 (5th Cir. 2001) ("Although this court has discussed the contours of the 'state-created danger' theory on several occasions, we have never adopted that theory. We need not do so here, since, even if we were to adopt it, Piotrowski could not recover.") (citations omitted).

Later in 2001, a panel of the Fifth Circuit judges expressly adopted the theory in *McClendon v. City of Columbia*, 258 F.3d 432 (5th Cir. 2001): "Since *Johnson*, we have continued to recognize the existence of the theory and observed that other circuits have found this theory to be constitutionally sound. We have not heretofore explicitly adopted and enforced this theory. We do so now." *Id.* at 436 (footnote omitted). The Court then reversed the district court's grant of summary judgment on this issue and remanded to the district court, even going so far as to say that

the doctrine was clearly established at the time of the incident in 1993. *Id.* at 443. Though the panel "implicitly acknowledged that neither the Supreme Court nor [the Fifth Circuit] had expressly sanctioned any 'state-created danger' theory as of July 1993, when the relevant events took place," "the panel found that [the] discussion of the state-created danger theory in *Salas v. Carpenter*, 980 F.2d 299, 309-10 (5th Cir.1992), combined with (1) the fact that several circuits had explicitly adopted the state-created danger theory prior to 1993, and (2) the fact that no circuit had explicitly rejected the state-created danger theory prior to 1993, was sufficient to render that theory 'clearly established' in July of 1993." *McClendon v. City of Columbia*, 305 F.3d 314, 321 (5th Cir. 2002) ("*McClendon II*").

However, on *en banc* rehearing in *McClendon*, the Fifth Circuit retreated from the panel's adoption of the doctrine. It noted:

> Many of our sister circuits have read this language to suggest that state officials can have a duty to protect an individual from injuries inflicted by a third party if the state actor played an affirmative role in creating or exacerbating a dangerous situation that led to the individual's injury. Those courts accepting some version of this "state-created danger" theory have applied the exception in a variety of factual contexts, and have adopted a variety of tests in expounding the theory. While this court has recognized the validity of the "special relationship" exception to the general *DeShaney* rule that state officials have no constitutional duty to protect individuals from private violence, we have not yet determined whether a state official has a similar duty to protect individuals from state-created dangers.

*McClendon II*, 305 F.3d at 324-25 (footnotes and citation omitted). The Court then noted that "courts applying both the ... 'state-created danger' exception to the *DeShaney* rule have generally required plaintiffs to demonstrate (or, at the motion-to-dismiss stage, to allege) that the defendant state official at a minimum acted with deliberate indifference toward the plaintiff." *Id.* at 326. The Court found that the plaintiff had not met this requirement.

The Court then proceeded to address the second prong of the qualified immunity analysis –
whether the right was clearly established – "because of the need to articulate whether it is
appropriate, when this circuit has not spoken to an issue, to look to the law of other circuits in
determining whether a right was 'clearly established.'" *Id.* at 327 n.9. The Court concluded that,
in determining whether a right was clearly established, courts are not limited to precedent from the
Supreme Court and the Fifth Circuit, but rather, that "in the absence of directly controlling authority,
a 'consensus of cases of persuasive authority' might, under some circumstances, be sufficient to
compel the conclusion that no reasonable officer could have believed that his or her actions were
lawful." *Id.* at 329.

However, even looking to other circuits, the Court found that the law was not clearly
established in 1993:

> Those courts sanctioning some version of the state-created danger theory prior to
> 1993 might fairly be characterized, at a high level of generality, to be in agreement
> about the existence of a substantive due process right to be free from state-created
> danger. However, these courts were not in agreement as to the specific nature of that
> right. For example, these courts apparently disagreed as to the appropriate mental
> state required to hold a state actor liable for harms inflicted by third parties. While
> most courts agreed that something more than "mere negligence" was required to
> support liability, the Ninth Circuit apparently favored a "deliberate indifference"
> standard, *see Grubbs*, 974 F.2d at 122-23, the Sixth Circuit used a slightly different
> "gross negligence" test, *see Nishiyama*, 814 F.2d at 282, and the Second Circuit
> hinted that intent to injure might be required, *see Dwares*, 985 F.2d at 99. In addition,
> even those courts accepting the theoretical validity of the state-created danger
> doctrine admitted uncertainty as to its contours. *See, e.g., Freeman*, 911 F.2d at 55
> (noting that "[i]t is not clear, under *DeShaney*, how large a role the state must play
> in the creation of danger and in the creation of vulnerability before it assumes a
> constitutional duty to protect"). Thus, while a number of our sister circuits had
> accepted some version of the state-created danger theory as of July of 1993, given the
> inconsistencies and uncertainties within this alleged consensus of authorities, an
> officer acting within the jurisdiction of this court could not possibly have assessed
> whether his or her conduct violated this right in the absence of explicit guidance
> from this court or the Supreme Court.

*McClendon II*, 305 F.3d at 331-32. In a footnote directly after the quoted text, the Court also indicated that the law was not clearly established in 2002 because of the Court's continued refusal to adopt the doctrine:

> The reluctance of this court, in the ten years since *Salas* was decided, to embrace some version of the state-created danger theory despite numerous opportunities to do so suggests that, regardless of the status of this doctrine in other circuits, a reasonable officer in this circuit would, even today, be unclear as to whether there is a right to be free from "state-created danger." Put differently, a strong consensus of authorities in other circuits is more likely to be determinative on a subject when this circuit is tabula rasa on that subject than when the landscape in this circuit is littered with opinions expressing varying levels of skepticism.

*Id.* at 332 n.12. The Court then concluded that, even if a consensus of circuits had adopted some version of the state-created danger theory at the time of the incident, the contours of an individual's right to be free from state-created danger were not sufficiently clear to provide the defendant with fair warning. *Id.* at 332. In addition, because the applicability of the state-created danger doctrine is "highly context-sensitive," the fact that the doctrine was accepted on a general level did not necessarily give fair warning on the facts presented to the individual defendant. *Id.* at 332 & n.13.

Soon after *McClendon II*, the Fifth Circuit continued its pattern of refusing to adopt the state-created danger theory. In *McKinney v. Irving Independent School District*, 309 F.3d 308, 313, (5th Cir. 2002), the court noted that in the "rehearing of *McClendon I* en banc, however, we neither adopted nor rejected the state-created danger theory" but that "[i]n order to recover under the state-created danger theory, we assume that a plaintiff would have to show, at a minimum, that: (1) the state actors created or increased the danger to the plaintiff and (2) the state actors acted with deliberate indifference." *Id.* at 313 (citing *Piotrowski I*, 51 F.3d at 515). Further, "to establish deliberate indifference, the plaintiff must show that the state actors created a dangerous environment,

that they knew it was dangerous, and that they 'used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur.'" *McKinney*, 309 F.3d at 313-14 (citing *Johnson*, 38 F.3d at 201). The court continued, "The key to the state-created danger cases ... lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid." *Id.* In a very similar discussion, the Fifth Circuit in *Morin v. Moore*, 309 F.3d 316, 321-22 (5th Cir. 2002) outlined these same requirements. The *Morin* court also concluded that the plaintiff failed to show the defendants' specific knowledge of a harm to a known victim.

In 2003, the Fifth Circuit decided *Scanlan v. Texas A&M University*, 343 F.3d 533 (5th Cir. 2003), one of several lawsuits arising out of the tragic bonfire collapse that injured twenty-seven and killed twelve students in 1999. The plaintiff asserted that the bonfire was very dangerous, but that the University refused to supervise the bonfire, and instead "used the Bonfire experience and tradition as a huge marketing tool to lure prospective students to A&M as well as to secure millions of dollars in donations from alumni." The plaintiffs also claimed that the University Officials "actively encouraged and enticed students and alumni to work on the Bonfire stack while they turned a blind eye to the peril." In reversing the district court's dismissal and remanding, the Fifth Circuit panel concluded that: "If these allegations were construed in the light most favorable to the plaintiff, the district court should have determined the plaintiffs had pleaded sufficient factual allegations to show the bonfire construction environment was dangerous, the University Officials knew it was dangerous, and the University Officials used their authority to create an opportunity for the resulting harm to occur. As a result, the district court should have concluded that the plaintiffs stated a section

1983 claim under the state-created danger theory." *Id.* at 538.

Soon after *Scanlan*, the Fifth Circuit decided *Rivera v. Houston Independent School District*, 349 F.3d 244 (5th Cir. 2003). In a footnote, the Court stated that *Scanlan* did not adopt the state-created danger theory: "In *Scanlan v. Texas A&M University*, 343 F.3d 533 (5th Cir.2003), we found that 'this Court has never explicitly adopted the state-created danger theory.' *Id.* at 537. Despite remanding that case to the district court for further proceedings, we did not recognize the state created danger theory." *Rivera*, 349 F.3d at 249 n.5. The Court then again declined to recognize "state-created danger as a trigger of State affirmative duties under the Due Process clause." *Id.* at 249. Nevertheless, it set forth the same "basic requirements" of the doctrine that it had in prior cases. *Rivera*, 349 F.3d at 249.

In 2004, the Court repeatedly noted that the Circuit had not adopted or rejected the doctrine, but recited these same requirements regarding the doctrine. *Priester v. Lowndes County*, 354 F.3d 414, 422 (5th Cir. 2004); *Beltran v. City of El Paso*, 367 F.3d 299, 307 (5th Cir. 2004); *Hernandez ex rel. Hernandez v. Texas Department of Protective & Regulatory Servs.*, 380 F.3d 872 (5th Cir. 2004). *Hernandez* is more factually similar to this case than others in which the Fifth Circuit has considered the state-created danger doctrine. In that case, state child protective services officials removed an infant from his family because of suspected abuse, and placed the infant with a foster family with a prior history of negative reports. The infant died while in the foster family's care. The parents sued the state defendants, alleging that those defendants were in violation of Section 1983 for being deliberately indifferent to the child's rights and well-being, failing to exercise professional judgment when making the decision to place the child in the foster home, and failing to adequately train the foster parents. *Id.* at 877-78. In a footnote, the Court emphasize that it had "not yet

determined whether a state official has a similar duty to protect individuals from state-created dangers." *Id.* at 880 n.1. It continued, however, "[i]n order to recover under the state-created danger theory, we assume that at a minimum, a plaintiff must demonstrate that (1) the state actors created or increased the danger to the plaintiff, and (2) the state actors acted with deliberate indifference." *Id.* (citing *McKinney v. Irving Indep. Sch. Dist.*, 309 F.3d 308, 314 (5th Cir. 2002)). The Court concluded that the parents failed to show deliberate indifference, and thus, even assuming a theory of liability for state-created danger, the plaintiffs would not be entitled to any relief. *Id.* In discussing the deliberate indifference requirement, the Court held that "the central inquiry for a determination of deliberate indifference must be whether the state social workers were aware of facts from which the inference could be drawn, that placing children in the ... foster home created a substantial risk of danger." *Id.* at 882.

In 2006, the Fifth Circuit again clearly stated that the state-created danger doctrine was not recognized in this Circuit. In *Rios v. City of Del Rio*, 444 F.3d 417 (5th Cir. 2006), the Court stated: "As we noted in *McClendon v. City of Columbia*, 305 F.3d 314, 327, 330-32 (5th Cir.2002) (en banc), this court has frequently spoken of the 'state-created danger' theory, and has discussed its various permutations and requirements as applied in other circuits, but neither the Supreme Court nor this court has ever either adopted the state-created danger theory or sustained a recovery on the basis thereof. We have, however, many times refused to allow recovery sought to be predicated thereunder." *Rios*, 444 F.3d at 422. The plaintiff argued that the Circuit had adopted the theory in *Scanlan*. The *Rios* court noted that the *Scanlan* opinion did not expressly adopt the theory, and that two subsequent panels had held that *Scanlan* did not adopt the theory, but declined to resolve the issue because plaintiffs's allegations failed to invoke the doctrine. The Court discussed its prior

opinion in *Saenz v. Heldenfels Bros., Inc.*, 183 F.3d at 389 (5th Cir. 1999), in which it "rejected application of the state-created danger theory stating that the defendant senior deputy 'was neither aware of an immediate danger facing a known victim, nor did he use his authority to prevent the appellants from receiving aid. This 'state-created danger' theory is inapposite without a known victim,' and that a state officer 'cannot offend due process by permitting an intoxicated driver to remain on the highway, thereby increasing the risk of harm to unidentified and unidentifiable members of the public.'" *Rios*, 444 F.3d at 424. The Court then noted that, "The same principles apply here and dictate the conclusion that [the defendant's] conduct violated no constitutional right."

The Court concluded that *Morin v. Moore* reached a similar conclusion: "We affirmed the district court's Rule 12(b)(6) dismissal of the complaint, noting that 'the allegations in this case do not show specific knowledge of a harm to a known victim.'" *Rios*, 444 F.3d at 424; *see also Lester v. City of College Station*, 103 Fed.Appx. 814 (5th Cir. 2004) ("even if it is assumed that the state-created danger theory applies, liability exists only if the state actor is aware of an immediate danger facing a known victim" and does not extend to "all foreseeable victims"). Thus, the allegation that the defendant officer restrained an individual in his patrol car, but then left him in the car with the keys such that he was able to free himself and commandeer the patrol car, speed away, and injure the plaintiff with the patrol car was insufficient to create liability under the state-created danger doctrine.

In 2007, the Fifth Circuit considered another bonfire case, *Breen v. Texas A&M University*, 485 F.3d 325 (5th Cir. 2007). In *Breen*, the Court noted that it had "discussed the theory in no fewer than 11 published decisions prior to *Scanlan*," but "had not formally approved of the theory or applied it to uphold a plaintiff's complaint against pretrial motions or affirm an award of damages."

*Id.* at 334. The Court also noted that it had, however, "recognized and described the essential elements of such a claim for the purpose of demonstrating that the plaintiffs' complaints in particular cases failed to state claims under the theory." *Id.* "In doing so, [the Fifth Circuit] explained that to recover on a state-created danger claim, the plaintiff must show that the harm to the plaintiff resulted because (1) the defendant's actions created or increased the danger to the plaintiff; and (2) the defendant acted with deliberate indifference toward the plaintiff. This court had also stated that the state-created danger theory requires an identifiable victim." *Id.* at 334-35. The Court then turned to the *Scanlan* case, concluding that it had in fact recognized the state-created danger doctrine as valid:

> [T]he *Scanlan* panel, unlike earlier panels of this court, was squarely faced with complaints that sufficiently alleged the elements of a state-created danger claim, and, therefore, stated claims under that theory. Consequently, the *Scanlan* court, by holding that the district court erred in dismissing plaintiffs' section 1983 claims, necessarily recognized that the state-created danger theory is a valid legal theory. Were that not the case, the *Scanlan* court would have been required to affirm the district court's dismissal of plaintiffs' complaints, notwithstanding the fact that they sufficiently alleged the elements of a state-created danger claim.

*Breen*, 485 F.3d at 335-36. The Court concluded that the statements in *Rios*, *Beltran*, and *Rivera* that *Scanlan* had not recognized the theory were "unnecessary to their holdings and, as such, constituted only non-binding dicta." *Id.* at 336. Thus, the Court held, "[t]he *Scanlan* panel's clearly implied recognition of state-created danger as a valid legal theory applicable to the case is the law of the case." *Id.* Further, "*Scanlan* quite clearly held that plaintiffs' allegations, if proven, would state a section 1983 claim under the state-created danger theory." *Id.* at 338. The Court concluded, however, that the theory was not clearly established in 1999:

> In light of this court's historical reticence towards adopting the state-created danger theory, however, neither this court's discussions of the theory nor our sister circuits'

adoption of it convinces us that a reasonable official in any of the defendants' shoes would have had fair notice on or before November 18, 1999 that his conduct with respect to the danger created by the Texas A&M bonfire stack could violate the students' constitutional rights. Plaintiffs are correct that a number of this court's decisions prior to 1999 spelled out the basic and essential elements that a plaintiff would need to establish in order to state a claim under the state-created danger theory, if it were to be adopted. In each of those cases, however, this court also expressly noted that the theory had never been adopted in this circuit. Because this court's pre-November 1999 decisions evince substantial uncertainty as to the existence of even the general right that the plaintiffs claim has been violated, those decisions cannot be said to have given defendants fair warning that any of their actions or omissions with respect to the 1999 Texas A&M bonfire construction could violate the affected students' constitutional rights.

Moreover, similar to the situation in *McClendon*, any consensus of the other federal circuits in adopting various formulations of the state-created danger theory is insufficient for this court to find that the theory was clearly established in this circuit as applied to these cases. Although a majority of federal circuits had approved of the state-created danger theory in a general sense by November 18, 1999, there was not a consensus among those courts as to the contours of the underlying substantive due process right, and the plaintiffs have not pointed to (and this court has not found) any pre-collapse cases in which an appellate court applied the state-created danger theory on facts even remotely analogous to the facts of these cases. Accordingly, we find that the adoption of the state-created danger theory in other circuits before November 1999 was insufficient to give the University officials fair notice that their conduct violated the students constitutional rights.

*Breen*, 485 F.3d at 340. The Court re-iterated that its reluctance to adopt the theory was highly significant to a determination of whether the right was clearly established: "Where this court has previously spoken on, and refrained from deciding, an issue, a consensus of authority from other jurisdictions would likely need to be particularly strong and clear before it could support a finding that the legal principle in question was clearly established law in this circuit." *Id.* at 340 n.13. Thus, the Court concluded that the defendants were entitled to qualified immunity.

Soon after, the Court granted rehearing en banc *sua sponte*, and issued a brief opinion withdrawing and deleting "Section III. A, including its subsections 1 through 3, of the panel opinion,

found at 485 F.3d 325, 332-38 (5th Cir.2007), along with footnote 14." *Breen v. Texas A&M Univ.*, 494 F.3d 315 (5th Cir. 2007) ("*Breen II*"). Thus, *Breen II* removed all portions of *Breen I* in which the Court found that *Scanlan* had recognized the theory, and left only that portion concluding that the law was not clearly established in 1999.

## 2. Analysis

Given the state of the law, this Court is faced with the situation in which the Fifth Circuit either still has not recognized the viability of the state-created danger doctrine or it has done so (in *Scanlan*), but later panels of the Court have expressly stated that it did not. Based on a review of all the cases above, however, the Court concludes, as did the *Breen I* panel, that there are three minimum requirements to invoke the doctrine: the plaintiff must show that the harm to the plaintiff resulted because (1) the defendant's actions created or increased the danger to the plaintiff; and (2) the defendant acted with deliberate indifference toward the plaintiff; and (3) there must be an "identifiable victim." The only Fifth Circuit case factually on point with this one is *Hernandez*, but in that case the Court decided the issue on the second requirement – deliberate indifference. That factor is not really in dispute here, however. Rather, Magistrate Judge Primomo concluded that Plaintiffs failed to establish the first and third requirements.

Plaintiffs attempt to analogize this case to *Scanlan* and a Ninth Circuit case, *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989), in which the court found a police officer liable for arresting a drunk driver and leaving his female passenger to walk home, leading to her attack and rape. They argue that in *Wood*, the police did not create the dangerous neighborhood or make it any more dangerous, nor did they force the plaintiff to walk home alone, but they did leave her stranded and it was foreseeable that she would try to make it home. Plaintiffs argue that in *Scanlan*, University

officials did not directly organize or build the bonfire, but they knew of the dangers, ignored the risks, and used the bonfire as a marketing tool and encouraged students to participate. Plaintiffs also emphasize the additional facts that in this case that Plaintiffs were not voluntarily at the Nixon Facility, and that TDFPS has a statutory duty to ensure the safety of those housed at its licensed facilities. Plaintiffs argue that the Defendants created the opportunity for abuse by licensing the facility, thus making it available to ORR as a housing option for Plaintiffs, even though they did not make the facility itself any more dangerous.

The Court does not find those cases factually analogous as there were specific allegations of affirmative conduct. In *Woods*, the officer's contact with the plaintiff altered the immediate circumstances, and removed her boyfriend and her ability to get home safely. In *Scanlan*, the plaintiffs alleged that the University affirmatively used the bonfire to lure students and alumni onto its own property to work on the bonfire it knew was dangerous. Those cases do not establish a constitutional violation on the facts of this case.

The Court concludes that Plaintiffs have failed to establish the violation of a constitutional right. Plaintiffs' first complaint is that Defendants licensed the Nixon Facility initially. However, the Court agrees with Magistrate Judge Primomo that Plaintiffs fail to demonstrate that such an act is a sufficient "affirmative action" directed to an identifiable victim to trigger the doctrine.[9] The

---

[9] Plaintiffs further appear to fail to demonstrate the requirement of deliberate indifference with regard to the initial licensing. Though Plaintiffs argue generally that Defendants recklessly licensed the facility, they fail to plead any specific facts that show that the Defendants knew of any dangers at the time they first licensed the facility. To be liable, Defendants must create a dangerous environment that they know is dangerous. *MicKinney*, 309 F.3d at 313. Presumably, the facility did not house children before it was licensed, and thus the abuse that Defendants knew or should have known about would not yet have occurred. Because this is not clear, however, and Plaintiffs do plead broadly, the Court does not rest on this conclusion at this motion-to-dismiss stage.

Fifth Circuit has held that the defendant must be aware of an immediate danger facing a known victim. *Saenz*, 183 F.3d at 392; *Morin*, 309 F.3d at 323; see *also Lester v. City of College Station*, 103 Fed. Appx. 814 (5th Cir. 2004) (even if the theory applies, liability exists only if the state actor is aware of an immediate danger facing a known victim, not all foreseeable victims).

In *Ruiz v. McDonnell*, 299 F.3d 1173 (10th Cir. 2002), the Tenth Circuit considered a factually similar case and refused to impose liability for danger creation on the basis of negligence in licensing because it was not a sufficiently affirmative act under *DeShaney*. The plaintiff's son died as a result of injuries he sustained while in the care of a licensed private day care facility. As part of its licensing process, the state agency for which the defendants worked was required to conduct an investigation into a potential licensee's fitness as a child care provider and to verify that it carried valid public liability insurance. *Id.* at 1178. The plaintiff alleged that the agency defendants failed in both regards by neglecting to uncover an extensive history of domestic violence between the facility's owners that was allegedly available through a simple search of court records, and by failing to discover that the facility did not carry the proper insurance. *Id.* The court rejected liability based on the state-created danger theory, holding that the act of licensing the child care facility did not pose an immediate threat of harm and was directed at the public in general, rather than the plaintiffs specifically. *Id.* at 1183.[10]

---

[10] The Court left open the question whether an affirmative act of "lulling" the parents into placing their child there could state a claim, noting that the plaintiffs had not shown any affirmative misrepresentations, only that the parents had been "lulled into a false sense of security." Plaintiffs argue that Defendants' act of licensing the Nixon Facility made it available to the federal agencies for placement, but this is indistinct from the mere fact of licensing. There is no allegation of any conduct other than the licensing itself and no allegation of any affirmative misrepresentation. The fact that the licensing resulted in the Nixon Facility being an option for placement due to the operation of regulations not controlled by the State Defendants is not an affirmative act. Even if the licensing was a but-for cause of the Plaintiffs' harm, that alone is insufficient for liability. *See Sandage v. Bd. of Comm'rs of Vanderburgh County*, 548 F.3d 595, 599 (7th Cir. 2008) ("If all that were required was a causal relationship between inaction and harm, the

The Seventh Circuit expressly agreed with *Ruiz* in *Waubanascum v. Shawano County*, 416 F.3d 658 (7th Cir. 2005), another case factually similar to this one. In that case, the plaintiff was a victim of sexual abuse while in foster care. The court held that the act of providing a foster care license to the abuser was insufficient to establish liability under the state-created danger doctrine:

> [E]vidence at trial revealed that Shawano County did not know who specifically would be placed into [the abuser's] home. Similar to the *Ruiz* court's conclusion, the only conceivable danger created by Shawano County's licensing of [the abuser] would be to the public as a whole (all children eligible to be placed in [the] home), because the licensure was not "aimed" at Waubanascum specifically. *Cf. Ruiz*, 299 F.3d at 1183 ("Unlike the direct placement of a child into an abusive home, the mere licensure of [the day care facility] was not an act directed at [the child], which, in and of itself placed [the child] in danger."). The evidence clearly established that it was Menominee County, not Shawano County, that placed Waubanascum in [the abuser's] home (in fact, the terms of the license unambiguously indicated that Menominee County would have responsibility for placement of any foster children in the home). Therefore, the evidence did not support the conclusion that Shawano County affirmatively placed Waubanascum into harm's way when it did not even know of Waubanascum's existence at the time it issued the license to [the abuser].

*Waubanascum*, 416 F.3d at 669-70. These authorities are in accord with the Fifth Circuit's and other courts' requirement that there must be an identifiable or known victim, which cannot simply be any child that might be placed at the Nixon Facility. *See, e.g.*, *Jones v. Reynolds*, 438 F.3d 685 (6th Cir. 2006) ("When by comparison the victim was not identifiable at the time of the alleged state action/inaction, we have held that a § 1983 suit may not be brought under the 'state created danger' theory.").[11] There is no allegation that the State Defendants here ever interacted with the Plaintiffs

---

rule of *DeShaney* would be undone.").

[11] Citing with approval the following cases: *Schroder v. City of Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005) (failing to enforce or lower the speed limit on a residential street "did not create a 'special danger' to a discrete class of individuals (of which the Schroders' son was a member), as opposed to a general traffic risk to pedestrians and other automobiles"); *Jones v. City of Carlisle*, 3 F.3d 945, 949-50 (6th Cir. 1993) (holding that an epileptic driver was "no more a danger to [the plaintiff] than to any other citizen on the City streets"); *Janan v. Trammell*, 785 F.2d 557, 560 (6th Cir. 1986) (holding that the release of an inmate on parole, who eventually murdered a citizen, did not violate the Due Process Clause because "there is [no]

before issuing the license and there is no allegation that the Plaintiffs could have been identified at the time the Nixon Facility was licensed.[12]  Thus, the Court finds that the act of licensing the facility is insufficient to establish a constitutional violation.

The Court thus turns to Plaintiffs' second complaint – that Defendants failed to monitor the Facility, failed to take steps to stop the abuse, and failed to revoke the Facility's license.  The Tenth Circuit again has issued a decision on point.  In *Robbins v. Oklahoma*, 519 F.3d 1242, 1251 (10th Cir. 2008), the court discussed its decision in *Ruiz* that licensing was insufficient for a constitutional violation and concluded that "[t]he same reasoning applies here, because the failure of DHS and its employees to revoke [the day care's] license, even if they had the authority to do so, would be directed at the public in general rather than at [plaintiffs and the child]." *Id.*  Thus, this case supports the conclusion that no constitutional violation was established.[13]

Plaintiffs state in their objections that "once the children were present at the facility, the continuation of the Nixon license despite the rampant abuse and incoming reports was clearly an active step directed at Plaintiffs specifically."  Objections at 8. Assuming this does demonstrate

showing that the victim, as distinguished from the public at large, faces a special danger"); *see also Bullard*, 126 Fed. Appx. at *720 (holding that a public-housing resident threatened by poor security in her building could "not meet th[e] very high burden of proving that the state knew or should have known that its actions specifically endangered the plaintiff") (internal quotation marks omitted); *Kennerly v. Montgomery County Bd. of Comm'rs*, 257 F. Supp. 2d 1037, 1044 (S.D. Ohio 2003) ("[A] plaintiff cannot merely ... nam[e] a more particular sub-class of the public as the group to which the government owed a duty, such as one's 'neighbors.' Neighbors are still the public. *Kallstrom* is not ambiguous: the government must be aware that its actions will increase the vulnerability of a specific individual to criminal danger.").

[12] The Court recognizes that this is inconsistent with the result in *Scanlan*, where the victims would not be readily identifiable beyond being the class of persons lured onto the University property for the bonfire.  Assuming *Scanlan* does establish a constitutional violation in this case, however, the inconsistency in cases establishes that the contours of the right were not clearly established.

[13] The Court notes that, despite the fact that Magistrate Judge Primomo cited to *Ruiz* and *Robbins*, Plaintiffs do not address these cases or attempt to distinguish them in any way.

deliberate indifference and risk directed at known persons, it nevertheless fails because there is no

affirmative act. Rather, the Defendants' failure to take acts, revoke the license, or to otherwise end

the abuse is inaction rather than action. There was no use of authority to "create an opportunity that

would not otherwise have existed" and no act that otherwise increase the risks that already existed

*McKinney v. Irving Independent School District*, 309 F.3d 308, 313 (5th Cir. 2002). As the Seventh

Circuit has stated, "'create or increase' must not be interpreted so broadly as to erase the essential

distinction between endangering and failing to protect." *Sandage*, 548 F.3d at 599. This Court

agrees with Magistrate Judge Primomo's conclusion that these allegations essentially amount to no

more than failing to provide protection from danger.

Accordingly, the Court agrees with Magistrate Judge Primomo that Plaintiffs have failed to

establish a constitutional violation under the first prong of the qualified-immunity analysis. This

case presents difficult facts, but as the Sixth Circuit has said,

> As is so often true in "state created danger" cases, there is much to lament about what
> happened here. . . .    Faced with these kinds of assertions, it is tempting to say that
> [the allegations] satisfy the "state created danger" doctrine. But, to do so, we would
> have to say that the doctrine covers conduct it does not-that it covers state action that
> does not create or increase the risk of danger to the victim and that it applies to state
> action that does not specifically increase the risk of danger to a discrete individual
> or group of individuals.

*Jones v. Reynolds*, 438 F.3d 685 (6th Cir. 2006).

## C. Whether the right was clearly established?

Given that the Court has found no constitutional violation, it need not decide whether the

right was clearly established. However, because the Magistrate Judge and the Plaintiffs considered

the issue, this Court will do so as well. The Court holds in the alternative that, even if Plaintiffs did

establish the violation of a constitutional right, that right was not clearly established at the time of

the events at issue.

Plaintiffs argue that all of the acts occurred after the Fifth Circuit panel's opinion in *Scanlan*, and thus the Defendants were "fully apprised that their conduct was unconstitutional," and to the extent the later panel opinions created confusion, the Court must look to other circuits to determine the issue of qualified immunity. Objections at 5. *Scanlan*, however, was decided on very different facts, and the Fifth Circuit has noted that liability in these types of cases is highly context-specific. Thus, even if *Scanlan* established the theory in this circuit, it would not put the Defendants on notice regarding their conduct in this case.

Further, the Fifth Circuit has twice emphasized the import of its reluctance to adopt the doctrine, noting that "[w]here this court has previously spoken on, and refrained from deciding, an issue, a consensus of authority from other jurisdictions would likely need to be particularly strong and clear before it could support a finding that the legal principle in question was clearly established law in this circuit." *Breen I*, 485 F.3d at 340 n.13; *McClendon II*, 305 F.3d at 332 n.12. Authority from other courts at the time of the conduct in factually similar cases held that the allegations here did not establish a constitutional violation. Thus, because decisions by at least two other circuits had rejected liability in similar fact scenarios, the law was not so clearly established in 2006 and 2007 that the State Defendants would have been given fair warning that their actions would violate Plaintiffs' constitutional rights.

The Court concludes that the law was not clearly established in this Circuit or by a consensus of persuasive authority that the acts in question were unconstitutional.

## Conclusion

The Court ACCEPTS the Magistrate Judge's recommendation and GRANTS the State

Defendants' Motion to Dismiss (docket no. 59). Defendants are entitled to qualified immunity on the individual-capacity claims. Accordingly, all claims asserted against Defendants Carey Cockrell, Dianna Spiser, and Joyce James in their individual capacities (specifically, the Ninth Cause of Action) are DISMISSED on the basis of qualified immunity.

The damages claims against these defendants in their official capacities were voluntarily withdrawn and are thus DISMISSED.

To the extent Plaintiffs stated an intent to pursue their claims for injunctive relief against these Defendants in their sur-reply, they have not objected to Magistrate Judge Primomo's conclusion that these claims are moot in light of the closing of the Nixon Facility, and they appear to have agreed to dismissal of these claims in later filings. Thus, the Court DISMISSES the claims for injunctive relief against these Defendants.

In sum, all claims against Defendants Cockrell, Spiser, and James are DISMISSED.

It is so ORDERED.

SIGNED this 16th day of March, 2009.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE