UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

E.H.C., et al.,

Plaintiffs,

VS. Civil Action No: SA-08-CA-124-XR

UNITED STATES OF AMERICA, et al.,

Defendants.

**ORDER**

On this date, the Court considered the Individual Federal Defendants Maureen Dunn and James De La Cruz's Consolidated Motion for Summary Judgment on Plaintiff E.H.C.'s Retaliation Claim (docket no. 274), and the response and reply thereto.[1] After careful consideration, the Court will grant the motion.

**I. Background**

Plaintiffs' Fifth Cause of Action is a *Bivens* claim for damages by Plaintiff E.H.C. against Defendants James De La Cruz and Maureen Dunn,[2] in their individual capacities, for retaliation against him for reporting sexual abuse. Plaintiff E.H.C. was born in Honduras. Sixth Am. Compl. ¶ 66. At the age of fifteen, he was apprehended in Texas by Border Patrol agents and subjected to immigration proceedings to determine his status. In the interim, he was detained at the Nixon facility

[1] Plaintiffs have filed a motion for leave to file sur-replies to four pending motions filed by Defendants. Docket no. 345. Plaintiffs' request to file a sur-reply to this motion is denied.

[2] The Complaint also asserts this retaliation claim against Defendant Jose Mungia and Defendant Maggie Gaytan. However, all claims against Mungia and Gaytan have been dismissed. *See* docket no. 243, 313 (Mungia) and docket no. 300 (Gaytan).

in Texas. *Id.* ¶ 67. Defendant Maureen Dunn was the Director of the Division of Unaccompanied Children's Services ("DUCS") in the Office of Refugee Resettlement ("ORR"), a part of the United States Department of Health and Human Services. Defendant James De La Cruz was a Federal Field Specialist ("FFS") Supervisor who supervised a number of Federal Field Specialists assigned to various facilities, including the Nixon facility.

**II. Plaintiff's Allegations**

The Sixth Amended Complaint alleges the following: At the Nixon facility, E.H.C. was approached by Belinda Leal for sexual favors, which he "promptly rebuffed." *Id.* ¶ 68. Plaintiff alleges that he then became a "whistleblower" in this case. *Id.* ¶ 69. Plaintiff alleges that "on or about February 10, 2007, E.H.C. told [Nixon facility] employees . . . about Defendant Belinda Leal's sexual abuse" and "on or about February 10, 2007, various [Nixon facility] employees reported Defendant Belinda Leal's abuse to the Gonzales County Sheriff's Office and to TDFPS." *Id.* ¶¶ 70, 71. Plaintiff alleges on information and belief that Defendants were promptly notified of the reports, including the fact that E.H.C. was the whistleblower. *Id.* ¶ 75. As a result of E.H.C.'s report, the Sheriff's Office, FBI, and TDFPS initiated extensive investigations of E.H.C.'s allegations. *Id.* ¶ 78. E.H.C. "continuously cooperated" with these investigations, and Defendants were informed at all times of the investigations and E.H.C.'s cooperation with the investigations. *Id.* ¶ ¶ 79, 80.

Plaintiff alleges that Defendant De La Cruz had supervisory authority over the Nixon facility and was informed, starting in February 2007, of E.H.C.'s allegations and of the resulting investigations. *Id.* ¶ 81. Defendant De La Cruz "also knew that E.H.C. was the child who had reported Defendant Leal's abuses." *Id.* ¶ 82. Dunn was also informed of E.H.C.'s allegations and the subsequent investigations in February or early March 2007. *Id.* ¶ 84.

Plaintiff E.H.C. alleges that he suffered severe mental and physical harm from these incidents, and while detained at the Nixon facility, he attempted suicide, but was given no counseling or treatment. *Id.* ¶ ¶ 85, 86. "Defendants placed Plaintiff E.H.C. on a de facto 'black list' because of his whistleblower actions, and because of his ongoing participation in the investigation." *Id.* ¶ 89. "This blacklisting was retaliatory and continuous and lasted for many months." *Id.* Around March 2007, ORR transferred all children out of the Nixon facility. *Id.* ¶ 90-94. "Defendants Dunn, Mungia, De La Cruz, and Gaytan jointly determined the placement of E.H.C." *Id.* ¶ 95.

"In early March 2007, Defendants Gaytan, De La Cruz, Mungia, and Dunn retaliated against Plaintiff E.H.C. by transferring him to a restrictive 'staff-secure' facility in Washington state, a facility that lacked adequate mental health care and was located far from his legal representative." *Id.* ¶ 96. "In the Spring of 2007, E.H.C.'s legal representative discussed E.H.C.'s placement and his need for a mental health facility with Defendant De La Cruz." *Id.* ¶ 97. "In June 2007, Defendants De La Cruz, Mungia, and Dunn transferred E.H.C. to a still harsher 'secure' facility in Indiana, with very poor conditions and inadequate mental health care and, again, located far from his legal representative, interfering with his pursuit of a Washington dependency order in support of Special Immigrant Juvenile status. This transfer was also retaliatory." *Id.* ¶ 98. "Although ORR repeatedly promised to transfer Plaintiff E.H.C. to a mental health facility in Texas, this did not take place until August 2007, when he was transferred to the Abraxas Hector Garza Center in San Antonio, Texas," but he still received no adequate mental health care or treatment. *Id.* ¶ 99.

"After removal proceedings were terminated against Plaintiff E.H.C., in the fall of 2007, and E.H.C.'s immigration status was resolved, U.S. custody over him was automatically terminated," but Defendants Dunn and De La Cruz allegedly further retaliated against E.H.C. by leaving him in the

Guadalupe County Jail in Seguin, Texas, and interfering with his placement in a less restrictive environment. *Id.* ¶ ¶ 100, 101. Plaintiff alleges that he would have been released but for Defendants' retaliatory and unlawful refusal to release him. *Id.* ¶ 101. Plaintiff alleges that, as a result of such continuous retaliation, he has suffered, and continues to suffer, serious emotional and physical harm. *Id.* ¶ 102.

Based on these allegations, Plaintiff E.H.C. asserts a *Bivens* claim for violation of his First and Fifth Amendment rights "to be free of retaliation and unjust punishment for having reported the sexual abuse at the Nixon facility." *Id.* ¶ 236. E.H.C. alleges that Defendants Dunn and De La Cruz transferred him to the medium and high-security facilities, and that they later unnecessarily detained him in a county jail for two weeks after their jurisdiction was terminated and interfered with his placement in a more reasonable environment "with the intent of retaliating against Plaintiff E.H.C. for reporting the ongoing sexual abuse at the Nixon facility." *Id.* ¶ ¶ 238- 239.

**III. Analysis**

The Court previously held that E.H.C.'s allegations were sufficient to survive a motion to dismiss. Defendants Dunn and De La Cruz now move for summary judgment on E.H.C.'s retaliation claim. They argue that no evidence supports the claim because De La Cruz and Dunn were not sufficiently personally involved in the two transfers that form the basis of the complaint, because Plaintiff cannot show that his detention in county jail after his immigration case was terminated was motivated by retaliation as opposed to difficulties in finding appropriate placement for E.H.C., and because Plaintiff cannot show causation.

The elements of a claim under a retaliation theory are the plaintiff's invocation of "a specific constitutional right," the defendant's intent to retaliate against the plaintiff for his or her exercise of

that right, a retaliatory adverse act, and causation. *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). The plaintiff must "produce direct evidence of motivation or, the more probable scenario, 'allege a chronology of events from which retaliation may plausibly be inferred.'" *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999). Defendants do not challenge Plaintiff's claim to have exercised a constitutional right. Nor is it disputed that Dunn and De La Cruz knew that E.H.C. had reported the sexual abuse at the Nixon facility. Rather, they assert that there is insufficient evidence of motive or causation.

"An action motivated by retaliation for the exercise of a constitutionally protected right is actionable, even if the act, when taken for a different reason, might have been legitimate." *Woods*, 60 F.3d at 1165. However, unless the complained-of action would not have taken place "but for" the retaliatory animus, then the retaliation claim has not been made out. *Johnson v. Rodriguez*, 110 F.3d 299, 313 n.19 (5th Cir. 1997). "It follows that, to state a claim based on a violation of a clearly established right, [Plaintiff] must plead sufficient factual matter to show that [Defendants] adopted and implemented the [transfers and detentions] at issue not for a neutral . . . reason but for the purpose of [retaliation]." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Discriminatory or retaliatory purpose is required to impose *Bivens* liability. *Id.* Further, a defendant must have been personally involved in the conduct causing a deprivation of constitutional rights, or there must be a causal connection between the actions of that person and the constitutional right sought to be redressed. *Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995); *Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983). *Bivens* suits can only serve their purpose of "deter[ring] individual federal officers from committing constitutional violations" when maintained against those "directly responsible" for constitutional violations. *Corr. Services Corp. v. Malesko*, 534 U.S. 61, 70-71 (2001).

Thus, Defendants argue, for E.H.C.'s retaliation claim to defeat the Defendants' entitlement to qualified immunity, E.H.C. must show that Defendants De La Cruz and Dunn personally participated in the housing decisions at issue and that, but for a retaliatory motive on their part: (1) E.H.C. would not have been transferred from the Nixon facility to a secure facility in Washington State; (2) E.H.C. would not have been transferred from the facility in Washington State to a secure facility in Indiana; and (3) E.H.C. would not have been detained in a county jail for a period of time after his immigration case had ended.

**A. Transfers**

Defendants Dunn and De La Cruz assert that they were not sufficiently personally involved in the transfers from Nixon to Washington or from Washington to Indiana, and that Plaintiff has no evidence that the transfers were motivated by any retaliatory animus. Rather, they argue, the transfers were initiated and effected by others and can be explained by the numerous behavioral problems E.H.C. exhibited at the facilities.

**1. Arguments**

In her Affidavit (Def. Ex. 1), Maureen Dunn states that she does not have any involvement in routine transfers of unaccompanied alien children between facilities, but that she may be consulted about a potential transfer if it involves an unusual issue such as the need for specialized medical care. She states that, typically, the decision to transfer a child is initiated by the facility itself, usually by the case manager, and a recommendation is written up and reviewed by the Field Coordinator, the FFS assigned to the facility, and the facility's clinical staff. While the FFS supervisor (such as De La Cruz) assigned to the transferring and receiving facilities will receive notice of the transfer, it is not necessary for the supervisor to grant approval. The FFS assigned to the facility has authority to

approve the transfer. However, in some cases, the FFS and his or her supervisor will approve a transfer without involvement of the facility. De La Cruz's affidavit reiterates these points.

Dunn states that she has no specific recollection of E.H.C. or the specifics of his case, and that while she may have received notice at some point about one or more of the transfers to which E.H.C. was subjected, she did not initiate or approve of any of the transfers. She denies taking any actions based on retaliatory motive. De La Cruz's affidavit states that he was a FFS Supervisor in 2007, and that he supervised eight Federal Field Specialists assigned to approximately twenty shelter facilities throughout the country. Nixon was one of the facilities to which the specialists under his supervision were assigned. He denies taking any actions based on retaliatory motive.

Plaintiff contends that the allegations of abuse had significant negative repercussions for Defendants, triggering demands from superiors and from Congress for explanations about what had happened. As a result, Plaintiff argues, Defendants transferred him to secure facilities that were not the least restrictive, failed to provide adequate mental health care, and interfered with the investigation and with Plaintiff's immigration proceedings. Plaintiff argues that Defendants could have placed him in an appropriate facility in San Antonio and that, but for a retaliatory motive, he would not have been placed in inappropriate facilities without adequate mental health treatment. Plaintiff points to evidence showing that De La Cruz was involved in communications about E.H.C.'s transfers and placements and that he "approved" E.H.C.'s transfer to Washington,[3] but did

[3] To support this assertion, Plaintiff cites to De La Cruz's deposition, but failed to include those pages in the record. It is unclear whether De La Cruz engaged in some kind of formal approval or just agreed with the transfer. However, De La Cruz does not deny that the deposition states that De La Cruz approved the transfer, instead arguing that any approval was superfluous because the transfer did not require his approval to be effective. De La Cruz argues that any such approval would be insufficient to subject him to liability.

not make sure that the facility was informed of E.H.C.'s exposure to sexual abuse as he did with the other children. Plaintiff also argues that Dunn was involved in placing children from the Nixon facility, that she sometimes was involved in transfers with special needs, and that she approved the transfers.

**2. Analysis**

It is undisputed that E.H.C. was placed at the Nixon facility on January 2, 2007. He reported the sexual abuse at Nixon on February 10, 2007. On February 22, 2007, E.H.C. told Nixon staff that he wanted to kill himself. He broke a lightbulb and cut himself with it. E.H.C. was then placed in the Southwest Mental Health Center ("SMHC"). Plaintiff submits an affidavit from his treating physician at SMHC, which states that he and the staff were not informed of E.H.C.'s exposure to sexual abuse, and this lack of information would interfere with his treatment. On March 6, E.H.C. was transferred from SMHC to the Selma Carson Home in Washington state.

De La Cruz states that he did not initiate E.H.C.'s transfer on March 6, 2007 to the Selma Carson Home, nor did he approve the transfer. Plaintiff points to no evidence indicating that De La Cruz suggested Selma Carson Home or that he was responsible for E.H.C.'s placement there as opposed to another facility. De La Cruz states the transfer request was initiated by others on March 5, based upon numerous behavioral problems E.H.C. exhibited at Nixon, including assaults on the staff and his admission to the psychiatric hospital for children after the incident of self-harm. He states that the transfer request to Washington was supported by Nixon shelter staff and the ORR Field Coordinator. De La Cruz states that he may have been aware of the transfer, but he recalls no participation in the transfer decision.

Defendants submit an ORR/DUCS Transfer Request and Tracking Form showing that a

transfer request was made on March 5, 2007. The transfer request shows Jose Munoz as E.H.C.'s case worker and Celeste Valencia as the DUCS Field Coordinator, and indicates that they both suggested the transfer to Selma Carson Home (also known as Pioneer) in Washington. The transfer form notes that E.H.C. stated that he wanted to kill himself on February 22, 2007 and that he was admitted to the psychiatric hospital and diagnosed with Mood Disorder Psychotic features. It noted that E.H.C. had refused on several occasions to take his medication and that he had several incidents at the Nixon facility, had been physically aggressive with staff and residents, and was socially inappropriate. The form states that he was feared to be a flight risk and that he "needs an environment where the staff can spend more one on one time with him." The form expressly requests a transfer to the Pioneer Human Services Facility (Selma Carson Home) in Washington. Plaintiff provides no evidence that either De La Cruz or Dunn was involved in the selection of Selma Carson Home or that other facilities were recommended but disapproved by De La Cruz or Dunn.

Plaintiff states that, before E.H.C. reported the sexual abuse on February 10, efforts were being made to place him in foster care, but after the reporting he was instead moved to a secure facility. Plaintiff relies on a February 1, 2007 "discharge plan" prepared by the Nixon Facility. Pl. Ex. 15. The discharge plan notes that E.H.C. was an emergency placement (placed on January 2, 2007), with an estimated length of stay in emergency care of 90 days. The discharge plan lists only three options under "[e]xplain the conservator's discharge plan for child," and they are removal, family reunification, and foster care. Thus, this exhibit does not indicate that Nixon or ORR staff believed that foster care was an appropriate placement as compared to a transfer or any other type of placement in the United States. This just indicates that Nixon staff had a plan to eventually discharge him to foster care rather than reuniting him with family or removing him (immigration

proceedings were pending).[4]

Moreover, as noted by Defendants, this form is dated February 1, 2007. At that time, although E.H.C. had been in fights with other residents and had been disruptive, he had not yet threatened or assaulted the staff and had not yet expressed a desire to commit suicide. On February 18 and 22, two different Nixon staff filled out significant incident reports noting that E.H.C. had assaulted staff and destroyed property, was a danger to himself and others, and suggested he be moved to another shelter or a staff-secure facility. Def. Ex. 8, 9. Thus, circumstances affecting an appropriate placement for E.H.C. changed significantly between February 1 and the March 6 transfer. There is no indication that De La Cruz or Dunn had any role in Nixon staff's suggesting that E.H.C. be transferred to a secure facility.

Further, even before E.H.C. reported the sexual abuse on February 10, the evidence shows that some staff believed that E.H.C. should be transferred to a different facility because of his behavior and threats. *See* Def. Ex. 7 SIR dated Feb. 2, 2007 ("Lead Supervisor Hector Amaya informed Shift Supervisor Lesvia Monreal to keep a close watch on [E.H.C.] because of the threats that he had made. He also instructed her to put him on a one on one. Resident [E.H.C.] is becoming a threat to the safety of staff members, other residents and himself. It would be in the best interest of everyone involved especially resident [E.H.C.] to transfer him.").

Plaintiff agrees that, after E.H.C. cut himself and said he wanted to kill himself on February

---

[4] Plaintiff also states that "[e]ven E.H.C.'s case manager at the Nixon facility believed he was still moving to a foster care placement." Exhibit 17. However, the exhibit referred to does not support this assertion. Rather, the exhibit, signed by a clinician, states that the clinician explained to E.H.C. that he would be moving to foster care. This clinician was named Dosely Rodriguez, while the case manager is noted on the form as a different individual, "Mr. Munoz." Mr. Munoz was listed on the transfer request form as one of the parties requesting transfer to Washington.

22, 2007, he was placed in SMHC for mental health treatment. However, Plaintiff complains that "information about E.H.C.'s exposure to sexual abuse was withheld from the psychiatric hospital, so they were unable to properly evaluate or treat E.H.C." and "[i]nstead, the cutting incident provided a pretense for placing E.H.C. in a more restrictive facility." Plaintiff argues that De La Cruz and Dunn knew that E.H.C. needed mental health treatment but failed to ensure that he received it. Plaintiff also argues that E.H.C. could have been placed in a residential treatment center such as Laurel Ridge in San Antonio.

To show that De La Cruz was aware of E.H.C.'s mental health needs, Plaintiff provides an email from De La Cruz to Jose Gonzalez, the FFS, dated February 21, 2007. Ex. 19. De La Cruz wrote, "There is one young man, the one who made the initial outcry, who may need to be transferred not because there is concern for his safety, but because he demonstrates that he may have special behavioral and mental health issues. As we discussed earlier. You are going to talk to the shelter staff to make sure that they strategize how to take appropriate care of him including appropriate de-escalative techniques. They will implement these immediately pending an assessment by their staff for a possible transfer for specialized treatment." While this does show that De La Cruz was aware of E.H.C.'s mental health issues, this email suggests that De La Cruz was concerned with adequately addressing those needs rather than denying E.H.C. an appropriate placement.

With regard to Dunn, Plaintiff argues that Dunn "approved of his transfers and she was a part of communications about his placement." In support, Plaintiff points to a "Placement Authorization" authorizing E.H.C.'s placement at Selma Carson Home dated March 6, 2007, which was electronically signed by Dunn. However, the fact that Dunn's electronic signature was on the placement authorization form does not show that Dunn was involved in choosing the facility to

which E.H.C. would be transferred. Even if she had a retaliatory motive, which has not been shown, there is no indication that her approval was a but-for cause of E.H.C.'s transfer. And even if others making the placement decision had a retaliatory motive, which has not been shown, Dunn could not be personally liable for those actions without a retaliatory purpose of her own. *James v. Tex. Collin County*, 535 F.3d 365, 373 (5th Cir. 2008), *Iqbal*, 556 U.S. at 677 (rejecting argument that supervisor's mere knowledge of subordinate's discriminatory purpose amounts to a violation of the Constitution).

Plaintiff further relies on an email dated February 21, 2007 from Dunn to Martha Newton (ORR Director) about the sexual abuse allegations at Nixon, in which she states, "We want to transfer the 5 boys who made the allegations from Nixon to Corpus Christi. They are being scape-goated by Nixon staff, according to their attorney and to Jose's conversations with the boys." But Dunn's email indicates that she was concerned with protecting the children who had made allegations of sexual abuse, rather than retaliating against them. In addition, other evidence shows that Dunn participated in the ensuing investigation on behalf of ORR and coordinated with law enforcement. *See James*, 535 F.3d at 377 (plaintiff's assertion that he was retaliated against because it was embarrassing to have the misdeeds of the department exposed was contradicted by the fact that plaintiff's comments led defendant to conduct an investigation into their merits that ultimately led him to severely punish the wrongdoers).

Plaintiff argues that ORR uses residential treatment facilities, and that ORR could have placed E.H.C. at Laurel Ridge, a residential treatment center in San Antonio. Plaintiff argues that if E.H.C. had been placed at Laurel Ridge, he could have cooperated with the investigations and

could have been near his legal representative in Texas to seek immigration relief.[5] Instead, Plaintiff contends, they placed him in a staff-secure facility in Washington, and failed to inform the facility, as they did to facilities receiving other victims of abuse, of E.H.C.'s exposure to sexual abuse.

As noted, after E.H.C.'s suicide attempt, he was treated at the SMHC. It appears that this was a residential psychiatric treatment placement or hospitalization, and that E.H.C. was housed there after his suicide attempt until he was transferred to Washington. *See* Def. Ex. 5 (noting that E.H.C. was admitted and, while there refused on several occasions to take his medication); Def. Ex. 11 (noting that E.H.C. was transferred to Selma Carson Home directly from the psychiatric hospital). Plaintiff fails to offer evidence showing that continued placement in a residential treatment facility such as Laurel Ridge was the most appropriate or even an appropriate or feasible placement for E.H.C. at the time. The fact that another child had been placed there in the past does not show that this placement was appropriate or viable for E.H.C. Further, even though Plaintiff alleges that De La Cruz retaliated against him by transferring him to Washington and Indiana facilities that lacked mental health services, the evidence shows that Defendant De La Cruz was working with E.H.C.'s representatives in June 2007 and was attempting to place E.H.C. in a specialized treatment facility. Pl. Ex. 19. And in fact, when E.H.C. was then transferred to a mental health facility in San Antonio, Hector Garza, the facility requested a transfer and recommended placement in a secure facility because of his "assaultive behavior." Def. Ex. 15.

Plaintiff relies heavily on the allegation that Selma Carson Home lacked adequate mental

[5] E.H.C. was granted consent by ICE to pursue Special Immigrant Juvenile ("SIJ") status on February 20, 2007. However, due to the transfers, he was "unable to complete state court dependency proceedings in any jurisdiction." Pl. Ex. 24. E.H.C. eventually applied for and was granted a U-visa. Defendants state that ORR helped him obtain the U-visa, and Plaintiff does not dispute this assertion.

health services to show that it was a retaliatory placement.[6] However, other than making conclusory assertions, Plaintiff fails to provide evidence that the available mental health services were inadequate. The Placement Authorization indicates that Selma Carson could consent to the child's mental health care. ORR034454. Other evidence indicates that E.H.C. completed a mental health screening with NW Family Therapy Institute on March 13, 2007, showing that Selma Carson Home was providing mental health treatment. Def. Ex. 11. Selma Carson had a clinician on staff, but apparently E.H.C. refused to meet with her. *Id.* E.H.C. had legal representatives in Washington to work on his immigration case, and the evidence indicates that the FFS in that area "worked with the child's attorney in Seattle to assure his mental health needs," but "the attorney . . . agreed that this was difficult because his violent behavior placed limits on the types of program available to care for both his behavioral and mental health needs." ORR022509. Plaintiff offers no evidence showing that other facilities, such as Laurel Ridge, could offer mental health treatment, were adequately equipped to handle E.H.C.'s behavioral problems, and were available. Plaintiff's evidence at most rises to the level of disagreement with the placement decision that was made. The evidence does not indicate that the placement at Selma Carson Home was inappropriate or retaliatory, since even accepting all of Plaintiff's evidence as true, it is consistent with a finding that the placement decision was made for legitimate reasons and fails to indicate that, but for a retaliatory motive on the part of Dunn or De La Cruz, the placement at Selma Carson Home would not have occurred.

E.H.C. also complains of his transfer to a secure facility in Indiana. De La Cruz states that, on April 18, 2007, Selma Carson Home requested that E.H.C. be transferred to a "secure" facility

[6] And though Plaintiff complains that Selma Carson was not informed of E.H.C.'s exposure to sexual abuse, there is no indication that Dunn or De La Cruz were responsible for informing the facility or somehow prevented the facility from receiving that information.

so that he could be in an environment where he would not hurt himself or others. The transfer request came two days after E.H.C. was arrested for second degree assault after he threw a chair at one staff member and tried to stab another in the neck with a pencil. On May 4, 2007, E.H.C. was transferred to a secure facility in Indiana called Southwest Indiana. De La Cruz states that, though he was aware of the pending transfer out of Selma Carson before May 4, 2007, he did not learn that E.H.C. had been transferred to Indiana until after that date. De La Cruz states that he did not initiate the transfer from Selma Carson to Southwest Indiana, did not approve the transfer, and did not participate in that transfer decision.

Plaintiff argues that the transfer to Indiana was retaliatory because the facility was not the least restrictive and did not provide mental health services. However, Plaintiff offers no evidence of an available facility that would address the safety concerns raised over E.H.C. Plaintiff's own evidence demonstrates that E.H.C. was arrested for assault while at the Selma Carson Home, was placed in juvenile detention, and was physically aggressive with staff and other residents. Pl. Ex. 25 ORR020125. This same evidence shows that he could not be returned to Selma Carson and that FFS Brenda Flores determined that an appropriate placement to address E.H.C.'s needs, including his psychiatric needs, was a secured facility. *Id.* In response to a request from Flores regarding locating an appropriate placement for E.H.C., Program Analyst Jim Schenkenberg suggested placement in Indiana. ("When I checked with Indiana yesterday, Indiana did have a secure bed."). Although this email was forwarded to De La Cruz, there is no indication that De La Cruz suggested or approved the placement.

Plaintiff points out that Dunn signed[7] a Notice of Placement in Secure or Staff Secure Facility

---

[7] The signature appears to be an electronic signature.

dated May 4, 2007, which notified E.H.C. that he was being placed with Southwest Indiana. Dunn may have signed the notice paperwork, but there is no indication that she had any role in choosing Southwest Indiana or that she was even aware of any of the underlying issues.

In sum, Plaintiff's evidence fails to raise a material fact issue on his claim that he was transferred to Washington and Indiana in retaliation for his whistleblowing. There is no evidence that De La Cruz or Dunn acted with a retaliatory motive, that they were involved in selecting the facilities E.H.C. complains of, or that they had a role in directing his placement there as opposed to another facility. Plaintiff also fails to show that his placement in those facilities was inappropriate or retaliatory or that he would not have been placed there but for Defendants' retaliatory motive.

**B. Detention in County Juvenile Detention/Jail**

Plaintiff complains that, after his immigration case was terminated, he was retained in county jail in further retaliation for his whistleblowing. Defendants assert that the delay in releasing him was caused by difficulties in finding a suitable and available facility for him.

On August 29, 2007, E.H.C. was transferred from Southwest Indiana to the Hector Garza Center in San Antonio. The evidence indicates that the reason for this transfer was that "it was hoped that the therapeutic services at The Hector Garza Center would benefit" E.H.C. ORR022508. While housed at Hector Garza, E.H.C. was involved in a number of assaults against staff members, and he was arrested and placed in the Bexar County Juvenile Detention Center. Around October 18, 2007, the Garza Center requested that he be transferred from the Bexar County Juvenile Detention Center to a secure facility because of his behavior problems and pending charges. The Garza Center requested transfer to the Guadalupe County Juvenile Detention Center. E.H.C. was transferred on

or about October 18.[8]

E.H.C.'s immigration case was terminated on or about October 17, 2007, when he was sixteen years old, pending the grant of a U-visa.[9] Pl. Ex. 24. De La Cruz states that, because E.H.C. had not yet received that visa, he had no legal status, and continued to meet the definition of an "unaccompanied alien child" under 6 U.S.C. § 279 and remained in ORR custody. *See* 6 U.S.C. § 279 ("the term 'unaccompanied alien child' means a child who-- (A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom-- (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody"). Plaintiff does not refute this assertion, but contends that De La Cruz acknowledged that ORR did not have jurisdiction over E.H.C. once his immigration case was terminated, citing an email dated November 5, 2007. ORR022460. However, other evidence indicates that ORR's custody rights were disputed before that time. Def. Ex. 16. The evidence shows that, until October 25, ORR was under the mistaken impression that E.H.C.'s legal representative would be taking custody of E.H.C. and was waiting for the appropriate paperwork. After this misunderstanding was cleared up, on October 27, 2007, E.H.C.'s legal representative filed a motion for custody redetermination before the Immigration Judge. The motion argued that E.H.C. had a place to stay in Austin, Texas (Casa Marianella), and that because E.H.C. had no pending immigration charges, he should not be in federal custody. The motion asked the court to order E.H.C.

---

[8] It is unclear whether E.H.C. is complaining that this transfer was retaliatory, but to the extent that he is, the claim fails to survive summary judgment for the same reasons as the prior transfers.

[9] De La Cruz states that ORR assisted E.H.C. in obtaining the U-visa for cooperating with the criminal investigation of the reported sexual assaults at Nixon. This undercuts Plaintiff's argument that E.H.C. was transferred to interfere with his immigration proceedings.

released on his own recognizance. On November 1, before the custody hearing took place, De La Cruz emailed E.H.C.'s legal representative to let him know that E.H.C. had been accepted into a program in Austin called Lifeworks, and that they would have a room for him on the sixth of November. E.H.C.'s legal representative had previously stated that ""the LifeWorks option is a very good [one], and [I] hope that they will accept him." Def. Ex. 17. On November 6, 2007, E.H.C. was released.

Even if ORR lacked custody over E.H.C. during that time, Plaintiff fails to establish that the continued detention would not have occurred but for Defendants' retaliatory motive. De La Cruz states that, after the immigration case was terminated, he and other ORR staff actively worked to release E.H.C. to a facility where his mental and behavioral needs could be addressed, and he worked with E.H.C.'s legal representative to find an appropriate placement. These assertions are not disputed.[10] It was not just De La Cruz or Dunn who felt it necessary to ensure an appropriate placement for E.H.C. before he could be released. *See* Def. Ex. 18 (Ortiz-Ang email) ("ORR wants to ensure he is placed in an agency that will be able to provide for these specific [mental and behavioral] needs."). E.H.C. apparently contends that he should have been released into the custody of his legal representative sooner and states that "usually" the legal representative would take care of finding a place for the child to live. But E.H.C. provides no evidence that this would be the case when the child has a history of extreme behavior problems. There is no indication that the delay was caused by any retaliatory animus by De La Cruz. Rather, the evidence shows that De La Cruz was

---

[10] Plaintiff responds that Defendants did not take these considerations into account or work with E.H.C.'s attorney in the other transfers. However, there is evidence that De La Cruz worked with E.H.C.'s attorneys in June 2007 and with regard to the transfer to Hector Garza. Further, it is clear that E.H.C.'s behavior was a paramount factor in the transfer and placement decisions.

working to find the best placement for E.H.C. And there is no evidence that Dunn was involved in the delay in any manner. Plaintiff's evidence does not permit a reasonable inference that the delay was caused by a retaliatory motive for E.H.C.'s whistleblowing nine months before, and fails to raise a material fact issue as to motive or causation.

**Conclusion**

Defendant Maureen Dunn and James De La Cruz's Motion for Summary Judgment on Plaintiff E.H.C.'s Retaliation Claim (docket no. 274) is GRANTED, and Plaintiff E.H.C. shall take nothing on that claim. Plaintiffs' motion for leave to file sur-replies (docket no. 345) is DENIED IN PART as to this motion.

It is so ORDERED.

SIGNED this 9th day of April, 2013

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE