UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| E.A.F.F., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | Civil Action No:  SA-08-CA-124-XR |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

On this date, the Court considered Defendants James De La Cruz and Jose Gonzalez's Motion for Summary Judgment on Deliberate Indifference Claim (docket no. 276) and Tsegaye Wolde's Motion for Summary Judgment On Count Four ("Deliberate Indifference") (docket no. 287), and the responses and replies thereto.[1] After careful consideration, the Court grants the motions.

**I. Background**

Plaintiffs are eleven[2] young men born in Central America who were detained in the United States by Border Patrol agents as undocumented and placed in federal custody pending their immigration proceedings.  Each of the Plaintiffs was a minor at the time of his detention, and each was placed at a facility located in Nixon, Texas[3] ("the Nixon facility") operated by Away From

---

[1] Plaintiffs filed an identical response to both motions (docket nos. 333 and 334), and Defendants filed a consolidated reply (docket no. 342).  Plaintiffs' motion for leave to file a sur-reply (docket no. 345) is denied in part as to these motions.

[2] There were originally twelve plaintiffs, but all claims asserted by L.M.V.F. have been dismissed.

[3] Nixon, Texas is a small town located about 55 miles east of San Antonio, Texas.

Home, Inc. ("AFH").[4]  AFH contracted with the federal government to house unaccompanied, undocumented minors while they awaited the final adjudication of their immigration status. Plaintiffs allege that they suffered "grave and repeated sexual, physical and emotional abuse" at Nixon.

Defendants are employees of the Office of Refugee Resettlement ("ORR"), a federal agency. On March 1, 2003, the Homeland Security Act of 2002 transferred functions under the U.S. immigration laws regarding the care and placement of "unaccompanied alien children" (sometimes referred to as "UAC"[5]) from the INS to the Director of ORR. 6 U.S.C. § 279; Pl. Ex. 1.  Pursuant to statute, ORR has responsibility for, among other things, "coordinating and implementing the care and placement of unaccompanied alien children who are in Federal custody by reason of their immigration status"; ensuring that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child; making and implementing placement determinations for all unaccompanied alien children who are in Federal custody by reason of their immigration status; identifying a sufficient number of qualified individuals, entities, and facilities to house unaccompanied alien children; overseeing the infrastructure and personnel of facilities in which unaccompanied alien children reside; and conducting investigations and inspections of facilities and other entities in which unaccompanied alien children reside, including regular follow-up visits to such facilities, placements, and other entities, to assess the continued

_____

[4] AFH also went by the name Southwest Initiatives Group and Texas Shelter Care.  For the sake of convenience and consistency, the Court will refer to it as AFH.

[5] The Court will use the terms "unaccompanied alien children" and "UAC" because that is the term used and defined in the statute and by the parties.  *See* 6 U.S.C. § 279(g)(2) (the term "unaccompanied alien child" means a child who--(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom--(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody).

suitability of such placements.  6 U.S.C. § 279.

ORR created a new office called the Division of Unaccompanied Children's Services ("DUCS") to carry out these responsibilities.  Pl. Ex. 1.  DUCS has developed a network of care options for unaccompanied minors, including shelter care, staff secure, foster care, and residential treatment care.  Pl. Ex. 1.  Although INS had existing facilities in place, most of these were detention facilities, and ORR/DUCS wanted to use alternatives such as shelter care facilities (like Nixon) in order to better comply with the *Flores* Settlement Agreement.[6]  Pl. Ex. 4 (Tota depo) at 24; Pl. Ex. 1.  These facilities generally operate under cooperative agreements and contracts with ORR.  A cooperative agreement "is an instrument contemplated by and awarded in accordance with the Federal Grant and Cooperative Agreement Act and the Government Performance and Results Act."  Pl. Ex. 11.  "The principal purpose of this relationship is to transfer money, property, services, or anything of value to the Recipient to accomplish a public purpose of support or stimulation.  There is substantial involvement anticipated between the Government and the Recipient during performance of the activity, establishing ORR and the Recipient as partners during performance . . . ."  Pl. Ex. 11.  Under the Cooperative Agreement, AFH agreed to provide shelter care and other child welfare related services in a state-licensed shelter care program to UAC in the least restrictive setting possible, in accordance with state licensing provisions, ORR/DUCS policies and procedures, and the *Flores* Agreement.  *Id.*

---

[6] The 1997 *Flores* Settlement Agreement was the result of the *Flores v. Reno* lawsuit brought by unaccompanied minors detained on suspicion of being deportable challenging the constitutionality of the INS's policies, practices, and regulations regarding the detention and release of such minors.  Pl. Ex. 6.  The settlement agreement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of INS."  *Id.*  The INS agreed not to place a minor in a secure facility if there were less restrictive alternatives available and appropriate in the circumstances.  The *Flores* Agreement also includes a list of "minimum standards for licensed programs," which requires that facilities comply with all applicable state child welfare laws and regulations and provide certain services for the minors.  *Id.*

ORR was to be substantially involved in the programmatic development and ongoing activities, including monitoring and evaluating the provision of services and providing consultation and guidance regarding programmatic issues or concerns as well as technical assistance on ORR's policies and procedures. Pl. Ex. 11. ORR was to conduct program monitoring (including desk monitoring) and site visits to ensure that Nixon's performance was in accord with program requirements and the Agreement. *Id.* After a monitoring, the ORR Project Officer was to "follow up to ensure the timely resolution of issues that need corrective actions or to confirm the implementation of recommendations made during monitoring." *Id.* AFH was required to submit quarterly financial reports and quarterly Program Progress Reports. The Project Officer was to also review all Quarterly Program Progress Reports and other information submitted by Nixon. Financial monitoring and management was coordinated by a Grants Officer. AFH was required to immediately notify ORR of any changes in the status or condition of any child, including any medical emergencies and any abuse or neglect incident handled under state law, and to report serious incidents to ORR/DUCS through a "Serious Incident Report" or "SIR."

ORR utilized the Nixon facility to house children from 2003 to 2007, when ORR terminated the grant. It is undisputed that the minors remained at all relevant times in the custody of ORR. Plaintiffs were housed at Nixon, and claim they were physically or sexually abused between September 2006 and March 2007. Plaintiffs allege that "the widespread sexual, physical and emotional abuse at the Nixon facility was rampant, open and notorious and either was known or should have been known to all Defendants." Sixth Am. Compl. ¶ 131.

Seven Plaintiffs, O.B., J.A.A.L., E.A.F.F., P.A.S.G., E.R.J., D.A.E.F., and J.C.C.B., allege that they were sexually abused by a female AFH staff member, Belinda Leal. Leal was employed

as a direct care worker at Nixon from December 2006 to February 2007.  Leal has since pled guilty and is serving a prison sentence for the molestation of four residents, including Plaintiffs J.C.C.B. and P.A.S.G. and former Plaintiff L.M.V.F., between January 15 and February 7, 2007.  Def. EX. 6.[7]  Plaintiff E.H.C. alleges that Leal approached him, but he rebuffed her.  Another Plaintiff, W.O.G., alleges that he was approached by a different female staff member, Lesvia Monreal, who attempted to sexually abuse him, but he rebuffed her.[8]  W.O.G. alleges that Monreal retaliated against him by forcing him to sleep on the floor, withholding food, and otherwise punishing him.

Plaintiffs O.E.F., J.M.R., and W.O.G. allege that they were physically abused by Nixon staff. The Sixth Amended Complaint alleges that O.E.F. was assaulted and beaten by Ruben Velasquez on two unspecified dates.  However, O.E.F.'s deposition testimony states that Velasquez only abused him once, and another staff member, Vasquez, abused him the second time.  J.M.R. alleges that Efraen Garcia assaulted and battered him severely in November 2006.  Garcia was charged with a class A misdemeanor for injury to a minor as a result of this incident.  Pl. Ex. 109 (ORR014236). W.O.G. alleges that he was "beaten by an [unspecified] adult staff member when he attempted to use the telephone on an unspecified date.[9]

---

[7]The TDFPS investigator also found reason to believe that Leal had abused Plaintiff E.A.F.F. Def Ex. 5.

[8] Defendants state that Plaintiffs' Sixth Amended Complaint, which is the live pleading, alleges no sexual abuse of Plaintiffs E.H.C. and W.O.G.  Both of these Plaintiffs allege that they were approached for sexual activity by Nixon staff, and that this constitutes sexual abuse.  For purposes of this Order, the Court will assume that the actions of the staff amounted to sexual abuse.

[9] The Sixth Amended Complaint does not allege that W.O.G. was physically abused.  However, in their Consolidated Statement of Facts (docket no. 336 at 3), Plaintiffs allege that W.O.G. was battered by an unidentified male staff member on an unspecified date, and in their Amended Response (docket no. 333 at 22-23), they allege that "W.O.G. was also beaten by an adult staff member when he attempted to use the telephone."  Defendants argue that this allegation, which is not in the Complaint, is not properly before the Court. *See Cutrera v. Bd. of Sup'rs of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005); *Smith v. BCE, Inc.*, Civ. A. No. SA-04-CA-0303-XR, 2005 WL 3454104, at *3 (W.D. Tex. Nov. 29, 2005), *aff'd*, 225 F. App'x

Plaintiffs assert nineteen causes of action against various Defendants.  At issue here are the *Bivens* claims asserted in the Fourth Cause of Action against the individual federal defendants Jose Gonzalez, James De La Cruz, and Tsegaye Wolde.  Jose Gonzalez was an ORR Federal Field Specialist ("FFS") based in San Antonio.  Gonzalez Depo. at 8.  He became an FFS, assigned to Nixon and two other facilities in Seguin and Corpus Christi, in August 2006.  *Id.*  An FFS oversees the services that are provided to the unaccompanied alien children.  *Id.* at 7.  An FFS was also to assist the Project Officer "with local related or program compliance issues."  Pl. Ex. 34.  In this regard, the FFS "visits facilities and provides oversight and guidance to facility staff regarding policies and procedures, works with the facilities on administrative issues, and provides follow-up information to the Project Officer."  *Id.*  The FFS also "ensures that the facilities are in compliance with the Cooperative Agreement, Statement of Work, the *Flores* Agreement, and DUCS Policies and Procedures."  *Id.*  Gonzalez visited the Nixon facility frequently and had an office there.  Gonzalez depo. at 23.  Gonzalez estimated that he spent about sixty percent of his time at Nixon, and had a staff meeting about once a week with the Nixon director, case managers, clinicians, and other interested parties such as attorneys and the DUCS field coordinator,[10] to talk about all of the children

---

212 (5th Cir. 2007).  Defendants argue that, even if the new allegations are construed as a motion for leave to amend, such a motion should be denied because Plaintiffs are represented by counsel, Plaintiffs have been given numerous opportunities to amend the complaint, discovery is closed, and there is no evidence that this abuse was ever confirmed or that W.O.G. ever notified anyone of the abuse.  For purposes of these motions only, the Court will consider these allegations.

[10] Hilary Chester was the primary field coordinator that worked with DUCS during the relevant time period.  DUCS field coordinators were not federal employees.  Chester was employed by the International Catholic Migration Commission, which had a memorandum of understanding with the United States Conference of Catholic Bishops, which was a grantee of ORR/DUCS for the Field Coordination Program.  Pl. Ex. 22 (Chester depo.) at 8.  Chester was the field coordinator for the Unaccompanied Minors Program in Central Texas from 2004 to the end of 2006.  Chester was generally at Nixon three days a week.  Gonzalez depo. at 28.  Chester stated that her job was "to make recommendations to ORR using child welfare best practices"; make recommendations on family reunifications; review all of the documents and speak with the children and with the case managers; make a recommendation about whether the child should be released to

in the facility. *Id.* at 24-26. Gonzalez also testified that he met with the children at Nixon when they requested it. *Id.* at 40-41. James De La Cruz was an ORR Federal Field Specialist Supervisor (and Gonzalez's supervisor) and was based in Houston.

Tsegaye Wolde became an ORR/DUCS Project Officer in March 2004, and was the Project Officer assigned to monitor and supervise the Nixon facility. Wolde Aff. ¶ 16. He was based in Washington, D.C. According to the Cooperative Agreement, the Project Officer "oversees day-to-day operations of grant and cooperative agreements including but not limited to program design, budget negotiation, conducting desk monitoring and site visits, review of key staff credentials, and review of job descriptions for key staff." Pl. Ex. 11.

Plaintiffs allege that they had Fifth Amendment rights to be free from physical, emotional, and sexual abuse while being detained at the Nixon Facility, Sixth Am. Compl. ¶ 222, that Defendants Gonzalez and De La Cruz, as federal officers, were responsible for monitoring, investigating, supervising, controlling, and correcting the treatment of the minors held at the Nixon facility, *id.* ¶ 223, that Defendants Gonzalez and De La Cruz intentionally refused and failed to properly require and enforce policies and practices to ensure the Plaintiffs' safety from sexual and physical assaults, *id.* ¶ 224, that they knew of or were deliberately indifferent to the widespread sexual and physical abuse of the minors, *id.* ¶ 225, that they, with knowledge or deliberate indifference, failed to take action of any kind to protect Plaintiffs, *id.* ¶ 226, that Defendant Wolde

---

a proposed sponsor; make recommendations about transfers; make recommendations about specialized services (mental health in particular); meet with the kids to explain the process to them; and act as a friend of the court in immigration court. Pl. Ex. 22 at 16. Chester testified that initially she was able to meet with every child, but as the size of the shelter grew, she could not meet with every child. She continued to meet with children who asked to meet with her or that were highlighted by the case managers. Pl. Ex. 22 at 17. Chester testified that once Jose Gonzalez was assigned to San Antonio they met "close to once every week or two." Pl. Ex. 22 at 30. Jose Gonzalez testified that the field coordinators were child welfare experts and were ORR's "eyes and ears" at the facilities. Pl. Ex. 23 at 27.

deprived Plaintiffs of their rights by knowingly and intentionally refusing and failing to halt the rampant physical and sexual abuses at the facility or to otherwise protect Plaintiffs, *id.* ¶ 227, and that as a result, Plaintiffs were deprived of the safe environment to which they were entitled and suffered sexual and physical assaults during their detention, *id.* ¶ 228.[11]

Defendants previously moved for dismissal based on qualified immunity.  They argued that they could not be liable under *Bivens* on a theory of respondeat superior, and that Plaintiffs' claims were based solely on their supervisory authority and did not allege any personal participation by Defendants.  The Court denied the motions (see docket no. 112 & 170), finding that Plaintiffs had adequately alleged a claim that Defendants failed to protect them under the standard set forth in *Farmer v. Brennan* and extended to pretrial detainees by the Fifth Circuit.  Defendants now move for summary judgment.

## II. Chronology

Nixon received its state license on May 12, 2003.  It was awarded a grant to house unaccompanied minors beginning July 1, 2003.  Nixon initially housed only sixteen children.

As noted, Wolde became Project Officer with responsibility over Nixon in March 2004.  As early as 2004, Nixon had problems with residents running away.  On May 4, 2004, Maggie Gaytan, the Director of the Nixon facility, sent a Plan of Action Report to assist in preventing future runaways.  Pl. Ex. 62.  Gaytan stated that "these children have lost their faith in the system and in us because it is taking so long for them to be reunited with their families.  It also is taking a long

---

[11] Plaintiffs also asserted *Bivens* claims against Leal (cause of action 1A), Monreal (cause of action 1B), Garcia (cause of action 2), and Velasquez (cause of action 3) for the abuse. Although they were employed by Nixon and not by the government, Plaintiffs allege that they were acting under color of federal law at the time of the abuse.  Plaintiffs have settled these claims and they have been voluntarily dismissed. Docket nos. 299, 300.

time from the time they ask for deportation to being able to get their travel document. . . . The children are getting very frustrated. . . . We have **all** become **too** trusting." *Id.* Gaytan outlined the measures that had been taken, including modifying windows, repositioning staff, and assigning certain children to staff to hold them accountable, modifying an average privacy fence by adding nine feet of metal, making it difficult to climb or jump, using a higher standard of training than the state license required, moving children to different rooms if they are too involved with children at risk of running away or having problems with bad behavior, placing children with problems on a five-minute watch, no longer allowing children to lock bathroom doors.[12] *Id.* Don Rains of Nixon acknowledged that he had been told that the runaway rate was "too high" but noted that there was tension between satisfying *Flores* and being shelter care on the one hand and dealing with "more desperate and aggressive children" and implementing security measures. *Id.* Plaintiffs assert that, instead of finding out why so many children were attempting to flee, Defendants permitted Nixon to simply modify the windows and build a fence and looked no further into the matter."[13]

On May 17 to 19, 2004, Wolde and two others from ORR conducted a monitoring visit to "monitor the shelter care facility's programmatic and financial compliances," as well as "to assess programmatic practices and documentation of services rendered to the unaccompanied minor children through the unaccompanied minors program Cooperative Agreement." Pl. Ex. 56 (2004 monitoring report). At that time, the Nixon facility was licensed to serve 48 minors. *Id.* The report noted that the program was well organized, with committed staff, was clean and well maintained,

---

[12] The report notes that runaways had escaped through bathroom windows.

[13] The Court notes that neither Gonzalez nor De La Cruz were employed by ORR or had any oversight responsibility over Nixon at that time. In addition, it appears that Nixon was working primarily with the Project Director, Ken Tota, at that time, or at least on this issue. Pl. Ex. 62.

and that the children were happy.  *Id.*  The program was noted to have a very strong case management team that worked closely together in releasing children in a short period of time; the program administrator worked well with other service providers; the children received needed services; and there was a strong team work spirit among top management.  *Id.*  However, case files did not include all services, and did not indicate they were reviewed for completeness, timely documentation, and accuracy.  Counseling was provided but not on a weekly basis as required, and was not consistent.  The report also noted a need for regular and on-going training to familiarize staff with the continuous changing ORR guidelines and to enable staff to handle the children with care and dignity.  *Id.*

Recommended improvements included incorporating the *Flores* requirements and ORR guidelines into the program manual, specifying what exactly each unit does, creating a small manual for each task, and then using the manual as an orientation/training tool.  The program design also failed to explain what legal services would be provided and who would provide them.  The report also noted that there was no check and balance system for purchases, that the purchasing system was unacceptable, that personnel files were missing and did not look updated or reviewed, and that the program lacked a trained human resource staff to ensure proper information was kept in the files.  *Id*.

In October 2004, two AFH staff reported to Robert Garza at Nixon that they observed that direct care worker M.M. appeared to have an inappropriate relationship with two of the residents.[14]  The staff observed one boy, who was leaving the facility, kiss M.M. on the cheek, give her a long

---

[14] Pursuant to the protective order entered in this case, third parties are referred to by their initials or job titles.

hug, and whisper that she was a very special lady to him.  The boy cried (as did M.M.).  The other boy, who was also leaving the facility, kissed M.M. on the cheek and then on the lips. Pl. Ex. 65.[15] There is no evidence that this was reported to ORR at the time.

On December 17, 2004, Nixon employee "Mr. Z" was involved in an incident with a minor at the facility.  Pl. Ex. 63.  After an investigation, it was determined that he had lost control of his anger and used unnecessary and inappropriate physical restraint. *Id.*  Accordingly, he was demoted.

In April 2005, James De La Cruz became an FFS and was assigned to approximately twenty facilities throughout the country.  De La Cruz Aff. ¶ 4. During 2005, fourteen AFH employees were fired for failing or refusing drug tests or for failing background checks.  Pl. Ex. 69.  On April 26, 2005, Mr. Z was again involved in an incident with a minor, and he was accused of disorderly conduct, aggressive verbal statements, and aggressive behavior toward a resident.  Pl. Ex. 71.  After an investigation by Efraen Garcia, the allegations were determined to be true, and Mr. Z was terminated by Robert Garza, AFH Director of Operations.  Pl. Ex. 71.[16]

In the summer of 2005, Hilary Chester, the DUCS field coordinator, and Nathalie Lummert, USCCB national staff who manages the field coordination program, spoke with Wolde about Robert Garza's inappropriate interactions with children at the facility.  Pl. Ex. 60.  Chester observed an

---

[15] Plaintiffs contend that this was evidence "strongly indicating that a woman staffer had engaged in sex with a child.  She was fired but then re-hired." This was reported to Nixon management but was not reported to ORR.  There was never any confirmation that inappropriate sexual activity occurred.  Based on other evidence in the record, it appears M.M. left employment at Nixon on March 3, 2005 (Pl. Ex. 50) when she became pregnant, and was later rehired in April 2006.  Pl. Ex. 88.  M.M.'s child was apparently confirmed to be M.M.'s husband.  In any event, the ORR Defendants were not aware of these allegations until 2007. Pl. Ex. 66.  In 2007, TDFPS investigated possible sexual abuse by M.M. and ruled out sexual abuse.

[16] Mr. Z was later rehired, and in February 2007, two residents alleged inappropriate sexual conduct by Mr. Z.  These allegations were investigated, but abuse was ruled out.

incident where she believed Garza was too rough in restraining a child.  Pl. Ex. 22 at 53.  One resident physically attacked another, and Garza "ran into the room and yanked the boy who was on top who was kicking the other boy, pulled him off and was yelling."  The resident complained that Garza had hurt his arm and pulled him too roughly, and Garza responded by yelling at the young man.  Pl. Ex. 22 at 53-54.  Chester explained to Garza that the young man had been sexually abused in his home country, and that grabbing him and being aggressive in his role as a shelter director would be more disturbing and be perceived in a very different way than a "regular young man who didn't have that history."  Pl. Ex. 22 at 55.  Chester stated that she relayed the incident to Wolde, and "it was not immediate, but eventually the decision was made by the shelter staff to have him be in charge of the shelter direct care staff and not being sort of the disciplinarian for the kids anymore."  Pl. Ex. 22 at 55.

However, at that point Chester also "began to complain to ORR that they needed to give the shelter some guidance on behavior management" and recommended that Nixon "subscribe to some kind of outside behavior management program."  Pl. Ex. 22 at 56.  Chester admitted that there were a lot of things about Nixon that were "wonderful" and "that they were doing right," but "it seemed that this one area, ORR just wouldn't step in and wouldn't give any guidance to them, wouldn't hold them accountable, wouldn't make them change their practices."  Pl. Ex. 22 at 56.

Wolde conducted another monitoring visit on June 1-3, 2005 "to review programmatic compliance."  Pl. Ex. 56 (2005 monitoring report).  Jim De La Cruz also attended an exit meeting on June 3. Pl. Ex. 56. The report noted that Nixon had served 163 minors in the last quarter and had released 140 of them, and that its capacity had increased to 96 children.  It noted that the program had made "big improvements in many areas," including renovating the facility, improving its

program design with a better policy and procedure in the form of a manual for each unit; tightening its security but maintaining the homey atmosphere to the children; strengthening its case management team; lowering the length of stay; providing swimming; and strengthening its internal training.  It noted the program needed to improve in strengthening its internal orientation and in-house training to staff, since its capacity had increased and its staff had increased significantly.  It noted shortages of clinicians and counseling services and that the program had to use "creative ways" of attracting licensed clinicians.  It noted a need to strengthen its financial unit with clear policies and procedures with a clear balance and check system.  The report again noted that the program was in general well organized, clean and well maintained, and that children were happy. The report also stated that the program had strengthened its orientation and in-house, ongoing training, that regular weekly staff trainings were held, including in behavioral management; and that case file documentation had improved significantly and included the majority of services.

Recommendations included installing video cameras so that each hall and the entire premises could be monitored 24 hours; strengthening staff training covering areas of child welfare by bringing outside experts as trainers, incorporating licensing guidelines, ORR policies and procedures, the cooperative agreement, internal agency policy and procedure, and child welfare topics into the staff training manual; tailoring training to specific responsibilities of each position, and giving training on timely reporting, proper communication, and professional ethics; ensuring that personnel files were reviewed regularly; creating an orientation wing; ensuring weekly individual counseling and documentation thereof; checking each case file by a supervisor regularly with clear comments on what to correct; improving the quality of the quarterly program progress reports to include major activities covered, problems encountered, actions taken and projections/goals for next quarter.  Pl.

Ex. 56.

In June 2005, three residents attempted to escape.  Pl. Ex. 70.  In July 2005, Hector Amaya, a lead supervisor, was arrested and charged with furnishing alcohol to a minor and driving with an invalid license.  Pl. Ex. 72.  He was found in a parked car with the youth (who was 19 years old) drinking.  The charge for providing alcohol to a minor was dropped.  The incident was not reported to ORR at the time.[17]

Plaintiffs contend that, by June 2005, Wolde and De La Cruz knew that there were problems with access to attorneys, a lack of required counseling and licensed clinicians, insufficient staff training, and that personnel and children's records were not adequately maintained or lacked required information.  Pl. 1st Am. Index (docket no. 336) at 8 (citing Pl. Ex. 75 (2004 & 2005 monitoring reports)).

In the spring of 2006, Hilary Chester told De La Cruz her concerns regarding how the Nixon facility managed children's behavior.  Pl. Ex. 60.  De La Cruz apparently responded that, because the Nixon facility had such a good reunification rate, they did not receive the kind of scrutiny or attention they probably needed.  Pl. Ex. 60.[18]  In May and June 2006, Chester spoke with Susana Ortiz-Ang, Deputy Director of ORR, requesting that ORR implement an appropriate behavior management system for the shelters to use.  Pl. Ex. 60.  She "reported her concern again that Nixon was grabbing children regularly but the facility did not report this to ORR."  Pl. Ex. 60.  Chester reported that staff grabbed children by the arm when they walked inside and outside the building,

---

[17] Defendants learned about this incident in March 2007, when they were looking through personnel files after the allegations of sexual abuse by Leal were known.  Pl. Ex. 72-73.

[18] Chester stated that "the response [from De La Cruz to her concerns] was it's a good program, they are getting really fast reunifications, the length of stay is very short, they're one of our best performing programs."  Pl. Ex. 22 at 56.

14

pushed children in line, and turned children around so they faced the wall, and that this happened often and no one thought these actions counted as a restraint or warranted an SIR. Chester recommended that Nixon facility staff learn and use different behavior management techniques, such as verbal de-escalation techniques. However, Maureen Dunn responded that she wanted each facility to adopt its own technique. Further, throughout the summer and fall of 2006, Chester told Gonzalez and De La Cruz that direct care staff was threatened by Garza that they would lose their jobs if they let kids escape, which caused the staff to blame kids. Chester told Gonzalez, De La Cruz, and Wolde that Nixon was becoming a terrible place to work.

In late April or early May[19] 2006, a female direct care worker, M.A., was caught in a bathroom with her pants down and a minor boy kneeling in front of her. Pl. Ex. 79 (ORR027546); Pl. Ex. 81 (ORR009596). The TDFPS investigation was closed with a disposition of "reason to believe" for abuse by the staffer. The report found AFH deficient under the standard for "abuse/neglect for facilities" but stated "staff member no longer employed at facility." Pl. Ex. 80. Nixon was also found deficient for failing to report the abuse incident to licensing. Pl. Ex. 81 (ORR009582). The evidence indicates that ORR/DUCS was not informed of the incident at the time. Wolde testified that this incident was not reported by Nixon to DUCS/ORR. The TDFPS report, written by Corey Buck, a TDFPS licensing investigator, indicates that "[a]n attempt to contact Jim Delagarza [*sic*] with office of refugee management was attempted and a message was

---

[19]Plaintiffs' Ex. 92 states it occurred on May 10. The TDFPS investigation report (Pl. Ex. 80) states it occurred both on May 2, 2006 (ORR012981) and on April 27, 2006 (ORR012988). There is also a letter of resignation signed by M.A. dated May 1, 2006 (ORR009583), and Nixon personnel records indicate that M.A.'s employment ended May 1, 2006. (Pl. Ex. 50 AFH0009794).

left." Pl. Ex. 80 (ORR012986).[20]  However, the evidence indicates that the phone number at which

the message was left was not a correct number.  De La Cruz Aff. ¶ 18.

Along with the bathroom incident, TDFPS also investigated other allegations, including that

a "child alleged to have gotten pregnant by another child, staff alleged to hit resident, staff alleged

to use drugs and come to work intoxicated on alcohol, sex offenders alleged to be working at the

facility."[21]  Pl. Ex. 81 (ORR009581).  Nixon was not found deficient with regard to these other

allegations.  Pl. Ex. 81 (ORR009582).  However, the Intake Report states, "Female staff members

are having sexual intercourse with male residents; one union resulted in pregnancy.  A male staff

member is making sexually inappropriate comments to female residents.  A staff member struck a

resident in a vital body area.  There appears to be an atmosphere of cover-up and permissiveness at

the shelter.  Residents are at risk of harm."  Pl. Ex. 82 (ORR027547).  Plaintiffs rely on this section

of the report for the proposition that Corey Buck, the investigator, had concluded in June 2006 that

"there appears to be an atmosphere of cover up and permissiveness.  Residents are at risk."

However, that portion of the report appears to be a summary description of the allegations rather

---

[20] It appears the reference on the report is meant to be Jim De La Cruz.  Plaintiffs have submitted an affidavit from Corey Buck, who states that he notified a federal officer whenever he received a report of abuse or neglect.  He states that for the first several reports, he left a message at a number he later discovered was not an accurate number.  After that time, he states he spoke directly to Gonzalez or De La Cruz about the several reports of abuse he received.  Pl. Ex. 93.   Plaintiffs assert that Buck "did report [the] incident to DUCS," citing Buck's affidavit.  However, it is unclear from the affidavit whether Buck spoke to anyone at ORR about this incident at the time, and Defendants' evidence indicates he did not.

[21]  It appears this is referring to the allegation that staff member M.M. became pregnant after having sex with a male resident, not that a child resident became pregnant. As noted, the baby was eventually determined to be her husband's.  The TDFPS report states that M.M. was dismissed from the shelter when she became pregnant, but that she was later rehired.  The other allegations were that a Mr. F struck one of the 16-year old male residents "several months ago"; Efraen Garcia runs the training class for employees, some of whom are residents hired as staff members, and he sexually harasses the trainees; staff members use cocaine and get caught during random drug tests, but they get hired back; it is believed there are staff members working at the shelter who have sexual assault felonies on their records.

than a conclusion concerning the investigation.  The report packet also includes an event on May

10, where the priority of the investigation was changed from category 1 to category 2, meaning "no

immediate risk."  Pl. Ex. 79 (ORR027549); Pl. Ex. 95A.  If Buck had concluded that residents were

at risk at that time, presumably TDFPS would have cited Nixon for additional deficiencies or taken

additional steps.

TDFPS conducted an investigation of another allegation of abuse at the Nixon facility in

June 2006.  Pl. Ex. 81(ORR009592).  A staff member, Ruben Velasquez, was alleged to have

choked a child and dragged him through the water.  TDFPS found a deficiency in following written

policies and procedures, stating that an "improper restraint technique was used by staff."  Pl. Ex. 81

(ORR009594).  The investigator's report states that the victim was restrained, during which time a

water jug got knocked over, making him wet.  Def. Reply Ex. C.  The staff that witnessed the

physical restraint reported that it was done appropriately, that the victim was placed in a "full

nelson" hold as a last resort, and that the hold was discontinued when additional staff arrived.  *Id.*

Based on the evidence, abuse was ruled out, and the recommendation was routine monitoring.  *Id.*

Thus, although the restraint was improper, it did not meet the definition of abuse.  Def. Reply Ex.

D.  On June 29, Velasquez received a verbal reprimand from AFH, which noted that he had been

through the training classes on the "Handle With Care"program,[22] including how to de-escalate a

situation and the Primary Restraint Technique.  Velasquez was told that the correct method of

restraint was not used.  This incident was not reported to ORR or DUCS at the time it occurred.

On June 29, 2006, a male resident escaped from the Nixon facility by running toward and

---

[22] Pl. Ex. 83 (AFH0004265).  The Court notes that this was one of the behavior management
techniques that Chester had recommended that Nixon use.

jumping through a window.  Pl. Ex. 87.  In July 2006, one female resident attempted suicide and one threatened to kill herself and was found in the shower with the wire from a headset.  Pl. Ex. 86.

Defendant Gonzalez became an FFS in late August 2006.  Gonzalez Aff. ¶ 4.  On August 25, 2006, Maggie Gaytan, the Nixon facility director, emailed Wolde and others about an allegation of sexual abuse by a child who had been transferred to another facility.  Pl. Ex. 90.  The receiving facility contacted AFH and also reported the incident to TDFPS licensing.  In response to the allegation, Gaytan emailed people at ORR, including Wolde, stating that "this young man could not keep his hands to himself and that he has had numerous instances which were documented"; that "the last incident was the last straw and we were not going to tolerate anymore of this behavior," which was the reason he was moved to Mesa; the investigator advised that the boy did not disclose any names and that it was going to be really hard to investigate; the investigator advised that she was going to staff this with her supervisor and make a decision on what to do, and that "without names she really could not do anything." Pl. Ex. 90. (ORR027799).  Wolde emailed Gaytan asking, "Is the child unable to provide names when he made the allegations?"  Pl. Ex. 90 (ORR004218).  Gaytan responded stating, "From my understanding that is what happened and he also recanted his statement."  Pl. Ex. 90 (ORR004218).  Gonzalez and De La Cruz also learned on or about August 28 that the child had recanted his allegation.  De La Cruz Aff. ¶17; Gonzalez Aff. ¶ 19.

Defendants state that this incident was the first time they learned of any allegation of physical or sexual abuse at Nixon.  Wolde Aff. ¶ 13; De La Cruz Aff. ¶ 15; Gonzalez Aff. ¶ 17. Defendants further state that the first time they heard of the April 2006 "bathroom incident" and the June 2006 improper restraint incident was on September 21, 2006, when De La Cruz was informed by a TDFPS official  of the incidents.  Wolde Aff. ¶ 16; Pl. Ex. 83.  A TDFPS supervisory official

had called De La Cruz to make sure he knew that TDFPS had cited Nixon for the bathroom incident. De La Cruz Aff. ¶ 18.  De La Cruz states that, in that conversation, he learned for the first time that the TDFPS licensing investigator who should have notified him of the incident had dialed the wrong phone number.  De La Cruz Aff. ¶ 18.  De La Cruz also learned about the June 2006 improper restraint incident involving Velasquez and the resulting citation.  Immediately following the conversation, De La Cruz called Wolde and the Field Coordinator to see if they were aware of the incident; they were not.  De La Cruz Aff. ¶ 20.  ORR officials held a meeting, concerned both that these incidents had occurred and that they had not been reported to ORR.  Wolde Depo. at 220.

De La Cruz called Maggie Gaytan to find out what had happened and why the sexual abuse had not been reported.  De La Cruz Aff. ¶ 21.  Gaytan confirmed that Nixon had failed to report the abuse to ORR and informed De La Cruz that the staff member and the child involved in the restroom incident had left the facility.  *Id.*  De La Cruz reminded her of the reporting requirements, and Gaytan expressed regret over the reporting failure.  *Id.*  De La Cruz spoke with Gonzalez several times by phone, and instructed Gonzalez to personally review applicable reporting requirements with Gaytan, follow up with her about obtaining copies of any internal documentation of the restroom incident and the TDFPS citations, and find out whether there were any other pending investigations. *Id.* ¶ 22; Pl. Ex. 37.  Pursuant to these instructions, Gonzalez reminded Gaytan of the reporting requirements and was assured that all staff members would be given a refresher course on restraints and documentation.  Gonzalez Aff. ¶ 21.  Gaytan informed Gonzalez that there were no further investigations involving Nixon.

On or about September 25, 2006, Wolde, Gonzalez, and De La Cruz reviewed a packet of documents provided to ORR by Nixon's Director.  Wolde Aff. ¶ 19; Gonzalez Aff. ¶ 22; De La Cruz

Aff. ¶ 25.  This packet included the TDFPS citation for the "abuse/neglect" related to the bathroom incident.  The packet also included the TDFPS citation for failure to follow written policies and procedures related to the June 2006 improper restraint.  The documents also included paperwork documenting that in 2004, M.M. had been accused of inappropriately kissing the two residents when they left the facility.  Wolde Aff. ¶ 19.  De La Cruz, Wolde, and Gonzalez concluded from the information in the packet and from information provided by the TFPS investigator that no staff member responsible for confirmed sexual abuse remained at Nixon, that the improper restraint incident had not risen to the level of intentional physical abuse, and that TDFPS had ruled out or been unable to confirm any abuse other than the restroom incident.  Gonzalez Aff. ¶ 23-24; De La Cruz Aff. ¶ 26-27; Wolde Aff. ¶ 21-22.

After reviewing the packet, Wolde coordinated a conference call with senior ORR management, Gonzalez, De La Cruz, Nixon's CEO Don Rains, and Gaytan to discuss the incident and necessary corrective actions.  Wolde Aff. ¶ 20; Wolde Depo. at 220.  Gonzalez testified that Nixon was placed on a corrective action plan to address issues of nonreporting.  Gonzalez depo. at 112; *see* also Wolde Depo. at 221.  Gonzalez worked with Nixon to deal with the nonreporting issue by having a couple of meetings with AFH management.  *Id.* at 114.  He testified that De La Cruz addressed it "head on" with them by saying it "cannot be happening" and were "pretty adamant about the severity of not providing that information to the guardian of the children."  *Id.* at 114.  Gonzalez testified that they went over policies and procedures and "made reference to the state licensing protocol."  *Id.* at 115.

Wolde testified that they "were asking what happened" and "asked them for a training . . . if they [had] conducted any training, and also to conduct an outside – to bring an outside trainer and

also to provide training to all staff" on sexual abuse.  Wolde depo. at 223.  He testified that,

"[d]uring the discussions, what we had discussed was not to leave staff alone and also not to have

– the program directors were not actually supervising – key ones were not supervising during the

weekend or holidays.  So we wanted them to be in shift in turn and provide those types of

supervision – supervisions, and also to be available whenever they are called for any time."  Wolde

depo. at 223.  He stated that "the major thing was training and also to have at least two people" and

"[e]very time they go around to have two people, because the problem was one person or the one

who was causing this."  Wolde Depo. at 224.  He stated that the "fourth thing we asked of them was

to avoid this part-time staff and to have permanent staff."  Wolde depo. at 224.  Nixon was

instructed to have 48 hours of training for new staff and 40 hours for existing staff, to include abuse

in general and sexual abuse.  *Id.*  Wolde stated that, although staff was receiving training, there was

"conflicting information," and "when we see this type of incidences, we didn't want to leave that

door open."  *Id.*  Nixon was instructed to bring in "outside training from other experts who are

familiar with sexual abuse, with restraint, and with child care."  *Id.* at 225.  Nixon personnel seemed

receptive to the suggestions and said they would implement them immediately.  *Id.* at 226.  Wolde

and ORR management "asked Jose [Gonzalez] to make sure that this is happening" and to help with

an outside trainer.  *Id.*  They also asked Gonzalez to make frequent unannounced visits.  *Id.*

Gonzalez also followed up with state licensing about the incidents.  *Id.* at 228.

Plaintiffs allege that "it was clear that Nixon staff was concealing crucial information," that

Defendants "were put on notice that the Nixon staff would conceal their own misconduct when they

could," and that Defendants "failed in their own duty to communicate properly with CPS."  Docket

no. 336 at 16.  Plaintiffs also contend that Defendants did not sufficiently scrutinize Nixon, noting

21

that De La Cruz stated that the "program has so far been one of our most reliable programs" and "[w]e need to be sensitive to 'pounding' on the program too much for this incident."  Pl. Ex. 94.

Plaintiffs allege that, in September 2006, "an incident occurred in [Hector] Amaya's office behind closed doors.  The UAC stated that Mr. Amaya grabbed him by the shirt and shook him, and admitted that he was afraid of Mr. Amaya.  Pl. Ex. 95A.  The TDFPS investigation report states that on the second interview, the boy stated that Amaya only grabbed his shirt and denied being pushed or shaken.  Amaya denied that the door was closed and denied touching the boy.  The investigator ruled out abuse and recommended only routine monitoring.  Pl. Ex. 95A.

On September 27, 2006, Gaytan contacted Gonzalez to inform him that a Nixon staff member, Lesvia Monreal, had used an improper restraint on September 26.  Gonzalez Aff. ¶ 25.  Specifically, a male resident had refused to follow instructions to go outside, and Monreal pushed him up against a wall, putting all her body weight on him, and saying in Spanish, "let's see who is stronger, me or you."  Pl. Ex. 91 (SIR); Def. Ex. 22.  Gaytan informed Gonzalez that the resident was not injured, that the staff member had been suspended pending an investigation, and that TDFPS had been notified.  Gonzalez relayed this information to De La Cruz and Wolde.  Wolde spoke with the Nixon Director, CEO, and Operations Director about providing training to all staff on restraints.  Wolde Aff. ¶ 24.  Gonzalez met with Gaytan, Director of Operations (Garza), and Lead Trainer (Garcia) on October 18 and personally reviewed the minimum standards applicable to 24-hour child care facilities and required them to give the entire staff a refresher course by November 17 and provide proof of completion by November 20.  Gonzalez Aff. ¶ 26; Pl. Ex. 102. Staff was to be trained on ORR policies and procedures for reporting SIRS and state requirements for reporting SIRS and definitions of abuse and neglect, and AFH was instructed that shelter policy should reflect

22

that it provides guidance to staff when dealing with these matters, and should be in the form of reference to a particular policy and procedure and training on how to identify abuse and neglect. Pl. Ex. 102 (ORR022967).  Gonzalez reported this to Wolde and De La Cruz.  Wolde Aff. ¶ 25; De La Cruz Aff. ¶ 29; Def. Ex. 24.

Beginning October 1, 2006, the Nixon facility was recommended for funding to serve 136 children.  Pl. Ex. 98 (ORR007121).  On October 1, 2006, three residents smashed a window and escaped at night.  Pl. Ex. 103.

On November 5, 2006, several residents ran away from the shelter by blocking the door with furniture and breaking through the sheetrock wall.  Pl. Ex. 100 (ORR011559).  The remaining residents were gathered for a head count.  There were approximately seventy male youth and their assigned staff in one area.  The boys became restless, and off-duty staff were called in to assist, including Robert Garza, Efraen Garcia, Joe Aguilar, and Frank Martinez.  All but Garcia admitted that they had been drinking, but it was believed that Garcia had also been drinking.  Pl. Ex. 111 (ORR013835) (also noting that CPS concluded that Garcia had been drinking).  J.M.R. alleges that Garcia slammed him into the wall, then threw him against a door so hard that it broke, and continued to beat him.  Pl. Ex. 15; *see also* Pl. Ex. 100 ("It is thought the UAC was thrown against a door with such force the door was damaged.").  Another resident "was thrown to the floor and struck his head against tile floor."  Pl. Ex. 100 (ORR011559).

CPS was notified and on November 6, 2006, the local sheriff initiated an investigation of the incident.  Wolde Aff. ¶ 26.  Gonzalez and De La Cruz were at a training and received a call on November 6 from Gaytan asking whether she should allow the sheriff to speak with the residents. De La Cruz and Gonzalez gave permission for the officers to speak with any Nixon resident willing

to be interviewed.  Gonzalez Aff. ¶ 27.  Defendants state that the force used far exceeded any previous inappropriate restraint at Nixon that had come to their attention.  Wolde Aff. ¶ 27; Gonzalez Aff. ¶ 29.  J.M.R. also alleges that a staffer (Martinez) dragged him out of bed the next morning and beat him again.

In response to the November 5 incident, Wolde participated in a conference call on November 9 with ORR personnel, including Gonzalez and De La Cruz, and Nixon personnel.  Def. Ex. 25.  In the conference call, Gaytan assured Defendants that the Nixon staff members involved had been suspended.  De La Cruz Aff. ¶ 34; Gonzalez Aff. ¶ 31. Wolde recommended that the children receive appropriate medical services and that their lawyers be informed, that a SIR be completed with complete information of the incident and what actions the facility administration took, recommended that Nixon hire a human resources person to assist in management and training, organized a number of follow-up conference calls, and coordinated a site visit to Nixon in November 27-30.  Wolde Aff. ¶ 28.  Wolde also instructed Gonzalez to notify the FBI (Gonzalez did), and discussed the TDFPS investigation with TDFPS officials and Gonzalez on November 15.  Def. Ex. 27.

The result of the TDFPS investigation was a finding of "reason to believe" physical abuse and neglect.  The investigator concluded that Garcia had abused residents, and that Joe Aguilar and Robert Garza failed to take an action that a reasonable person would have taken under the circumstances by failing to intervene.  Def. Ex. 3.  The Nixon facility was cited for improper restraint techniques.  Pl. Ex. 100 (ORR011560).  A warrant for the arrest of Garcia was filed, charging him with two Class A misdemeanors for injury to a child.  Pl. Ex. 100 (ORR011560); Def. Ex. 3.

Five girls attempted to escape from the shelter on or about November 13, 2006. Pl. Ex. 105. They were placed in shorts and shower shoes, and Defendants were notified. Pl. Ex. 105. On November 14, 2006, Wolde sent an email to Gaytan, Gonzalez, Chester, and De La Cruz regarding the attempted runaways. Pl. Ex. 107. He wrote, "I am concerned about this program and curious why children are attempting to run away. There must be reason(s) why children wanted to leave this program. In the past, children were exited [*sic*] to attend classes, vocational services, swimming, outings, etc. Why has that changed all of a sudden?" Pl. Ex. 107. Wolde also planned a trip to Nixon in late November. Pl. Ex. 107.

On November 14, 2006, Chester sent an email to Wolde listing problems at the Nixon shelter, including staff grabbing and pulling children by their arms and sleeves, staff yelling at children to "shut up," children being humiliated in front of other children, groups of children being punished because of one child's misbehavior, and Garza grabbing and shoving children. Pl. Ex. 60. Chester and DUCS D.C. staff had a conference call the next day. Pl. Ex. 60.

On November 15, Gonzalez and De La Cruz had a conference call with TDFPS licensing and investigative staff, including Corey Buck, to discuss the alleged abuse on November 5. Pl. Ex. 111. De La Cruz wrote his notes of the meeting, stating, "Upon investigation of that incident numerous other issues came to light that will require corrective action in order to prevent further serious incidents from reoccurring. Some of those issues are clearly issues/violation of TDFPRS minimum standards and others are issues of 'quality of care' that a contracting entity such as TDFPRS or U.S. Department of Health would need to address." *Id.* De La Cruz noted that Garcia "is the trainer for types of restraint used by the shelter staff" and yet improperly restrained J.M.R. De La Cruz also raised concerns about Garza, who was said to have threatened a resident and used taunting language.

*Id.* De La Cruz noted that, in the last approximately three years before the last expansion, the shelter had only approximately seven major incidents, but since it expanded "a little over three months ago it has experienced 6." *Id.* (ORR013837). De La Cruz reported that one CPS staff "informed ORR Ducs that she had given Maggie the suggestion to start implementing new TDFPRS Minimum standards of assigning specific children to specific staff," though the standards were not yet effective. De La Cruz wrote, "The shelter should immediately initiate this practice because the standard will becoming [*sic*] effective within approximately one month and Nixon has had in [*sic*] increase in runaways." *Id.* (ORR013837). It was noted that Corey Buck also interviewed a Nixon staff person who had left during the November 5 incident because he "could not stand how children were treated at this place." *Id.* (ORR024555). However, there is no indication that this staff person reported any other physical or sexual abuse occurring at the facility.

Other notes from the meeting state, "It was the opinion of the leadership at the Texas department of protective regulatory services that incidents and lack of training, staffing and administration coupled with the new numbers of children at Nixon have had an adverse effect in the quality of Care." Pl. Ex. 110. One individual was noted as having "issues with" the staff ratio and training of staff, although Nixon was meeting state minimum guidelines. Concerns were raised about Garza being in charge of training, the fact that he had "not been an effective leader and [had] not performed up to his job responsibilities of having adequately trained staff," had been resistant to recommended changes, and that he had admitted to drinking on the night of the November 5 incident. *Id.*

On November 17, Wolde emailed Gonzalez and De La Cruz, stating "I think we need to investigate or cover the following topics:" including "accounts of the incidences that occurred,

26

abuse, inappropriate restraints and reporting violations"; "staff and training" including whether there was sufficient staff, whether staff were adequately trained and with what materials, whether outside trainers were used, whether there was a disciplinary protocol for children and staff; "responsibilities and communications"; whether Nixon could handle the large number of children and staff and whether it was violating any agreements; and what types of technical assistance the team should provide during the trip.  Pl. Ex. 38.

Gonzalez and De La Cruz state that, between mid-November and mid-February 2007 things were quiet, and they learned of no allegations or incidents of physical or sexual abuse by Nixon staff.  Gonzalez Aff. ¶ 33; De La Cruz Aff. ¶ 36.  However, to help ensure safety, they recommended to Wolde that ORR reduce the number of children placed at Nixon.  Gonzalez Aff. ¶ 34; De La Cruz Aff. ¶ 37.[23]  Wolde also recommended to ORR to reduce the number of children to help ensure safety.  Wolde Aff. ¶ 32.

In their statement of facts, Plaintiffs allege that, "during this time period," Plaintiff O.E.F. was beaten twice by staffers at Nixon.  Docket no. 336 at 20.  Plaintiffs allege that, the first time, Velasquez pulled him out of a line and beat him across the torso with the heel of his hand, leaving bruises and the second time, another staffer (apparently Vasquez) pulled him from an upper bunk bed by the feet, throwing him on the floor and beating him severely.  Docket no. 333 at 22; O.E.F. depo. at 26-27.[24]  O.E.F. testified that, when he showed the marks from the first beating to Garza,

---

[23] The Court notes that this affidavit statement is inconsistent with Gonzalez's deposition testimony, in which he stated he had not recommended reducing the number of children because it was outside his capacity.  Gonzalez depo. at 147.  However, in a memo dated December 6, 2006, Gonzalez did say, "At this point I think it is a bit to [sic] many kids for the facilities."  Pl. Ex. 99.  In this same memo he recommended against suspending new placements.  Id. (ORR014187).

[24] As previously noted, this differs from the Sixth Amended Complaint, which alleges that "Plaintiff O.E.F. was assaulted and beaten by Nixon staff member Ruben Velasquez on two separate occasions."  Sixth

Garza ignored him and said sometimes the residents would hit each other.  O.E.F. depo. at 20.

O.E.F. stated that he saw Velasquez hit and kick other residents and that other employees/staff saw

this too.  O.E.F. depo. at 22-24.  O.E.F. did not report any of the abuse other than the time he spoke

to Garza and was ignored.  Pl. Ex. 19 at 84.

Plaintiffs allege that, "[a]lso during this time period," W.O.G. was battered by an

unidentified male staffer, and a female staff member entered his shower while he was naked, seeking

sexual favors. W.O.G. testified that the woman would bring a towel and then "supervise" while they

were in the shower. W.O.G. depo. at 20.  He also testified that she touched him on the back and that

he told her to stop.  W.O.G. depo. at 23-24.  He stated that she punished him by taking away t.v. and

telephone calls.  W.O.G. did not know the name of the female staffer, but Plaintiffs assert that it was

Lesvia Monreal.  With regard to the telephone incident, W.O.G. testified that he was making a

telephone call without permission, and the staff person found him, took the telephone away and

pushed him back, and he hit the door.  W.O.G. depo. at 28-29.  He stated that the person grabbed

and pushed him, and that it left a red mark on his arm.  W.O.G. depo. at 30.  W.O.G. testified that

he did not report the abuse, but if the federal government employees had come to talk to him, he

would have told them about it.  Pl. Ex. 20 at 163.

On November 20, Nathalie Lummert of USCCB emailed Susana Ortiz-Ang (DUCS Deputy

Director) and Wolde asking them to consider decreasing the size of the Nixon facility.  Pl. ex. 60.

On November 22, TDFPS sent a letter to AFH notifying it that, "[d]ue to an increase of

investigations and deficiencies, your monitoring plan will change from a Plan 2 to a Plan 1."  Def.

---

Am. Compl. ¶ 126.  The context of the deposition testimony makes clear that Vasquez and Velasquez were
different people, and O.E.F. testified that Velasquez only hit him the one time.  O.E.F. depo. at 21-22.

Ex. 23.

TDFPS licensing investigated another incident of an alleged improper restraint by Ruben Velasquez on November 26.  Pl. Ex. 98; Def. Reply Ex. D.  A resident claimed that Velasquez intentionally struck him in the face while he was being restrained.  Def. Reply Ex. D.  It is undisputed that Velasquez did restrain the resident, but witnesses indicated that the resident was highly agitated and was struggling, kicking, and biting.  Other residents stated that the alleged victim threatened them to get them to lie about the incident.  The investigator's conclusion was that an improper restraint was used, but abuse was ruled out.  Def. Reply Ex. D.  The investigator said there were no witnesses to support the statement that Velasquez hit the boy.  *Id.*[25]

Wolde, De La Cruz, Gonzalez, and others participated in a site visit at Nixon from November 27 to 30, 2006.[26]  The purpose of the visit included: "evaluat[ing] the capability of the agency and its management team to run a program with 136 beds"; "investigat[ing] numerous incidents and provid[ing] recommendations on" "numerous incidents that occurred in the agency since October 1, 2006, abuse of staff by children, inappropriate restraints, and reporting violations made by the agency"; and "provid[ing] technical assistance as needed."  Pl. Ex. 98 (Nov. 2006 team report).  "[The] DUCS Project Officer, HQ Case Management staff, FFS Team Leader, and FFS field

---

[25]Defendants' affidavits state that they learned of no allegations of physical or sexual abuse on the part of Nixon staff between mid-November 2006 and mid-February.  Wolde Aff. ¶ 31; De La Cruz Aff. ¶ 36; Gonzalez Aff. ¶ 33.  Although abuse was ruled out, this was an allegation of physical abuse, and it does appear Defendants were aware of it.  Pl. Ex. 98 at 5 (ORR007124) (noting that, during the site visit a few days later, ORR/DUCS met with a licensing investigator who was visiting the program for the incident that occurred on November 25).

[26]During this site visit, ORR DUCS staff "had the opportunity to meet with a representative of TDFPRS Residential Child Care Licensing Investigator," who "informed ORR DUCS that within an approximate four month period Nixon had seven incidents that required them to investigate activities at the shelter," which was "one more than had occurred the entire previous two years."  Pl. Ex. 98 (ORR007124).

specialist provide[d] three days of intensive technical assistance to Nixon staff and management on the use of restraints, behavior management, proper completion of serious incident reports, and timely reporting of incidents.  DUCS staff provide[d] recommendations in writing to Nixon staff during the exit briefing of this technical assistance site visit."  Pl. Ex. 92 (ORR011821).  Wolde testified that he included Janet Zinn, a Case Manager from DUCS headquarters who was a child welfare expert, to discuss "what should be done and how we should handle it" because he was not an expert in this area.  Wolde depo. at 234-35, 241.  Wolde stated that he interviewed some children (between five and ten) during the visit, as well as some of the staff.  Wolde depo. at 243-44.  He testified that De La Cruz and Zinn also interviewed staff.  *Id.* at 244.  Wolde stated that they spoke with state licensing during the trip and "discussed how to improve the relationship and to communicate properly in the future."  *Id.* at 249.

A report[27] from the site visit states, "Between October 1, 2006 and November 30, there were more SIR (Serious Incidence Reports) than the entire FY 2005[, including] seven runaways happening twice on the same day and investigations by their licensing agency on restraints and sexual abuse by a staff member."  It also states, "Recent incidents have served to illuminate several AFH administrative and management issues.  [*sic*] had not appropriately managed staffing issues to address the growing number of shelter beds and other unresolved management problems.  These issues include hiring capable assistant director and other staff, firing staff who refused to follow shelter and ORR DUCs policies, and to strengthen training and communication even though AFH has a strong case management team."  Pl. Ex. 98.

The report noted that the personnel files reviewed lacked "so many required documents on

---

[27]This report appears to be a draft.

training, performance evaluation, background checks, documents related to disciplinary actions, etc." and that the staff was large enough that a human resources person was needed. AFH recommended that the Operations Manager position be eliminated and the money used to hire a qualified HR person, which ORR approved. AFH then hired an experienced HR person. The report also made the following recommendation: "AFH needs to review the licensing and ORR requirements on hiring, training and personnel files and make sure that all the requirements are met." *Id.*

The report notes that numerous incidents had occurred within several months, including the November 5 runaway attempt and the resulting physical abuse, the investigation of an improper restraint in late November, and a confirmed incident of sexual abuse by a staff member perpetrated against a child during the summer (the bathroom incident). The report continues, "[d]uring the site visit it was learned by ORR DUCS that a split in the relationship between several key staff in the shelter had allowed for conditions in the shelter to deteriorate" and "[a]ll levels of direct care staff were affected through insufficient staff coverage on weekends, insufficient training, lack of proper communication between staff and various teams and insufficient oversight and guidance by top level administrators." *Id.* The report was issued to follow up on initial recommendations made by the DUCS team at the end of the visit. *Id.* Gaytan agreed to make the following immediate change: prioritize a search for deputy director, training director, and full-time masters-level clinician.

The following corrective actions were required by ORR: (1) shelter administration will revise internal policies and procedures regarding significant and critical incidents in adherence with ORR DUCS and TDFPS requirements; (2) these policies should include required detailed verbal and written reporting and response procedures; (3) all staff should attend mandatory and regular training

on significant and critical incident handling, reporting, and follow-up; (4) all critical incident reports and SIRs should be placed in a loose-leaf binder in a central location and checked daily by each staff member; (5) daily progress notes for each child should be developed and made available to all relevant staff for an appropriate plan of communication at the end of each shift and placed in the child's file; (6) a written policy and procedure should be developed and implemented that requires each staff member working with that child to have read the child's file before starting the shift; (7) staff representatives from direct care staff, case management, and clinical team should contribute to the development of an appropriate reporting format for improving internal communication; (8) weekly meetings with clinical, case management, and DUCS Field Coordinator staff to review children's cases.  The following recommendations were also made: shift supervisors to provide opportunities for staff debriefings of critical incidents with involved staff; key positions need to be filled as soon as possible; clinical team needs to be fully staffed; personnel files to be updated and completed, including yearly performance evaluations, current job descriptions to match job qualifications, commendations, and disciplinary actions; initial and ongoing staff training requirements should be fully implemented and documented; and staff training should include a state mandated behavioral management plan.  ORR would also "suggest a reduction in number of beds to better serve UACS from 136 to 104 for now."  *Id.*

The report stated, "Prior to the site visit Jose Gonzalez conducted interviews with all children and care [*sic*] and various direct care staff.  During this site visit, the team conducted numerous interviews with children, direct care staff, case managers, and clinicians.  All four of the staff involved in the initial incident were initially suspended.  After the investigation by Texas Licensure and as a result of several interviews conducted by the ORR DUCS site visit team, the four staff

involved have been terminated." *Id.*[28]   The report noted deficiencies in disciplinary policies (discipline policy not detailed and inconsistent discipline) and in training (staff trained only once a year on the same topics, and the shelter did not use outside trainers); lack of grievance procedure for children to report grievances.  *Id*.  DUCS required AFH to hire three new employees and to demonstrate that they made an effort to hire on work experience rather than on previous relationships to AFH employees (noting that hiring from the outside would help reduce tendencies for staff to develop loyalties and "staff splitting"); the program director was expected to spearhead the development of clear policies and procedures implemented in a consistent manner to address communication among leadership staff.  *Id*.  Improvements in training were required (staff training hours to follow state mandated minimum standards and ORR policies with a commitment to ongoing and more frequent training), as were clear disciplinary procedures applied consistently.  AFH was also required to develop a procedure for rights, responsibilities, and avenue to express concerns to be provided to each child in writing at intake.

The "findings" state that "one of the biggest deficiencies" was that "the shelter has been operating more in the form of a military bootcamp or juvenile detention" and "[t]he lack of nurturing staff to client relationships coupled with boredom appear to be main contributors to the surge of recent elopements from the facility."  *Id*.  The ORR staff recommended that staff members should develop recreational activities and interact with the residents by playing cards and other appropriate recreational activities, and that staff should be encouraged to model appropriate communication and respect to other staff and children at all times.  *Id.*  The report noted that clinical staff could

---

[28] The record indicates that Garza's employment was terminated on December 4, 2006; Martinez's employment was terminated on December 8, 2006; Joe Aguilar's was terminated on December 11, 2006; and Garcia's was terminated on December 18, 2006.  Pl. Ex. 50.

contribute their expertise to a new behavioral management program and add input to staff training, but they should not be the sole trainers or arbiters of discipline; rather, an outside or new trainer should be skilled in treatment of children and other life skills issues.  *Id.*  ORR staff recommended that shift supervisors be brought together more frequently to review and process trends in children's behavior, management of direct care staff, incident reports, and any other pertinent information.  *Id.*

A follow-up report notes that, during the site visit, numerous direct care staff workers were interviewed, and it was concluded this part of the agency was the most neglected.  It noted that Nixon should hire more staff from "outside" rather than based on previous relationships and that it should "define behaviors that it is not willing to accept by staff," including "staff knowing or having suspicions of inappropriate behavior but not reporting it."  The report also stated that children at intake should be informed that if they did not feel comfortable with their treatment or any other concern, the agency had someone in place to address those concerns.  It also stated, "The agency should immediately look into changing their direct care practices so that staff are allowed to have positive age appropriate interactions with the children"; "the shelter should look into different types of behavior modification program[s] that utilize a level system with identified choices for rewards or consequences"; "staff should also be trained in some form of interpersonal communication skills that de-escalates verbal and physical aggression"; "staff should receive guidance by clinical staff on how to de-escalate children's disruptive and non-compliant behavior."  Plaintiffs complain that the visit focused too heavily on financial matters, such as an improper lease situation and salary issues.[29]

---

[29] The focus on financial issues was due to the fact that they were negotiating the budget for the next contract period.

Plaintiffs further allege that, "[d]uring this time period [Hector] Amaya spent a great deal of time behind closed doors with a vulnerable child named 'B', and reports began to emerge about Amaya's giving of inappropriate gifts, such as a ring, and money to certain children as well." In late November 2006, Gaytan received a call from an ICE Officer who said he had concerns about Amaya because there were allegations about him giving money to a child that was recently deported, and that he "takes young boys into his office and closes the door." Pl. Ex. 112. Gaytan wrote a memo[30] about the incident, stating that she "had already spoken to several individuals about the money situation and that as far as [she] was concerned the matter had been resolved." *Id*. The young man had been deported but had been re-apprehended and returned to "clear up the money matter." He wrote a statement that Amaya did not give him the money, that he had kept the money from the shelter the whole time he was there, that one of the transport people had mentioned Amaya's name over and over to him, and he kept denying that Amaya gave him the money, but he did not want to believe him. *Id*.[31] Concerns of possible sexual abuse by Amaya were investigated by TDFPS in early December. Abuse was ruled out and the investigation completed by December 12. Pl. Ex. 95.

Belinda Leal began working as direct care staff at Nixon in December 2006. During her

---

[30] The memo is titled "Away From Home, Inc. Inter-Office Communications" and is not addressed to any person in particular. Pl. Ex. 112.

[31] Plaintiffs allege that Amaya's employee files were not reviewed until March 2007, when Defendants discovered that he had been arrested for providing alcohol to a minor. In March 2007, Defendants also discussed information that Amaya had given a ring to a resident and had been communicating with him after he had been transferred. De La Cruz wrote that Amaya had told him that there was a concern that Amaya was calling the boy, but in fact the boy was calling Amaya, and noted, "Of course with other current circumstances this does not look good because one of the shelter's main problems is that staff has developed inappropriate relationships with kids to the extent that some have been sexually abused." Pl. Ex. 112. Gonzalez noted that none of this information had been told to him by shelter staff, but he informed the new facility that the staff would not contact the boy without permission. Pl. Ex. 112. Wolde stated that "we should check if this is true and take appropriate action." Pl. Ex. 112. There is no allegation that Amaya ever abused any of the Plaintiffs.

employment, Leal allegedly abused at least fourteen young boys (repeatedly), including the Plaintiffs in this lawsuit.

On December 6, Gonzalez sent an email to De La Cruz with his findings and conclusions from the site visit.  Pl. Ex. 36.  Therein, he concluded that the November 5 incident "was totally mishandled" and that the "restraints were inappropriate" and "time reporting guidelines were also not followed."  He stated that he "did do a follow up group with all of the residents but it was very late."  He concluded that the cause of the "runaways and disruptions" was "a lack of communication and low staff to UAC ratio and the children did not have a structured program to be a part of."  He also spoke to staff and was told there was a lack of communication and a lack of good documentation, including reporting of serious incidents.  He recommended "staffing" children in a more thorough way and having more complete documentation in accordance with the cooperative agreement and ORR policies and procedures; creating a level system with rewards and consequences; revisiting policies and procedures; learning a chain of command or phone tree when a child had discipline issues or there were runaway threats; and developing an emergency plan.  The clinical staff also stated they were overworked, and Gonzalez recommending fully staffing the clinical team and to "help and assist in developing plans for behavior interventions, level system of rewards and consequences."  Gonzalez also noted that morale among direct care staff was low and that their training was "all at one shot and [a] very long day."  He recommended training on an ongoing basis, better communication strategies among staff, helping "to understand the children and their unique needs"; "participat[ing] in the team concept of managing the kids"; "more planned structured activities with the children as per P&P"; and "get[ting] a list of ethical guidelines to follow and implement."  He further noted that Nixon had not brought in outside trainers.  He stated

that he had been in communication with someone named Anita Deleon "that has taken charge and is helping implementing a more comprehensive behavior intervention program that is proactive and less reactive in nature. The model will not be based on a bootcamp ideology." Gonzalez concluded that Nixon was violating agreements "especially in reference to the day-to-day care of the children" and that it was not currently able to provide quality services to UAC. He concluded that there were "a bit to [*sic*] many kids for the facilities" but "in the future if program changes are implemented they will be able" to handle the large number of children. He recommended providing technical assistance in the form of structuring the program; going over the cooperative agreement with supervisors, administration, and director; "show[ing] them what a chain of command is"; "help[ing] with the creation of appropriate consequences and rewards for the shelter population"; and "introduc[ing] new theories and people who are expert in this field." He recommending providing the following technical assistance: documentation, policies and procedures, behavior intervention, and ethical duties and responsibility for staff and clinicians. After the November site visit, Gonzalez was at the Nixon facility at least three times a week when he was not traveling out of town. Pl. Ex. 37.

On December 12, Wolde informed Nixon that there would be a 32-bed reduction in funding for AFH, so that it would be serving only 104 beds. Pl. Ex. 125. (ORR004262). Alyce Martin was hired as a new Deputy Director of the Nixon facility in late December 2006. Martin was expected to address and improve some of the noted past deficiencies. Pl. Ex. 123 (ORR006998).[32]

In early January 2007, Rosa Olivares, a social worker and training coordinator that had been

---

[32] Plaintiffs also note that resident B's arm was broken during horseplay with a staffer in December (the SIR is dated February 23, 2007) and that R.E.C. "cut his wrists" on December 28, 2006. Pl. Ex. 116, 117. However, the broken arm appeared to be the result of an accident and the staffer involved was suspended, and R.E.C. repeatedly insisted that he had cut his wrist by accident.

hired in October abruptly resigned.  She sent an email to Gonzalez stating, "my work ethics and licensing requirements prevent me from moving forward with this project.  I find this place highly disfunctional [*sic*] and unorganized from administration to direct care staff, in term [*sic*] it is reflected on the quality of services provided to the residents.  I find this place highly unethical and disfunctional [*sic*] to the degree that is hostile not only for employees, but for residents as well. Based on my observations and professional opinion the lack of structure, consistency, and empirical based practices constitute a risk to the well being of the residents and opens a window of liability issues for the administration."  Pl. Ex. 118.  She continued, "Is difficult to try to make direct staff to be professional when there are no ethics, professionalism, or structure in the administrative team. In my observations most employees do not seem to have any awareness of best practices when it comes to working with children. . . .  I am very challenged facing extreme resistance as some people withold [*sic*] information or provide me with misleading information that I need in order to prepare my work.   In addition the administration has a huge problem with highly unethical dual relationships. . . .   I am not willing to risk my license or compromise my work ethics.  I am not interested in joining dual realionships [*sic*] or triangualations [*sic*]."  Pl. Ex. 118.  In an email exchange between De La Cruz and Gonzalez, they said they wished that she could be more specific and provide more details, and De La Cruz wrote, "Without knowing this type of information we do not know if there really are strong dysfunctional tendencies in the shelter, she is just over whelmed, not diversly [*sic*] experienced, or just disgruntled."  Pl. Ex. 119 (ORR020581).  De La Cruz suggested that Gonzalez could email back and ask for examples or inform Gaytan and have her attempt to get Olivares to come for an exit interview and explain why she had a poor experience. Pl. Ex. 119.

Plaintiffs argue that, by the end of 2006, Defendants were aware of the high number of SIRs and runaways as well as the other issues.  But, they argue, "[d]espite the clear and imminent dangers to the UAC, the Defendants failed to take urgent protective actions," continued to permit staff to enter any part of the facility alone, at any hour, failed to systematically interview the boys at the facility to find out what was going on, failed to require any child welfare approved behavior intervention programs to be immediately implemented, and permitted inadequate monitoring of shift notes and limited reporting and coordination to continue.  Plaintiffs state the only real change was the reduction in beds in mid-December.

In January 2007, Hilary Chester resigned.  Her letter described her concerns about children's care in a large facility.  Pl. Ex. 60.  On January 17, DUCS and voluntary agency managers met, and the managers expressed concern that conditions at Nixon remained problematic.  *Id.*[33]

Plaintiffs assert that, during this time, Plaintiff E.H.C. was exhibiting symptoms of PTSD, insofar as he became very sensitive about touching and did not want women staffers near him, especially Lesvia Monreal, and asked to be deported.  Plaintiffs assert that J.A.A.L. demonstrated clear signs of depression.  Plaintiffs argue that J.C.C.B. also became depressed and anguished; his shift notes showed that he was unable to sleep, had a hard time getting up in the morning, and refused to eat.  Plaintiffs argue that there were clear indications of ongoing abuse because many children began to "act out," expose themselves, and/or show serious disrespect for the staff.  Others had trouble sleeping, or suffered other signs of depression.  But, Plaintiffs contend, because there was no serious review of the reports and the "weekly counseling efforts were perfunctory," the

---

[33] This is taken from a timeline of communication prepared by USCCB; there are no details concerning what problems USCCB was referring to.  Similarly, Chester's resignation letter is not in the record.

symptoms were not noticed and Defendants never looked at these materials or evaluated the review system.  Plaintiffs state that two suicide attempts by E.H.C. went virtually unnoticed.[34]  Plaintiffs also note that six more residents (including two alleged victims of Leal) ran away.  Pl. Ex. 152, 153.

On February 10, 2007, E.H.C. reported that Belinda Leal had sexually abused some of the residents.  Wolde learned of the allegations on February 10 from De La Cruz or Gonzalez.  On February 12, Gonzalez reported the allegations to the FBI.  Gonzalez increased his presence at Nixon to every day.  Pl. Ex. 37.

Leal was charged with sexually abusing J.C.C.B., P.A.S.G., R.M.S. (not a plaintiff), and L.M.V.F. between January 20 and February 7.  Pl. Ex. 126.  Plaintiffs allege that Leal also molested numerous other male residents.  Wolde states that he suggested that Gonzalez and De La Cruz locate appropriate services for the affected children, and ensured that the FBI and TDFPS investigations were monitored and that there was coordination with pro bono attorneys assigned to represent the children.  At some point in February, Wolde recommended to senior management to terminate the program at Nixon, and senior management then took over.  Wold Aff. ¶ 39.

On February 16, Maureen Dunn, DUCS Director, temporarily suspended placements at Nixon due to the allegations of sexual abuse "and other serious incidents there over the past several months."  ORR04264.  On February 20, De La Cruz sent a letter to Dunn,  recommending further reductions in bed space or eliminating Nixon as a shelter.  Def. Ex. 32.  De La Cruz wrote, "Due to these lapses in communication, 'failure to report,' lack of willingness or ability to effectively supervise employees who put children at risk for abuse or injury, and an inability to implement

---

[34] The "suicide attempts" occurred on January 5 and February 19, 2007 (after the sexual abuse was known).  The staff notes from the January 5 incident state, 'I had to take a plastic garbage bag off of [E.H.C.'s] head because it looked like he wasn't breathing very well.  I don't know if it was a joke, but I didn't think it was funny."  Pl. Ex. 130 (ORR034774).  The notes from the next shift state "good."  *Id.*

previous guidance from ORR DUCS and stakeholders such as DHS, we cannot conclude that the Nixon shelter is a safe place for children." Def. Ex. 32. He also wrote that, "the level of seriousness in previous and current allegations compel me to say that the safety risk to children is primary and any other concern, including program size, is by far secondary at most." De La Cruz requested that, if Nixon was allowed to remain open, it be allowed to do so only after fulfilling some minimum conditions, including coming up with a safety plan to address deficiencies in supervision of direct care staff, including use of staffing patterns and practices preventing staff from having isolated contact with children.

On February 22 and 23, 2007, allegations were made by two residents against Mr. Z. Pl. Ex. 64, Pl. Ex. 120 (SIR: resident L.M.V.F. reported that Mr. Z "would watch the boys as they were showering in the evenings. He stated that Mr. Z would pull back the shower curtain so that he could watch the boys showering naked, and told them that if they were to tell anyone something would happen to them.") (SIR: resident B.A.C.S. alleged that Mr. Z. had come into his room on several occasions and touched him on his leg and buttocks and he felt it was sexual in nature; he also stated that Mr. Z would watch him undress in the shower room). Mr. Z was indefinitely suspended pending an investigation. Pl. Ex. 63. The notes from the TDFPS investigation state that Mr. Z had been working at Nixon for four months[35]; that he denied the allegations; that L.M.V.F. was interviewed and denied any problems with Mr. Z; that during the time these allegations were made, several other children were interviewed regarding sexual abuse and no one mentioned Mr. Z. as a possible alleged perpetrator. Def. Reply Ex. A. The investigation was closed with a disposition of

---

[35] Plaintiffs state this is the same Mr. Z who was demoted in 2004 and fired in 2005 for aggressive behavior.

"ruled out for sexual abuse" of L.M.V.F. by Mr. Z.  Def. Reply Ex. A.

ORR began moving children out of Nixon on or about February 26, 2007.  On February 27, 2007, direct care staff M.M. was suspended pending an investigation of suspected sexual abuse that was reported to TDFPS.  Pl. Ex. 66; Def. Ex. 36.  The investigator later concluded that there was not a preponderance of evidence to conclude that sexual abuse occurred.  Def. Reply Ex. F.  The child denied the abuse and stated another resident was trying to get back at staff for writing him up and began the rumors.  *Id.*  Defendants state that they did not learn of prior M.M. sexual abuse allegations until April 2, 2007, when they received the full TDFPS investigative file regarding the April/May 2006 bathroom incident and various other allegations, because the TDFPS report incorrectly stated that a child living at Nixon had become pregnant instead of stating that M.M. had become pregnant from sex with a resident.  Wolde Aff. ¶ 43; De La Cruz Aff. ¶ 53; Gonzalez Aff. ¶ 46.  By that time M.M. was no longer working at Nixon.  *Id.*  ORR personnel had become aware of the allegation that M.M. improperly kissed two residents in September 2006, but the TDFPS investigation had not indicated that abuse had taken place.  Wolde Aff. ¶ 19-20.

ORR personnel, including De La Cruz and Gonzalez visited Nixon for a fact-finding visit from February 28 to March 2, 2007.  Pl. Ex. 57.  A report from the visit concluded that staff reductions following the reduction in bed capacity, coupled with the termination of mid-level management staff in key positions after the November 5 incident, "led to a) a weak management structure without effective oversight or supervisory functions and b) inadequate staffing ratios when there was no coverage for absent employees."  Pl. Ex. 57.  ORR developed a comprehensive plan, including removing all children from the facility and stationing De La Cruz at Nixon to oversee the process.  On March 2, under the direction of ORR's Director, De La Cruz assumed supervisory

42

control of the Nixon facility and would be onsite 24/7 to ensure that the remaining children would be appropriately cared for and the transfer process was executed effectively and safely.  Pl. Ex. 123; Def. Ex. 32.  All children were removed in early March.

ORR continued considering options including keeping Nixon open, *see* Pl. Ex. 57 (team recommendation to maintain the grant but require corrective actions).  June Lloyd, a child welfare program manager for ORR, noted that Nixon lacked clear policies and procedures, including on reporting and staffing, accepted procedures on how to staff, monitor/enter bathrooms, shower areas, when staff must work in pairs, when male/female teams are required, and understanding the dynamics of sexual abuse.  Pl. Ex. 57 (ORR007001).  It was recommended that, if the facility continued to be a grantee, the staffing plan would have increased supervision of direct care workers "so that there will not be any time direct care workers will be left alone with the children."  ORR also contemplated changes to facility management, including hiring a new program director, overseeing staffing decisions, working with the government's regional child welfare expert to implement new patterns and requirements for personnel shifts, including specific accountability measures in the new job descriptions for all levels of program supervisors, increased ORR supervision, and developing a national training curriculum on child abuse prevention that would be mandatory for grantee employees.  *Id.*  With respect to staffing, ORR "analyzed staff-to-child ratios and staffing patterns to determine the appropriate levels and responsibilities of personnel."  *Id.*

During this time, Hector Amaya was terminated because he either knew of alleged inappropriate behavior (M.M.) or he himself engaged in inappropriate behavior.  De La Cruz was critical of Amaya for not reporting concerns about M.M. continuing to work at Nixon despite the allegations of sexually inappropriate behavior.  In addition, when Defendants learned of the other

concerns about Amaya's behavior, they expressed concern that Nixon's problems went beyond direct care workers but were also in the management team.  Pl. Ex. 112. De La Cruz also told Nixon directors that Gaytan needed to be fired because she either lied about knowing about the sexual abuse allegations or was incompetent, and Gaytan resigned.  De La Cruz also expressed concern that Nixon had re-hired M.M. despite concerns that she might have had an inappropriate relationship with the residents.  Pl. Ex. 66.

Plaintiffs allege that the necessary corrective actions were taken too late.  Eventually, ORR decided to terminate the grant, citing AFH's failure to protect the children and failure to report findings of abuse in a timely manner.  Pl. Ex. 166 (termination letter from Office of Grant Management Director and ORR Director).

### III. Legal Standards

#### A. *Bivens*

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 389 (1971), the Supreme Court held that a plaintiff may recover monetary damages for injuries suffered as a result of federal officials' violations of the Fourth Amendment.  *Bivens* actions were later allowed in *Davis v. Passman*, 442 U.S. 228 (1979), for a Fifth Amendment due process claim involving gender-based employment discrimination, and in *Carlson v. Green*, 446 U.S. 14 (1980), for an Eighth Amendment claim based on federal government officials' deliberate indifference to a federal prisoner's medical needs.  *Minneci v. Pollard*, 132 S. Ct. 617, 619 (2012).  "Because vicarious liability is inapplicable to *Bivens* . . . suits, the plaintiff in a suit such as the present one must plead that each Government-official defendant, through his own individual actions, has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

44

**B. Qualified Immunity**

Defendants assert that they are entitled to qualified immunity. "Qualified immunity protects public officers from suit if their conduct does not violate any 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bishop v. Arcuri*, 674 F.3d 456, 460 (5th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To defeat a claim of qualified immunity, a plaintiff must show: (1) the government official violated a statutory or constitutional right; and (2) the right was clearly established at the time of the challenged conduct. *Harlow*, 457 U.S. at 818. The second prong of the qualified immunity test is understood as two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the defendant's conduct was objectively unreasonable in the light of that then clearly established law. *Tolan v. Cotton*, 713 F.3d 299, 305 (5th Cir. 2013).

"[A]t least since 1989, it has been clearly established that officials will only be liable for episodic acts or omissions resulting in the violation of a detainee's clearly established constitutional rights if they 'had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.'" *Jacobs v. W. Feliciana Sheriff's Dept.*, 228 F.3d 388, 393-94 (5th Cir. 2000); *see also Scott v. Moore*, 114 F.3d 51 (5th Cir. 1997) (classifying sexual assault of pretrial detainee by jailer as episodic act or omission even though plaintiff's claim was based on inadequate staffing). Further, the Fifth Circuit held in 2005 that supervisory liability for constitutional violations by subordinate employees under a subjective deliberate indifference standard was clearly established. *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245 (5th Cir. 2005).

For purposes of qualified immunity, we hold Defendants to the standard of deliberate indifference in determining whether their conduct was objectively reasonable. *Jacobs*, 228 F.3d at

45

394 (citing *Hare*, 135 F.3d at 327).  The determination of the objective reasonableness of particular conduct in light of the deliberate indifference standard is a question of law for the court.  *Id.*[36]  The deliberate indifference standard serves only to demonstrate the clearly established law in effect at the time of the incident; under that standard – the minimum standard not to be deliberately indifferent – the actions of the individual defendants are examined to determine whether, as a matter of law, they were objectively unreasonable.  *Id.* (citing *Hare*, 135 F.3d at 328).   In other words, we are to determine whether, in light of the facts as viewed in the light most favorable to the plaintiffs, the conduct of the individual defendants was objectively unreasonable when applied against the deliberate indifference standard.  *Jacobs*, 228 F.3d at 394 (citing *Hare III*, 135 F.3d at 329).

A qualified immunity defense alters the usual summary judgment burden of proof.  *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).  Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law.  *Id.*  A plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in plaintiff's favor.  *Id.*  It is the plaintiff's burden to demonstrate that all reasonable officials similarly situated would have then known that the alleged acts of the defendant violated the Constitution.  *Thompson v. Upshur Cnty.*, 245 F.3d 447, 460 (5th Cir. 2001).  That is distinct from the burden of establishing a genuine issue as to the defendant's deliberately indifferent state of mind.  *Id.*

---

[36] In addition, the Fifth Circuit has held that "[w]hether the evidence is sufficient to demonstrate deliberate indifference for supervisory liability is a legal issue."  *Estate of Davis ex re. McCully v. City of N. Richland Hills*, 406 F.3d 375, 379 (5th Cir. 2005).  In this case, the facts are not generally disputed.  It is only the materiality of the facts that is disputed.  Accordingly, the motions are appropriate for disposition by summary judgment.

## IV. Analysis

Plaintiffs bring claims under the Fifth Amendment for violations of substantive due process.[37]  They allege that they had a right to be free from physical and sexual abuse while at Nixon, and that Defendants were responsible for monitoring, investigating, supervising, controlling, and correcting the treatment of minors at Nixon.  Sixth Am. Compl. ¶ 223.  Plaintiffs allege that Defendants knew of or were deliberately indifferent to the widespread sexual and physical abuse of the minors at Nixon, and failed to take action to protect Plaintiffs.  *Id.* ¶¶ 225-226.  Plaintiffs also allege that Defendants "intentionally refused and failed to properly require and enforce policies and practices to ensure the Plaintiffs' safety from sexual and physical assaults."  *Id.* ¶ 224.

Supervisory officials may not be held liable for the actions of their subordinates under any theory of vicarious liability.  However, a supervisor may be held liable if there exists either (1) his personal involvement in the constitutional deprivation; or (2) he implements a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.  *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 289 (5th Cir. 2002) (citing *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987)); *Toledo v. Bureau of Prisons*, 238 F. App'x 10, at *1 (5th Cir. 2007) (stating same standard for supervisors in *Bivens* action).

Plaintiffs do not point to any express unconstitutional policy implemented by any of the Defendants that directed the abuse in this case.  In other words, there is no claim that any of the alleged abusers in this case were carrying out any express policy implemented or directed by Defendants when they abused Plaintiffs.  Further, there is evidence that Nixon had an express policy

---

[37] A person detained for deportation is equivalent to a pretrial detainee, and a pretrial detainee's constitutional claims are considered under the Due Process Clause. *Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000). It is undisputed that the minor Plaintiffs were in federal custody due to their immigration status.

that staff would "not physically, mentally, sexually and/or emotionally abuse" any facility resident. Pl. Ex. 71 (NIX082-0042). It is also undisputed that Nixon employees were required to comply with state licensing standards, which prohibit physical or sexual abuse.

To the extent that Plaintiffs argue that the Nixon facility was overcrowded due to the increase in the number of residents directed by Defendants, and that this was a policy established by Defendants, there is no evidence that Defendants were responsible for the capacity of Nixon.[38] Nor is there evidence that sexual or physical abuse was a known or obvious consequence of having such a high number of children or that it was the "moving force" behind the assaults. *See Brown v. Harris Cnty., Tex.*, 409 F. App'x 728, 731 (5th Cir. 2010) (there was no evidence that sexual assault is a known or obvious consequence of prison overcrowding). To the extent there is evidence that Defendants were aware that the increase in capacity was affecting quality of care or posing a greater risk to residents, the evidence shows that Defendants took steps to reduce capacity.[39] Defendants recommended a reduction in capacity in November, and this was effected on December 12, when capacity was reduced from 136 to 104 beds. Therefore, to the extent that the increased capacity could be considered a deliberate policy attributable to any of the individual Defendants, Defendants were not deliberately indifferent insofar as steps were taken to reduce the number of beds at Nixon.

---

[38] Plaintiffs do not cite to any evidence that any of the individual Defendants had the authority to determine the number of residents at Nixon. It does not appear that Gonzalez or De La Cruz had authority over the number of beds at Nixon. Although Wolde was involved in determining the budget for increases in capacity, the Court is not aware of any evidence that he was involved in directing or approving capacity increases. Rather, the evidence indicates that persons higher up in ORR made the determination regarding increases in capacity. *See* Dunn depo. at 98.

[39] Defendants may have been aware that TDFPS believed in November 2006 that the previous incidents "and lack of training, staffing and administration coupled with the new numbers of children have had an adverse effect on the quality of care." Pl. Ex. 110. However, this is not an indication that TDFPS believed that abuse was a substantially likely or obvious result of the increase in residents.

48

Plaintiffs also make reference to case law stating that there may be supervisory liability for "systematic maladministration" and that a supervisor's policy may be established by the existence of widespread practice. Docket no. 333 at 12. This refers to such persistent conduct that it has become a traditional way of carrying out business or has become the customary practice of the subordinates. However, there is no evidence that Defendants condoned or approved the type of physical or sexual abuse of the Plaintiffs that occurred here, or that they approved or condoned of *any* type of sexual relationships between staff and residents or physical abuse of residents. As will be discussed below, abuse was not so widespread and open that it had become the traditional or customary way of doing business at Nixon.[40] Thus, Plaintiffs' claim that Defendants promulgated an unconstitutional policy or custom fails.

Plaintiffs do not allege that any of the individual defendants directly abused them or violated their constitutional rights; rather, they allege that Defendants violated their due process rights because they failed to protect them from a known or obvious risk of harm. In addition, Plaintiffs rely upon theories of supervisory liability, including failure to train, failure to supervise, and failure to institute policies. Even when a supervisor is not personally involved in a constitutional violation, a supervisor may be held liable for failure to train or supervise subordinates if: (1) the supervisor failed to train or supervise; (2) a causal link exists between the failure and violation of plaintiff's

---

[40] As will be discussed, much of the improper sexual activity or abuse alleged by Plaintiffs is unconfirmed. In addition, when sexual abuse was confirmed, such as the bathroom incident, it was not tolerated, and M.A. was terminated. Further, there was only one incident of confirmed physical abuse – that by Garcia against J.M.R. in November 2006, and Garcia was terminated as a result. Other incidents of improper restraints were dealt with through disciplinary measures, such as when Mr. Z was first demoted and then later terminated for improper restraint and aggressive behavior, and Velasquez was given a verbal reprimand for his improper restraint in June 2006. Further, allegations of abuse were reported to TDFPS for investigation. Although Plaintiffs testified that sexual and physical abuse was common and witnessed by staff, there is no evidence that they told Defendants other than as described in this Order.

rights; and (3) the failure to train or supervise amounts to deliberate indifference.  Similarly, failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights.  *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011); *Brumfield v. Hollins*, 551 F.3d 322, 328 (5th Cir. 2008).[41]

Both parties agree, and the case law is clear, that the relevant standard of culpability for such supervisory liability is deliberate indifference.[42]  However, the parties disagree on whether it is a subjective or objective deliberate indifference standard.  Defendants argue that it is the subjective deliberate indifference standard set forth in *Farmer v. Brennan* for direct violations of due process.[43]

---

[41] These standards have developed in the context of § 1983 actions.  However, actions under section 1983 and *Bivens* are analogous.  *Izen v. Catalina*, 398 F.3d 363, 367 n.3 (5th Cir. 2005) ("we have held that the constitutional torts authorized by each are coextensive"); *Evans v. Ball*, 168 F.3d 856, 863 n.10 (5th Cir. 1999) ("A *Bivens* action is analogous to an action under § 1983-the only difference being that § 1983 applies to constitutional violations by state, rather than federal, officials."), *overruled on other grounds by Castellano*, 352 F.3d at 948-49 & n.36.

[42]Although Plaintiffs cite *Youngberg v. Romero*, 457 U.S. 307 (1982), in which the Supreme Court held that the Due Process Clause requires state officials to provide for the reasonable safety and care of involuntarily committed mental patients, the Court does not construe Plaintiffs' position as espousing the professional judgment standard of *Youngberg* because Plaintiffs expressly assert that the appropriate standard for their due process claims is deliberate indifference.  Even if Plaintiffs are asserting that the *Youngberg* standard applies, the Court would conclude otherwise, since the boys here, as immigration detainees, are more akin to pretrial detainees than to involuntarily committed mental patients.  The boys were detained due to their immigration status, and most are eventually deported.  *See* Pl. Ex. 7 (AFH0005873).

[43] In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court considered the appropriate definition of deliberate indifference for a claim brought under the Eighth Amendment that prison officials (the warden, a case manager, and the Director of the Bureau of Prisons) had transferred an inmate or placed him in its general population despite knowledge that the prison had a violent history of inmate assaults and despite knowledge that the inmate, a transsexual, would be particularly vulnerable to sexual attack by other inmates.  The Supreme Court held that the appropriate standard of deliberate indifference for violations of the Eighth Amendment was subjective deliberate indifference.  Under the subjective deliberate indifference standard, the plaintiff must show that the defendant acted with subjective deliberate indifference toward the plaintiff.  *Id.* at 837.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  *Id.*  Although we may infer deliberate indifference from the fact that the risk was obvious, the defendant may escape liability by showing that the obviousness escaped him.  *Id.* at 842-43 & n.8.  The Fifth Circuit has adopted the *Farmer* subjective deliberate indifference standard to measure the duty owed to pretrial detainees under the Due Process Clause.  *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 648 (5th Cir. 1996) ("we find that the *Farmer* formulation of the

Plaintiffs argue that it is the objective deliberate indifference standard set forth in *City of Canton v. Harris* for determining whether a municipality may be liable for a subordinate's underlying constitutional violation.[44]  Plaintiffs contend that, under *Canton*, individual supervisory liability may arise where there has been a pattern or practice of the same or similar violations in the past or, in the case of a single violation, where the risk of harm was obvious.  Plaintiffs assert that "[a]ctual notice to a supervisory defendant of the danger at hand is not required in custom, pattern and practice cases" because  the "custom, pattern and practice itself creates the requisite constructive notice and hence establishes the deliberate indifference."  Pl. Am. Resp. at 11-12.

It is clear that the subjective *Farmer* standard is applicable to claims that a defendant, whether an employee or a supervisor, personally and directly violated the plaintiff's Eighth Amendment or Due Process rights or failed to protect a pretrial detainee from private violence when he had a duty to do so.  *Farmer*, 511 U.S. at 841; *Hare*, 74 F.3d at 648 (the *Farmer* formulation of

---

deliberate indifference standard properly captures the essence of the inquiry as to whether a pretrial detainee has been deprived of his due process rights to medical care and protection from violence").

[44] In *City of Canton*, 489 U.S. 383 (1989), the plaintiff brought a claim against the City based on failure to receive medical attention while in police custody, in violation of the Due Process Clause of the Fourteenth Amendment.  The plaintiff's claim was premised on a failure to train.  The Supreme Court held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388.  The Court stated that deliberate indifference, not gross negligence, was the standard. The Court continued, "[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Id.* at 390.  "In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury."  *Id.*  The focus "must be on adequacy of the training program in relation to the tasks the particular officers must perform."  *Id.*  Under *Canton*, "[i]f a [municipality's training] program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action-the 'deliberate indifference'-necessary to trigger municipal liability."  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997).

the deliberate indifference standard applies when a pretrial detainee has been deprived of his due process right to protection from violence); *Hernandez v. Tex. Dept. of Prot. & Reg. Servs.*, 380 F.3d 872 (5th Cir. 2004) (holding that subjective deliberate indifference standard governs failure to protect against due process violations in special relationship case); *Jacobs v. W. Feliciana Sheriff's Dept.*, 228 F.3d 388 (5th Cir. 2000) (standard for failure to protect from suicide in episodic act or omission case is subjective deliberate indifference).[45]

And it is clear that the deliberate indifference standard applicable to municipalities for acts of subordinates in episodic act or omission cases is an objective standard. The Fifth Circuit has

---

[45]Generally, the Due Process Clause confers no affirmative right to government aid or protection from abuse by private third parties. *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 196 (5th Cir. 1989). Plaintiffs argue that a duty on the part of these Defendants to protect Plaintiffs under the Due Process Clause arose out of the special relationship created by the Plaintiffs' involuntary detention. Pl. Am. Resp. (docket no. 333) at 8. Defendants state that it 'is unclear why Plaintiffs raise the issue of a 'special relationship' between UAC and the federal government," but note that, "[r]egardless of the existence of such a relationship, the 'deliberate indifference' standard would apply here." Def. Consol. Reply (docket no. 342) at 12 n.15. However, it is the "special relationship" between the children and the Government/Defendants arising out of the Government's custody and restraints upon the children that gives rise to the duty to protect them. *See Griffith v. Johnston*, 899 F.2d 1427 (5th Cir. 1990) (stating TDHS created a special relationship with the Griffith children when it removed them from their homes and placed them under state supervision, at which time it assumed the responsibility to provide constitutionally adequate care for these children); *Doe v. Taylor Indep. Sch. Dist.*, 975 F.2d 137, 142 n.12 (5th Cir. 1992) (noting that a special relationship also exists in the prison and jail context because prisoners and detainees, as a consequence of the restraints imposed upon them, are rendered incapable of providing for and protecting themselves). The Court agrees that, under either specific "special relationship" jurisprudence or the analysis applicable to failure-to-protect due process claims brought by pretrial detainees or others in government custody, the applicable standard is subjective deliberate indifference. *See McClendon v. City of Columbia*, 305 F.3d 314, 326 & n.8 (5th Cir. 2002) (noting that plaintiffs relying on the special relationship rule are generally required to demonstrate that the defendant at a minimum acted with deliberate indifference toward the plaintiff, and stating that, to act with deliberate indifference, a defendant must know of and disregard an excessive risk to the victim's health or safety, that the defendant's actual knowledge is critical, and a defendant's failure to alleviate a significant risk that he should have perceived but did not does not rise to the level of deliberate indifference); *Mahmoud v. Bowie*, 234 F.3d 29, *1 (5th Cir. 2000) (unpublished) ("If a pretrial detainee bases his claim upon a jail official's "episodic acts or omissions," the standard of subjective deliberate indifference enunciated in *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed.2d 811 (1994), is the measure of culpability. *Hare*, 74 F.3d at 643); *Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000) ("To prove an underlying constitutional violation in an episodic acts case, the detainee must establish that the official acted with subjective deliberate indifference.").

explained this dual standard in the context of municipal liability:

> We separate the two issues: the existence of a constitutional violation simpliciter and a municipality's liability for that violation. Different versions of the deliberate indifference test govern the two inquiries. Our opinion in this case makes clear that to prove an underlying constitutional violation in an individual or episodic acts case, a pre-trial detainee must establish that an official acted with *subjective* deliberate indifference. Once the detainee has met this burden, she has proved a violation of her rights under the Due Process Clause. To succeed in holding a municipality accountable for that due process violation, however, the detainee must show that the municipal employee's act resulted from a municipal policy or custom adopted or maintained with *objective* deliberate indifference to the detainee's constitutional rights. *See Farmer*, 511 U.S. at 825, 114 S. Ct. at 1981 ("It would be hard to describe the *Canton* understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective.").

*Hare v. City of Corinth*, 74 F.3d 633, 649 n.4 (5th Cir. 1996) (emphasis in original); *see also Lawson v. Dallas Cnty.*, 286 F.3d 257, 264 (5th Cir. 2002) ("Unlike the deliberate indifference standard applied to individual employees, this standard [for municipal deliberate indifference] is an objective one; it considers not only what the policymaker actually knew, but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the plaintiff's rights."); *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 526 (5th Cir. 1999) ("In an episodic act or omission case, we employ different standards depending on whether the liability of the individual defendant or the municipal defendant is at issue.").[46]

Which standard applies to claims against a supervisor in his individual capacity for failure

---

[46] In *Farmer v. Brennan*, the Supreme Court recognized that *Canton* employs an objective deliberate indifference standard. *Farmer*, 511 U.S. at 841. It held that *Canton*'s objective deliberate indifference standard is not the appropriate test for measuring liability under the Eighth Amendment, but was "for the quite different purpose of identifying the threshold for holding a city responsible for the constitutional torts committed by its inadequately trained agents." *Id.* The Fifth Circuit has further explained that "the standard of liability in a case against the actual perpetrator of a constitutional violation derives from the particular constitutional provision at issue," whereas the standard of liability for supervisory liability derives from the language of § 1983, which provides a remedy against anyone who, under color of state law, "causes" another to be subjected to a violation of his or her constitutional rights. *Doe*, 15 F.3d at 454 n.8.

to train or supervise is less clear.[47]  In *Doe v. Taylor Independent School District*, 15 F.3d 443, 453 (5th Cir. 1994), the Fifth Circuit held that the same standard for assessing municipal liability for failure to train or supervise (the *Canton* standard) applies to individual supervisory liability for failure to supervise.  *See id.* ("The Court's reasoning in assessing a municipality's liability [in *Canton*] leads us to use the same standard in assessing an individual supervisor's liability under § 1983.").[48]  Since both the Supreme Court and the Fifth Circuit recognize that the *Canton* standard is an objective standard, it would appear that the Fifth Circuit would apply the objective deliberate indifference standard to claims against individual supervisors for failure to train or supervise.[49]  However, it is possible that, in adopting the *Canton* standard, the Fifth Circuit intended only to adopt a "deliberate indifference" standard – as opposed to a gross negligence or lesser standard of culpability that had been included in prior case law – for supervisory liability claims, without incorporating the objective aspects of the test.[50]

---

[47] Defendants contend that this Court's prior order on the motion to dismiss held that a subjective deliberate indifference standard applies.  However, that order considered the failure-to-protect claim against Defendants, which is based directly on a violation of the Due Process Clause, not a claim that a failure to supervise or train caused another's violation of the Due Process Clause.

[48] *See also Lewis v. Pugh*, 289 F. App'x 767, 771 (5th Cir. 2008) ("The same standards of fault and causation apply to an individual supervisor's liability and the liability of a municipality for failure to supervise."); *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 426 (5th Cir. 2006) ("We have held that we 'use the same standard in assessing an individual supervisor's liability under § 1983' as that used 'in assessing a municipality's liability' thereunder."); *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005) ("The standard applicable to failure to train allegations against supervisors is based on that for municipal liability."); *Breaux v. City of Garland*, 205 F.3d 150, 161 (5th Cir. 2000) ("In 'assessing an individual supervisor's liability under § 1983,' this circuit applies the *City of Canton* standard of municipal liability.")

[49] *See, e.g.*, *Scott v. Moore*, 114 F.3d 51, 54 (5th Cir. 1997) (*en banc*) (emphasizing that the standard applicable to the underlying constitutional violation is subjective deliberate indifference and the *Canton* standard for whether a city may be held accountable for that violation is objective).

[50] In *Doe*, the Fifth Circuit recognized that prior cases had utilized a deliberate indifference or gross negligence standard, and that its holding in *Doe* was narrowing the standard to deliberate indifference.  A couple of later cases cite *Doe* as adopting the *Canton* deliberate indifference standard to eliminate gross

Fifth Circuit cases since *Doe* do not clearly and consistently apply a subjective or objective standard to supervisory failure to train or supervise claims. Some cases apply a seemingly subjective standard. *E.g.*, *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001) (referring to the deliberate indifference standard for supervisory liability for failure to train or supervise as "the subjective deliberate indifference standard"); *Southard v. Tex. Bd. of Crim. Justice*, 114 F.3d 539 (5th Cir. 1997) (although citing both subjective and objective standard language for failure to supervise claim, granting qualified immunity because the evidence did not raise a fact issue that the supervisor "subjectively knew" subordinate was sexually harassing employees).[51] And, as pointed out by Defendants, numerous Fifth Circuit cases purport to apply *Farmer* or both *Farmer* and *Canton* to claims against individual supervisors for failure to train or supervise.[52] Some of these

---

negligence from the supervisory liability standard. *See Davis v. City of N. Richland Hills*, 406 F.3d 375, 381 n.25 (5th Cir. 2005); *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001).

[51] In *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 254 (5th Cir. 2005), the Fifth Circuit considered "whether the allegations of the complaints support supervisory liability on the part of Norris and Perry when their subordinate, Nurse Jackson, violated the patients' constitutional rights." It held that supervisors may be liable when they act, or fail to act, with deliberate indifference to violations of others' constitutional rights committed by their subordinates, citing *Canton*. It then stated that "[t]he test for deliberate indifference is subjective, rather than objective, in nature because 'an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.'" *Id.* at 255. Although it was clearly considering supervisory liability for a subordinate's violation of constitutional rights, *Atteberry* did not involve a failure to train or supervise claim. Rather, the claim was a direct failure-to-protect from harm claim, which would involve the substantive deliberate indifference standard applicable to direct violations of the Constitution. In fact, the cases *Atteberry* cites for the subjective deliberate indifference standard are those sorts of claims – *Farmer* and *Hernandez* – and a case involving direct violations of the Constitution by the defendant, *Palmer v. Johnson*, 193 F.3d 346 (5th Cir. 1999).

[52] In *Smith v. Brenoettsy*, 158 F.3d 908, 911-12 (5th Cir. 1998), after stating the general standard for failure to train or supervise, the Court states, "For an official to act with deliberate indifference, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L. Ed.2d 811 (1994)." Thus, *Smith* applies the *Farmer* subjective deliberate indifference standard.

Further, in *Lewis v. Pugh*, which expressly states that individual supervisor and municipal liability standards are the same, the Court also states that "[f]or an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious

cases state that the defendant must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference (a subjective standard); yet they also state the defendant may be found deliberately indifferent if the risk of harm was obvious (an objective standard), without discussing whether the defendant may show that the obviousness escaped him (a subjective standard). *E.g.*, *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381-82 (5th Cir. 2005).

On the other hand, Plaintiffs cite *Porter v. Epps*, 659 F.3d 440 (5th Cir. 2011), in which the Court unambiguously applied an objective standard to a failure-to-train claim against an individual supervisor. The Court held that "[t]o establish that a state actor disregarded a known or obvious consequence of his actions, there must be 'actual or constructive notice' 'that a particular omission in their training program causes . . . employees to violate citizens' constitutional rights' and the actor nevertheless 'choose[s] to retain that program." *Id.* at 447.

In addition, although Defendants argue for a subjective standard, they also assert that the applicable standard is set forth by the Fifth Circuit in *Doe v. Taylor Independent School District*, 15 F.3d 443, 454-55 (5th Cir. 1994). *Doe* is the case in which the Fifth Circuit first stated that it would apply the *Canton* standard to claims against individual supervisors, and it adopts an arguably objective deliberate indifference standard, though it does not expressly consider whether the

---

harm exists, and he must also draw the inference." *Lewis*, 289 F. App'x at 772. As noted, this is a subjective standard. *Lewis* cites *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375 (5th Cir. 2005) for this proposition, which in turn cites *Smith v. Brenoettsey*, which, as noted, cites *Farmer*. *Estate of Davis* contains the cited subjective deliberate indifference standard, but in the same paragraph cites *Canton* for the applicable standard. Similarly, in *Brown v. Callahan*, 623 F.3d 249, 255 (5th Cir. 2010), the Court defines deliberate indifference by citing both objective standard language from *Board of County Commissioners v. Brown* and *City of Canton*, and also the subjective standard ("having actually drawn that inference") and citing *Smith v. Brenoettsey*. Thus, these cases suggest a subjective deliberate indifference standard should be applied to supervisory liability claims, or are at least ambiguous.

standard is subjective or objective.

In *Doe*, a high school student sued the principal and superintendent after she was sexually molested by her teacher.  The Court held that a supervisory school official can be held personally liable for a subordinate's violation of an elementary or secondary school student's constitutional right to bodily integrity in physical sexual abuse cases if the plaintiff establishes that: (1) the defendant learned of facts or a pattern of inappropriate sexual behavior by a subordinate pointing plainly toward the conclusion that the subordinate was sexually abusing the student; and (2) the defendant demonstrated deliberate indifference toward the constitutional rights of the student by failing to take action that was obviously necessary to prevent or stop the abuse; and (3) such failure caused a constitutional injury to the student.

Thus, there is some ambiguity concerning the relevant deliberate indifference standard for individual supervisory failure to train or supervise claims.  However, the difference between the objective and subjective standards is not so great that it affects the outcome of the Court's analysis in this case.[53]  Thus, *presuming* that the Nixon employees who physically and sexually abused Plaintiffs were acting under color of federal law and *presuming* they were directly supervised by Defendants sufficient to impose supervisory liability, the Court will utilize the analysis set forth in

---

[53] The Fifth Circuit has explained the difference between the objective and subjective deliberate indifference standards as follows: the objective standard is failing to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known, whereas subjective recklessness is disregarding a risk of harm that is actually known.  *Rosa H.*, 106 F.3d at 658; *see also Farmer*, 511 U.S. at 836.  Therefore, under the subjective standard, although we may infer that a defendant knew of a substantial risk from the very fact that it was obvious, the defendant may nevertheless escape liability by showing that the obviousness escaped him.  *Farmer*, 511 U.S. at 842-43 & n.8 (but noting that he "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist").

the various Fifth Circuit precedents concerning supervisory liability.[54]

Those precedents make clear that deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Even under the objective standard, liability requires more than unintentional negligent oversight or even gross negligence; there must be a deliberate choice. *Canton*, 489 U.S. at 388 & n.7; *Brown v. Callahan*, 623 F.3d 249, 255 (5th Cir. 2010) ("Deliberate indifference is more than mere negligence or even gross negligence."). In this context, a showing of deliberate indifference generally requires a showing of more than a single instance of the lack of training or supervision causing a violation of constitutional rights. *Brumfield v. Hollins*, 551 F.3d 322, 329 (5th Cir. 2008). A plaintiff must

_____

[54] This case is further complicated by the fact that the individuals alleged to have abused Plaintiffs are not government employees and are not direct subordinates of Defendants. The *Canton* and *Doe* cases involved a supervisor's liability for his subordinate's constitutional violations when the subordinate was a government employee. Though Defendants had a supervisory role over the Nixon facility and its personnel pursuant to statute (6 U.S.C. § 279 states that ORR shall oversee the infrastructure and personnel of facilities in which unaccompanied alien children reside) and the cooperative agreement, the Nixon personnel were not truly their subordinates in the same sense as in *Canton* and *Doe* and were not government employees. Wolde testified that he did not have authority to hire, fire, or discipline Nixon staff, although the Cooperative Agreement required Nixon to obtain his concurrence for hiring and replacement of certain key positions such as CEO, Facility Administrator, Clinician, and Lead Case Manager. Wolde Aff. ¶¶ 9-12. Gonzalez and De La Cruz also stated that they did not have authority to hire, fire, or discipline Nixon staff, or set conditions of their employment. Gonzalez Aff. ¶ 13-16; De La Cruz Aff. ¶ 11-16.

If the alleged abusers in this case are solely Nixon facility employees, not government employees, their abuse of Plaintiffs was not in itself a constitutional violation. *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1416 (5th Cir. 1997) (noting that public school janitor did not act under color of state law in raping student). In that case, we must "locate the primary constitutional wrong" in Gonzalez, De La Cruz, Wolde, or another federal employee as opposed to the Nixon facility employees. *Id.* Thus, even Plaintiffs' failure to supervise/train claims would have to be measured under the subjective deliberate indifference standard applicable to direct violations of the Due Process Clause/failure-to-protect claims because there can be no supervisory liability without an underlying constitutional violation by a government actor.

Plaintiffs, however, argue that the Nixon employees are the equivalent of federal employees, and asserted *Bivens* claims against Leal, Monreal, and Velasquez (those claims have been voluntarily dismissed). Although Leal argued that she was not a government actor for purposes of *Bivens* (docket no. 268), the Court never reached that issue, and none of the remaining parties' briefing addresses the issue of whether these individuals can be considered federal actors for purposes of the *Bivens* deliberate indifference claims. For purposes of this Order, the Court will assume that the Nixon employees who allegedly violated Plaintiffs' constitutional rights were government employee-type subordinates of Defendants for purposes of supervisory liability.

demonstrate at least a pattern of similar violations arising from training or supervising that is so clearly inadequate as to be obviously likely to result in a constitutional violation. *Id.* A limited exception for single-incident liability exists only "where the facts giving rise to the violation are such that it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy or failure to train." *Id.* Courts must be hesitant to permit this exception to swallow the rule that forbids respondeat superior liability. *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005).

To establish supervisory liability, Plaintiffs must therefore establish that Defendants actually knew of a substantial risk of serious harm or that the facts known to them demonstrated that the risk of abuse was obvious. *Hernandez*, 380 F.3d at 881. Defendants need not anticipate the exact source of harm (the particular person that will inflict the harm) or the exact method of harm (*i.e.*, how the abuse will be carried out). *Id.* at 881, 882. Deliberate indifference may be shown if the defendant exhibited a conscious disregard for prior known severe abuses. *Id.*

## A. Failure to Protect

Plaintiffs rely on the known past instances of alleged and confirmed physical and sexual abuse (a pattern of abuse) and on the warnings given by Chester, Buck, and Olivares to demonstrate that Defendants must have known of a substantial risk of abuse.[55] Alternatively, they contend, the risk of abuse was obvious based on these same factors, as well as the numerous runaways and attempted suicides.

---

[55] There is no evidence that any Plaintiff or other resident who was abused ever reported that abuse to Gonzalez, De La Cruz, or Wolde before February 10, 2007. Nor did any resident report physical or sexual abuse of others to these Defendants until E.H.C. reported that Leal was sexually abusing residents. Nor did any Nixon staff report a risk of future sexual or physical abuse. Nor is there any evidence that these Defendants observed any physical or sexual abuse.

1. Pattern of Abuse

The parties dispute which of the many incidents of alleged abuse may be considered part of the pattern of abuse relevant to determining deliberate indifference. Plaintiffs allege numerous instances of alleged physical and sexual abuse over a period of years, as described in the chronology. Essentially, Plaintiffs' theory is that abuse of all types was open and rampant at Nixon, making the future risk of any type of abuse known or obvious.

Most cases of supervisory liability, such as in *Doe*, consider whether the supervisor knew that the particular violator of constitutional rights was actually abusing or likely to abuse the plaintiff. In this case, Plaintiffs allege no reason for Defendants to believe that Leal as an individual posed a risk to the Nixon residents. With regard to Garcia and Velasquez, Plaintiffs do make some specific allegations about those individuals that are relevant to whether they posed a risk of abusing residents. However, Plaintiffs do not necessarily rely on prior incidents or specific characteristics of these particular individuals to argue that Defendants knew or should have known that these particular individuals posed a risk. Rather, as noted, their theory is that, given the numerous and widespread abuses of all types (actual and alleged), Defendants should have and in fact must have been aware of the risk of future abuse of residents by any Nixon staff.

In that regard, *Alton v. Hopgood*, 994 F. Supp. 827 (S.D. Tex. 1998), *aff'd*, 168 F.3d 196 (5th Cir. 1999), is analogous. The plaintiff in *Alton* was allegedly hazed by the Corps at Texas A&M, and he relied on twenty-eight alleged incidents of hazing over a two-year period to establish that the defendants must have known of the risk that he would be hazed. The district court noted that, because some of the evidence was referring to the same incidents, there really were only twenty-four incidents, and not all appeared to be hazing as defined by Texas law. *Id.* at 836. Even if they were

60

hazing, the district court concluded, it appeared that few actually rose to the level of a constitutional

violation.  *Id.*  And, no misconduct was reported to the defendants that approached the severity of

that alleged in the current litigation.  *Id.*  The district court found that the defendant school officials

were entitled to qualified immunity.[56]

Similarly, in this case, most of the incidents that Plaintiffs rely on do not clearly rise to the

level of constitutional violations.  *See Estate of Davis*, 406 F.3d at 383 (deliberate indifference

usually requires a plaintiff to demonstrate a pattern of violations or a pattern of incidents in which

the citizens were injured).  Plaintiffs assert that emotional abuse was common, but the only incidents

they point to specifically (and that were clearly known to Defendants) are the types of behaviors

criticized by Chester (lining up, group punishment, no talking at meals, yelling).  Plaintiffs have not

demonstrated that any of these behaviors amounted to constitutional violations.

Plaintiffs also allege that physical abuse was widespread.  Hillary Chester, although critical

of Nixon's practices, agreed that physical abuse was not rampant, open, or obvious.  Even if it was

as common as alleged, only a few allegations of physical abuse were known to Defendants.  *See*

*Pineda*, 291 F.3d at 330 n.13 (distinguishing between existence of a pattern of misconduct and

knowledge of that misconduct).  In addition, Plaintiffs point to incidents of improper restraints, but

it is not clear that these (other than the November 5 incident) amounted to any constitutional

violation, insofar as an improper restraint could be found when the employee restrained a resident

face-down, or in a nonemergency situation, without actual injury to the resident.  Because an

improper restraint does not necessarily amount to a due process violation, even numerous improper

---

[56] The Fifth Circuit affirmed.  It stated that, while the evidence supported an inference that the officials knew of hazing within the Corps, there was no evidence that the officials acted with deliberate indifference in preventing abuse because they had acted to prevent hazing and to punish hazing activities when they were made aware of it.  *Alton*, 168 F.3d at 200.

restraints would not necessarily establish a pattern of prior constitutional violations or injuries. *Cf. Pineda*, 291 F.3d at 329 (eleven incidents offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the nations's largest cities and police forces). Thus, although there had been at least three instances of improper restraints (December 2004 Mr. Z; June 2006 Velasquez; September 2006 Monreal) before the November 2006 physical abuse incident, and even if each Defendant was aware of all of these instances (which has not been shown), Plaintiffs have not shown that these improper restraints established a pattern of intentional physical abuse or due process violations. *See Connick v. Thompson*, 131 S. Ct. 1350 (2011) (four prior *Brady* violations did not establish a pattern because they did not involve failure to disclose blood evidence, a crime lab report, or physical or scientific knowledge of any kind; they were not similar and could not put defendant on notice that specific training was necessary to avoid this constitutional violation).

Further, the prior incidents of alleged physical abuse were investigated by TDFPS and did not result in abuse findings. In *Hernandez*, the Fifth Circuit recognized that it was undisputed that defendants knew of allegations of abuse in the foster home prior to placing a child there, but held that the plaintiffs had to demonstrate a disputed fact issue on whether the defendant knew or suspected the foster parent to be a child abuser. *Hernandez*, 380 F.3d at 883. There had been two prior allegations of abuse, but they had been investigated and abuse had been ruled out. The social worker who conducted the investigations and found no abuse was held not to be deliberately indifferent, even if she could have done a more thorough investigation (because that was mere negligence). *Id.* at 883-84. In addition, in *Southard v. Texas Board of Criminal Justice*, 114 F.3d 539 (5th Cir. 1997), the Fifth Circuit held that where a supervisor knew of similar complaints of

sexual harassment but relied upon adequate, independent investigations by the EEO office that ruled out sexual harassment, the evidence failed to raise a fact issue on subjective deliberate indifference. Because the prior incidents of alleged physical abuse at Nixon were investigated by TDFPS and abuse was ruled out, the Court finds that they do not establish a pattern of abuse or due process violations sufficient to impute actual or constructive knowledge of the risk of future physical abuse. Accordingly, the November 5 incident complained of by J.M.R. was the first incident of a due process violation arising from physical abuse of which Defendants would have been aware.[57]

With regard to Garcia, Velasquez, Vasquez, or other unidentified individuals who abused or allegedly physically abused residents, the evidence does not show that Defendants were put on notice of a risk that Garcia, Velasquez, Vasquez or any other Nixon employee specifically would intentionally and without provocation physically abuse J.M.R., O.E.F., W.O.G., or any other resident.  There was no prior behavior by Garcia that would indicate a propensity for a due process violation.[58]  In addition, the circumstances on the night of November 2006 were unique, given that

---

[57] The Court concludes that the single-incident exception would not apply.  As will be discussed, there was no failure of training or other indication that the risk of abuse was obvious.  *See Estate of Davis*, 406 F.3d at 383 n.34.

[58] Plaintiffs point out that Garcia had a known drinking problem, had a background in juvenile justice, and that his ex-girlfriend had obtained a TRO against him in 2001.  However, it is not known whether Defendants knew this information or whether Defendants were involved in the hiring decision.  Garcia was not one of the key personnel that required Wolde's approval.  In addition, although these issues would raise concerns, they would not be sufficient to establish a substantial risk that Garcia would abuse a resident. "Prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question."  *Davis*, 406 F.3d 375.

Further, the Supreme Court has established a very high standard of liability for hiring decisions.  In *Board of County Commissioners v. Brown*, 520 U.S. 397 (1997), the Court held that "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequences of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'"  Although these facts indicate a reason for concern, they do not point to the plainly obvious conclusion that Garcia would physically abuse a resident.  Although Garcia had a juvenile justice background, Plaintiffs cite no evidence that he previously abused a resident in that capacity

Garcia had been called in from being off-duty and had been drinking.  As to Velasquez, the fact that he had been cited for improper restraint once or twice[59] before he allegedly beat O.E.F. would not suffice to put Defendants on notice that he would pull O.E.F. out of a line and beat him across the torso with the heel of his hand, as alleged.  Similarly, Plaintiffs cite to no evidence indicating that Vasquez posed a risk of future due process violations.

With regard to the sexual abuse by Leal, the evidence again fails to establish that Defendants were aware of a substantial risk of sexual abuse.  At the time of the abuse by Leal, Defendants were aware of only two prior incidents of alleged or confirmed sexual abuse – the confirmed April/May 2006 bathroom incident and the recanted allegation in August 2006.  When they received the TDFPS investigation packet in September 2006, it did contain information that two residents had kissed M.M. goodbye in 2004.  Wolde Aff. ¶ 19.  However, this was not a clear indication of possible sexual abuse, and the TDFPS investigation did not find any abuse in relation to that incident.  Defendants were not aware of the more serious concerns surrounding M.M. (that she had allegedly gotten pregnant through an inappropriate sexual relationship with a resident) or any allegations concerning Monreal, Mr. Z, or Amaya until after the abuse by Leal was discovered.  With regard to the bathroom incident, because M.A. had been fired, there was no risk of further abuse by M.A.  Further, Defendants could have reasonably believed that, because the boy had recanted, the August

---

(nor do they point to any of the other Nixon employees who had juvenile justice backgrounds physically abusing residents).  The fact that an employee at a residential shelter had a background in juvenile justice is not sufficient to indicate that the employee was highly likely to abuse a resident.  Further, the record contains an undated risk evaluation stating that, despite Garcia's history of DWI, he did not pose a risk to children.

[59] Velasquez was cited for improper restraint in June and November 2006.  It is unclear whether the alleged abuse of O.E.F. occurred before or after November 2006.  *See Connick v. Thompson*, 131 S. Ct. 1350, 1360 n.7 (2011) (contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide "notice to the cit[y] and the opportunity to conform to constitutional dictates").

2006 allegation was not credible and did not indicate a substantial risk.[60]  These incidents are not

a sufficient pattern of similar violations that would put Defendants on notice of a future risk of

sexual abuse or make the risk of abuse obvious.

Even considering allegations of physical and sexual abuse as combined due process

violations, at the time of the physical abuse of J.M.R. by Garcia, Defendants were only aware of one

confirmed case of sexual abuse (the April/May 2006 bathroom incident).   This incident is

sufficiently dissimilar that it would not have put Defendants on notice of a risk of intentional

physical abuse of the type that occurred on November 5.

Because it is unclear when in the time period between September 2006 and February 2007

O.E.F. and W.O.G. were allegedly physically abused, at that time Defendants may have been aware

of either (1) only one confirmed case of sexual abuse (the bathroom incident), or (2) one confirmed

case of sexual abuse (the bathroom incident) and one confirmed case of physical abuse (the

November 5, 2006 incident).  These instances do not establish a pattern of abuse sufficient to

provide notice or render the risk of physical abuse obvious.

At the time of the sexual abuse by Leal (from December 2006 or January 2007 through

February 10, 2007), Defendants were aware of one confirmed case of sexual abuse (the bathroom

incident) and one confirmed case of physical abuse (the November 5, 2006 incident).   The

perpetrators of these abuses had been suspended or terminated and thus no longer posed a risk.

---

[60] As will be discussed below, although Defendants did not take any specific steps with regard to
those specific instances of abuse or alleged abuse, they did take steps to address abuse.  They spoke with
Nixon's director to emphasize that it was important for Nixon to report all incidents of abuse so that ORR
could take appropriate steps.  They also obtained all the investigative records from TDFPS, made sure there
were no other outstanding investigations or issues, and worked to ensure adequate communication with
TDFPS in the future.  They also suggested Nixon bring in an outside trainer to train all staff on sexual abuse,
and told Nixon to ensure adequate supervision and that staff not be left alone with residents.

Again, these instances do not establish a pattern of abuse sufficient to provide notice or render the risk of future sexual abuse obvious.

### 2. Express Warnings

Plaintiffs rely on alleged express warnings from Hillary Chester, the Field Coordinator, Corey Buck, the TDFPS licensing investigator, and Rosa Olivares, the Nixon social worker who resigned, to establish actual knowledge of a risk of abuse.

Hillary Chester warned Defendants that they needed to make Nixon adopt a behavior management program because she believed that Nixon was not utilizing appropriate behavior management techniques and was permitting staff to handle the children in a physical manner and instituting a bootcamp type atmosphere.   After an incident in the Summer of 2005, Chester expressed concerns to Wolde about Garza being too strict and not having a child welfare background.  She testified that Garza yelled at the children.  She stated that, after a while, he was no longer the disciplinarian.  However, around that time, Chester started telling ORR that Nixon needed a behavior management system.

She stated that, in 2006, Garza had more contact with the kids again, though it was more "indirect" and he implemented policies that she believed were against child welfare practices, including no speaking at meals, lining up to be counted, and collective punishment.  She stated that this made Nixon "unpleasant," but ORR officials to whom she reported her concerns said it did not sound like abuse.  She also told Dunn and possibly others that "the staff put their hands on the kids too often."   Chester admitted that there "wasn't overt physical abuse, certainly, but it had just created an atmosphere which was not the least restrictive, which is in the *Flores* Agreement, and it doesn't really follow child welfare standards for, essentially a shelter setting."   Chester said that

Wolde's response was that Nixon "had the highest reunification rate, the fastest reunification rate, the lowest length of stay, and that that's what mattered."  Chester said that De La Cruz's response was, "we have to be political, we have to be diplomatic, we have to recognize that they are doing a lot of things really well."  She also testified that the kids had fewer outings and were more regulated, and that Garza threatened the staff, which created "a really ugly atmosphere where the staff were really worried that if the kids misbehaved, they would lose their job as an individual." She testified that it was "dreary and tense" in the Summer of 2006.

Chester further stated that under child welfare standards, the preferred practice is not to put your hands on children or physically direct or restrain them unless you are following a managed system or protocol.  Under "patented systems of behavior management" the standard practice would be to verbally de-escalate and exhaust other options before physically restraining or directing children.  One such system she named was Handle with Care.[61]  Chester depo. at 117.  Susana Ortiz-Ang and Maureen Dunn of DUCS responded that it did not sound like abuse, and Dunn wanted each shelter to adopt its own behavior management system.  Chester also stated that she sent Wolde an email in November or December 2006 because she was frustrated, and it "was incredibly detailed, listing every sort of thing that I thought was problematic about the shelter and . . . listed the practices and the policies that I was seeing that I thought were not in the children's interest and were not in keeping with the standard child welfare practices."

When asked if she ever raised concerns that physical abuse was going on and that the

---

[61] As will be discussed, there is some evidence in the record that Nixon was utilizing the Handle With Care program.  Pl. Ex. 83 (AFH0004265) (memo from Garza, Director of Operations, to Direct Care Staff Ruben Velasquez stating that he was taught the Handle with Care program in training classes, as well as how to de-escalate a situation and the Primary Restraint Technique); Def. Ex. 3 (P00322) ("Efraen Garcia stated that he is the instructor trained in "Handle with Care" a type of restraint which they are currently using at the facility.").

children were faced with an obvious risk of serious bodily harm, she stated, "I think that what I was conveying was the level of antagonism between the staff and the minors, and I was trying to describe the normalization of them grabbing kids by their arms and turning them around so that they would be facing a wall and the collective punishment and the blame that the staff felt if the kids misbehaved, they would get in trouble and the atmosphere that was created and saying this is dangerous, this is risky, this is how things can go very wrong, and I think that I was describing the risks." Certainly this is not a direct warning of possible sexual abuse. To the extent that it may have been a warning of possible physical abuse, it is still insufficient to establish that Defendants were actually aware of a significant risk of physical abuse. Chester's warnings that practices at Nixon were not in keeping with standard child welfare practices or were not in the child's best interests were not warnings that the children were likely to be physically abused. Chester testified that at least some higher officials at ORR did not believe that these practices sounded like abuse, and Chester agreed that it was not abuse. She also agreed that abuse was not open and obvious.

Rosa Olivares, the social worker who quit after only a month in late December 2006 or early January 2007 also did not concretely warn of a substantial risk of abuse. She stated that the facility was dysfunctional, unorganized, highly unethical, and hostile to employees and residents. She did state she believed that "the lack of structure, consistency, and empirical based practices constitute a risk to the well being of the residents and opens a window of liability issues for the administration." Pl. Ex. 118. However, her more specific statements were that direct care staff were not professional and "most employees do not seem to have any awareness of best practices when it comes to children." She stated that the administration had "a huge problem with highly unethical dual relationships" and she was not interested in getting involved in "dual relationships" or

"triangulations." *Id.* Assertions that staff conduct might violate child welfare best practices does not equate to an assertion that staff would intentionally physically or sexually abuse children. Thus, these warnings did not clearly and obviously point to a substantial risk of intentional physical or sexual abuse. De La Cruz even wrote that, without knowing specific details, "we do not know if there really are strong dysfunctional tendencies in the shelter, she is just over whelmed, not diversly [*sic*] experienced, or just disgruntled." Pl. Ex. 119.

Plaintiffs point to a licensing investigative report from July 2006, which states that "there appears to be an atmosphere of cover up and permissiveness. Residents are at risk of harm." However, as noted in the chronology, this does not appear to be a conclusion reached by the investigator, but rather a summary description of the allegations being made upon intake. As noted, abuse was ruled out except for the bathroom incident, and the investigation was converted from a plan 1 to plan 2, meaning no immediate risk of harm.

Plaintiffs also provide the affidavit of Buck, who states that, in his opinion, Nixon had become an unsafe operation. However, Buck does not specify at what time he came to this conclusion or whether he relayed this specific opinion to any of the Defendants. There is evidence that, after the sexual abuse allegations were known, some individuals at licensing stated that they would close Nixon down. It is not known whether this refers to Buck, and it is not known whether Buck reached the conclusion that Nixon was "unsafe" before or after February 2007. Presumably, however, if the CPS licensing investigator believed Nixon to be unsafe in the sense that there was a significant risk of abuse, steps would have been taken to prevent that abuse. There is no indication that CPS took any steps other than increasing Nixon's monitoring plan from Level 2 to Level 1 on November 22, 2006 due to the "increase of investigations and deficiencies." However, there is no

evidence regarding what level of risk triggers a Level 2 monitoring plan, nor is there evidence that anyone at TDFPS believed there to be a substantial risk of abuse or that such a belief was conveyed to Defendants before February 2007.  Therefore, the evidence does not support Plaintiffs' assertion that Defendants were warned of a substantial risk of physical or sexual abuse by either Chester, Olivares, or Buck.

### 3. Suicides/Runaways/Acting Out

Plaintiffs also argue that the suicide attempts, runaways, and other behavior of the residents should have made Defendants aware of a problem at Nixon.

The evidence shows that Nixon had problems with runaways even in 2004, before Plaintiffs' alleged abuse.  Although Wolde testified that runaways are a serious cause for concern, Gonzalez testified that runaways were to be expected, given that these minors had not come to the United States to be placed in shelter care.  Although Wolde wondered why there had been an increase in runaway attempts, he did not conclude that the increase must be due to abuse, nor did the increase in runaways plainly point to abuse.  Further, in response to his questioning, Chester shared her concerns, but as noted those concerns did not point plainly to abuse. Defendants may have been told and may have also agreed that Nixon was operating under a "bootcamp" atmosphere, but a bootcamp atmosphere does not point plainly to a risk of abuse.  Gonzalez wrote to Wolde that he believed the cause of the runaways was "a lack of communication and a low staff to UAC ratio and the children did not have a structured program to be a part of."  There is no evidence that Defendants actually believed the number of runaways to be a sign of abuse or that they pointed plainly to abuse.

Plaintiffs also point to the various suicide attempts that occurred at Nixon as signs of abuse. However, it is undisputed that many of these children suffered abuse or other traumatic experiences

in their homelands, and many witnessed and experienced traumatic events on their journeys to the United States.  *See* Pl. Ex. 22 (Chester depo.) at 33 ("Kids who were trying to pursue some kind of immigration relief could get really stressed and anxious, kids who didn't have family reunification options at all, and then just so many of these kids had come from either bad situations or had really bad experiences along the way, that they were sort of suffering from that trauma.").  Thus, it would not have been obvious that the children were depressed or exhibiting other signs of trauma because of abuse at Nixon.

Plaintiffs point specifically to E.H.C.'s behavior, including his suicide attempts, as being a warning sign of abuse.  However, E.H.C. was placed at Nixon on January 2, 2007 (*see* ORR027745), and his first alleged suicide attempt was January 5, 2007, when he placed a plastic bag over his head.  Pl. Ex. 26.  Therefore, it would not have been obvious that E.H.C.'s behavior was due to conditions at Nixon as opposed to his previous experiences.  In addition, there was no sudden change in E.H.C.'s behavior that might have indicated a problem.  The clinician's notes from counseling show that he was irritable, withdrawn, hostile, agitated, or angry on January 18, January 29, January 30, and February 2.  The second suicide attempt occurred on February 19, after E.H.C. had already reported the abuse and Leal had been suspended.

### 4. Deliberate Indifference to Risk

Even if Defendants were subjectively or objectively aware of a substantial risk of harm or abuse, the evidence shows that they were not deliberately indifferent to such a risk.  Instead, as laid out above in the chronology, they responded reasonably to all allegations of abuse and their actions demonstrate concern for the well being of the residents.  A good-faith, albeit ineffective, response is generally not sufficient to show deliberate indifference.  *Atteberry*, 430 F.3d at 255.

71

In *Doe v. Dallas Independent School District*, 153 F.3d 211, 219 (5th Cir. 1998), the principal was on notice of an allegation of sexual abuse by a specific teacher.  She met with the teacher and the student and determined that the allegations were not true.  Nevertheless, she warned the teacher to examine his behavior closely and to ensure that he was not doing anything that could be misinterpreted by a child.  The Fifth Circuit held that the fact that the principal misread the situation and made a tragic error in judgment did not create a genuine issue of material fact as to whether she acted with deliberate indifference toward the student's constitutional rights.

Similarly, in *Gonzalez v. Ysleta Independent School Dist.*, 996 F.2d 745 (5th Cir. 1993), the school board of trustees had elected to keep a teacher in the classroom in the face of similar allegations of sexual abuse two years earlier, and that teacher then molested the plaintiff.  Upon learning of the suspected sexual abuse allegation, the Board asked the superintendent and his deputy personally to investigate the incident and prepare a recommendation.  The report found that the evidence was not strong enough to justify termination proceedings, and recommended that the teacher be issued an official reprimand and transfer out of the school.  The Court held that the "Board's adoption of these precautions reflect not indifference or apathy, but concern." *Id.* at 762. In addition, the Court stated that the inadequacy of these measures was not "obvious" at the time of the decision because the prior two accusations, "while certainly a cause for concern, did not compare in gravity" to the later conduct "and thus "provided no grounds for suspecting that he might be capable of such a vile act." *Id.*

Plaintiffs emphasize that Defendants did not "systematically interview the detained minors themselves, even as warning signs and incidents rose to frightening levels" and that Defendants failed to thoroughly screen the minors.  However, Defendants's conduct was objectively reasonable.

The deliberate indifference standard and the case law construing it did not impose a duty on Defendants to interview Nixon residents.  Plaintiffs argue that the superintendent in *Doe v. Taylor ISD* was found not to be deliberately indifferent because he spoke to Doe to determine whether she was being sexually abused by her teacher.  However, *Doe* does not hold that a defendant must have spoken to a suspected victim in order to be held not deliberately indifferent.  Moreover, Defendants have explained why they did not speak to the actual victims of abuse in this case – either the victim was no longer at the facility (and thus there was no risk of abuse) or they did not want to interfere with an ongoing investigation.

In addition, there is evidence that Defendants did speak to some of the residents during monitoring visits and during their regular visits to Nixon, and that the FFS spoke with the residents on a regular basis.  In addition, Defendants were aware that the Field Coordinator was onsite and was available to speak to children, as were the clinicians, who were engaged in weekly counseling sessions with residents.  *See* Pl. Ex. 1 (Field Coordinators meet with the children); Pl. Ex. 6 (*Flores* requires at least one weekly individual counseling session and twice weekly group counseling).  Thus, although Defendants themselves might not have spoken to the residents, they knew that others were doing so and could reasonably assume that relevant information would be obtained and reported to them. Thus, Defendants' conduct in not systematically interviewing Nixon residents was objectively reasonable.  Further, even assuming they should have done more in this regard, they were not deliberately indifferent given the steps they did take to find out what was going on and to take corrective action.

## B. Failure to train or supervise

Plaintiffs contend that Defendants failed to train or supervise the Nixon staff and that this

caused the constitutional violations at issue.  Plaintiffs assert that, despite numerous warnings, Defendants failed to insist on compliance with child welfare approved best practices designed to prevent physical abuse by staff.  Plaintiffs also complain that, after the bed capacity increased and warnings and reports of misconduct were received, Defendants did not increase their oversight, monitoring, or supervisory efforts to a reasonable and clearly necessary level of scrutiny, and there was no effort to periodically speak with all detained children to identify problems and dangers.

For a supervisor to be liable for failure to train, the focus must be on the adequacy of the training program in relation to the tasks the particular subordinates must perform.  *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005) (citing *City of Canton*, 489 U.S. at 390-91).  Mere proof that the injury could have been prevented if the subordinate had received better or additional training cannot, without more, support liability.  *Id.*  Further, for liability to attach based on an inadequate training claim, the plaintiff must allege with specificity how a particular training program is defective.  *Id.* (plaintiff must allege what skills were needed that were not sufficiently trained).

In this regard, it will not suffice to prove that an injury or accident could have been avoided if the subordinate had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.  *Id* (stating that *City of Canton* does not permit the plaintiff to style their complaint about the specific injury suffered as a failure to train claim).  "[C]ulpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Id.* at 1360.  In a single-incident scenario, the plaintiff must prove that the "highly predictable" consequence of the failure to train

would result in the specific injury suffered, and that the failure to train represented the 'moving force' behind the constitutional violation. *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005).

Plaintiffs point to no specific training deficiency other than child welfare best practices or behavior management techniques. They note that Chester asserted that Nixon needed a better behavior management system and used bootcamp-like techniques. As previously noted, the alleged deficiencies in the behavior management program cited by Chester would not have created an obvious risk of the type of physical abuse alleged in this case. Further, there is evidence in the record that Defendants did ensure that Nixon employees were trained in behavior management techniques. The grant required that the grantee use "a positive, strength-based behavior management approach." Pl. Ex. 7. It further required that training be provided to all staff to meet minimum licensing standards, and should cover ORR/DUCS Policies and Procedures, behavior management, cultural sensitivity, the *Flores* agreement, and mental health and child welfare best practices. *Id.* ORR Policies and Procedures required that providers "have a viable organizational management structure that promotes best practices, facilitates optimum delivery of services and ensures UAC's safety and well-being." Pl. Ex. 51. Further, "staff responsible for the care of UAC must be appropriately qualified, experienced, screened, and trained to ensure that the UACs' physical, social, emotional, educational and recreational needs are met." *Id.*

In addition, the evidence does not show that *no* behavior management or de-escalation techniques were being used at Nixon. Chester stated that Dunn said that each facility should be free to choose its own system, indicating that Nixon did have a system in place, even if it was not one recommended by Chester. Moreover, as noted, the evidence indicates that Nixon may have even

been using the type of program recommended by Chester, and that both individuals who allegedly physically abused Plaintiffs – Velasquez and Garcia – received such training.   The evidence shows that Velasquez had been trained in Handle With Care and in de-escalation.   The evidence also shows that, before the November 2006 incident, Garcia was trained in Handle With Care and de-escalation techniques, and in fact he was the lead trainer at the facility.   Thus, a failure to train (as warned by Chester) was not a cause of either incident, or even if it was, Defendants were not on notice that the training at Nixon was so deficient that intentional physical abuse was likely.   Moreover, Defendants responded to each known abuse or improper restraint incident by recommending or providing further training.

Nixon was also required to ensure compliance with state minimum licensing standards.   The Nixon facility employees were being monitored and were subject to state minimum standards established by TDFPS.   Those standards include a requirement to "employ and supervise staff to ensure health and safety of children."   Def. Ex. 23 (ORR012556).   The record indicates that, at all relevant times, Nixon was under either a Plan 1 or Plan 2 monitoring plan by TDFPS.   Defendants knew that Nixon was being monitored by TDFPS to ensure compliance with state minimum standards, and Defendants worked to keep lines of communication open between TDFPS and ORR.   ORR and Defendants received copies of investigations conducted by TDFPS.   The evidence also indicates that Nixon was required by TDFPS to have written behavior intervention policies and procedures (which would include restraints) and was required to follow them.   Def. Ex. 24 (ORR016018).   At the time of the alleged physical abuse of Plaintiffs or the November 5 incident involving Garcia and J.M.R., Defendants were not aware of any deficiencies other than for improper restraints that did not rise to the level of abuse.

76

In addition, Defendants also reasonably supervised Nixon. The record shows that Wolde and others went to Nixon annually for a site monitoring visit. During that visit, they spoke to staff and residents, and reviewed records. When deficiencies were noted, corrective action was required or other recommendations were made. The record shows that, after the November 5, 2006 incident, Gonzalez was at Nixon at least three times a week unless he was traveling. In addition, Defendants knew that the DUCS Field Coordinator, who was often at Nixon, would report any concerns to them.

Even if the prior improper restraints and Chester's warning were sufficient to provide actual or constructive notice of the risk of intentional physical abuse from inadequate training, the evidence shows that Defendants were not deliberately indifferent to such a risk. As noted, Nixon was required to comply with state-mandated behavior management protocols, and ORR also required appropriate behavior management. There is evidence that appropriate behavior management systems or techniques were in use at Nixon. The 2005 monitoring report noted that Nixon had strengthened its training program, including in behavioral management. In June 2006, Velasquez's reprimand included a reference that he had been trained in the Handle With Care program, including how to de-escalate a situation and proper restraint technique. In 2005, Defendants recommended bringing in outside trainers for child welfare issues. In September 2006, after they first learned of the abuse incidents, they told Nixon to bring in outside trainers for abuse, restraint, and child care. After the September 27 improper restraint incident involving Monreal, Wolde spoke with Nixon management about providing training to all staff on abuse and neglect. In October, Gonzalez required all Nixon staff to get training. Thus, Defendants had taken steps to ensure training to prevent physical abuse before the November 5 incident involving Garcia and J.M.R. Although they had not prevented the abuse, their actions demonstrate that they were not deliberately indifferent.

77

After that incident, Defendants took even more steps to prevent future abuse.  In November, Wolde specifically told Gonzalez and De La Cruz to investigate whether staff were adequately trained, with what materials, and to determine whether outside trainers were used.  At the end-of-November site visit, Wolde brought a child welfare expert to help him determine what should be done because he was not a child welfare expert.  They recommended that Nixon hire a human resources person to ensure that licensing and ORR requirements on hiring and training were being met.  They also recommended that "staff training should include a state mandated behavioral management plan."  They recommended that the staff develop better rapport with the children and suggested steps to minimize the "bootcamp" atmosphere and recommended that Nixon look into different types of behavior modification programs.  They attempted to remedy issues with upper management that they felt had contributed to the problems.  Although Gonzalez reported on December 6 that Nixon had not brought in outside trainers, he stated that he was working with Anita Deleon, that she had taken charge, and was helping implement a more comprehensive behavior intervention program not based on a bootcamp ideology.

Plaintiffs fail to establish that there was a lack of training or supervision, that the lack of training or supervision caused the constitutional violation, or that the Defendants were deliberately indifferent.

## C. Failure to adopt staffing policy

Plaintiffs argue that Defendants' failure to adopt a staffing policy requiring that staff work in pairs on the boys' wing amounts to deliberate indifference and was a cause of the abuse.  Failure to adopt a policy may serve as the basis for liability only when the omission "amount[s] to an intentional choice, not merely an unintentionally negligent oversight," and such an omission is

equivalent to an intentional choice only where the entity has acted with deliberate indifference. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 217 (5th Cir. 1998); *Evans v. City of Marlin*, 986 F.2d 104, 108 (5th Cir.1993) ("To serve as a basis for § 1983 liability, the failure to promulgate municipal policy must amount to 'an intentional choice, not merely an unintentionally negligent oversight.'"). "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Id.*

The evidence shows that Defendants did adopt staffing and safety policies designed to prevent abuse. The grant required that Nixon ensure that it was staffed 24 hours a days, and staffing ratios should follow state licensing regulations. Pl. Ex. 7. The Cooperative Agreement required Nixon to implement security measures, including employing trained staff who are responsible for the overall security of the facility on a 24 hour per day, seven days a week basis. Pl. Ex. 11. These staff were responsible for the interior security of the shelter, including inspection of facility locks, gates, alarms, video surveillance systems, visitor entry procedures/logs and regular perimeter checks. Nixon was required to ensure that video cameras monitor hallways, exits, and common areas, and that staff members responsible for security monitored this system. Nixon was also required to ensure that proper background investigations had been completed on all staff per state licensing requirements and per ORR/DUCS policies and procedures. *Id.* J.C.C.B. testified that staff were not allowed to stay in a room alone for too long or someone would come check, and there was also evidence that staff checked on the residents in their rooms regularly. Thus, Defendants were not deliberately indifferent to the risk of abuse and implemented measures to protect against such potential abuse. Given the existing safety measures in place, the Court cannot conclude that the obvious result of failing to adopt the particular staffing policy (pairs) suggested by Plaintiffs would

be sexual abuse. *See Scott v. Moore*, 114 F.3d 51 (5th Cir. 1997) (where city took steps to ensure inmate safety, including background checks, medical examinations, and polygraph tests of jailers, took steps to generally limit contact between mail and female jailers and detainees, and used a patrol duty sergeant to periodically check on jail personnel, city was not deliberately indifferent because it lacked sufficient prescience to anticipate that a well-trained jailer would, without warning, assault a female detainee).

Nevertheless, if the prior incidents of confirmed and alleged sexual abuse were sufficient to put Defendants on notice that their staffing policies were insufficient, the evidence shows that Defendants did suggest the policy of staffing in pairs that Plaintiffs claim was necessary. Defendants provided evidence that, after they learned of the first incident of sexual abuse in April/May 2006 in September 2006, they told Nixon to live monitor the video cameras, and to ensure that staff worked in pairs, and they were assured that this would happen.[62] To the extent AFH may not have implemented this directive, to hold Defendants accountable would be to hold them liable on the basis of respondeat superior insofar as Defendants did not officially sanction or order this failure. *See Doe*, 153 F.3d at 217 n.4 (to hold school board liable for omissions of the principal to whom it had delegated discretion on whether to investigate reports of sexual abuse would violate *Monell*).

Nevertheless, Plaintiffs attempt to establish deliberate indifference by arguing that Defendants were aware that Nixon had not adopted or enforced this policy and yet Defendants were deliberately indifferent to the failure. Plaintiffs must demonstrate that the particular inadequacies

---

[62] Plaintiffs appear to complain that Defendants did not require videocameras in the bathrooms and bedrooms. However, the Court finds that not requiring videocameras in the bathrooms and bedroom was objectively reasonable because of the obvious privacy implications.

that led to the constitutional violation were the products of deliberate choice.  As noted, Defendants did recommend that Nixon establish such a staffing pattern.

Plaintiffs contend that Defendants knew that Nixon had not done so, because Gonzalez was at the facility frequently and could see that staff were entering bedrooms alone.  They also assert that Gonzalez "did *not* require the staff to work in pairs in the boys' wing, as the other Defendants could plainly see from his reports and communications."  They further assert that Defendants arrived for a special on-site visit on November 28, 2006 and "[a]s they could see, the staff continued to enter the boys' rooms alone and at will."  However, Plaintiffs do not cite any evidence in support of these assertions.[63]  Therefore, Plaintiffs fail to establish with competent summary judgment evidence that any Defendant knew that staff were not working in pairs.

Further, between September 2006 and the time the Leal incident was revealed on February 10, 2007, Defendants were not aware of any further allegations of sexual abuse or misconduct, or any misconduct arising from an incident where a staff member was alone with a resident.  In other words, after they were assured that adequate security measures were in place, no further incident occurred to put them on notice that perhaps something was still amiss.  *See also Hardeman v. Kerr Cnty.*, Civ. A. No. 04-CA-584-XR, 2006 WL 503846 (W.D. Tex. Jan. 24, 2006) (where County had policies in place to protect female inmates from male guards, fact that policies were not enforced

---

[63] As noted by Defendants, Plaintiffs have presented their evidence in a confusing and cumbersome manner.  Plaintiffs' Amended Response to the motions for summary judgment contains arguments presumably based on evidence, but does not cite to any evidence in the record.  Rather, the reader is supposed to refer to two separate documents, the Amended Consolidated Statement of Facts, which is grouped into sections referenced by number, and Plaintiffs' First Amended Index to Their Amended Presentation of Evidence, which then lists exhibits that support the factual assertions made in the Consolidated Statement of Facts.  The 175 exhibits are then presented on CD in twenty groups (not labeled by which exhibits are included in each group, making it cumbersome to look up specific exhibits).  The Court has reviewed the statement of facts and the exhibits, but has been unable to find support for Plaintiffs' conclusory assertions that Defendants knew that some staff were still entering the boys' rooms alone.

and supervision was lacking was insufficient to render County liable for failure to supervise), *aff'd*, 244 F. App'x 593 (5th Cir. 2007).  When Defendants learned of the Leal abuse, they took immediate steps to protect the residents, including steps to ensure adequate staffing policies, and eventually decided that Nixon could not be trusted to keep the residents safe.  Again, the evidence demonstrates that Defendants took steps to protect residents from abuse and were not deliberately indifferent to such risk.

### Conclusion

Plaintiffs fail to establish that Defendants were actually aware of a significant risk of abuse, that the risk of abuse was obvious, or that they deliberately disregarded or ignored such a risk.  To the extent Defendants were made aware of abuses or risk of abuse, Defendants took steps to address them and to protect residents from future abuse.  Their conduct was objectively reasonable.  To the extent their response was ineffective, it nevertheless demonstrated concern rather than deliberate indifference.

Plaintiffs' failure to train, failure to supervise, and failure to adopt policy claims also fail because there was no such failure or, assuming there was such a failure, it was not the cause of the constitutional violation.  Even if there was such a failure and it was the cause of the constitutional violation, Defendants were not deliberately indifferent.

Defendants are entitled to summary judgment on the basis of qualified immunity.

Accordingly, docket numbers 276 and 287 are GRANTED and Count Four is dismissed on the merits.

It is so ORDERED.

SIGNED this 5th day of July, 2013.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE