UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DAVID WALDING, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | Civil Action No:  SA-08-CA-124-XR |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

On this date, the Court considered the United States' motion to dismiss Plaintiffs' Federal Tort Claims Act ("FTCA") claims for lack of jurisdiction (docket no. 64).  The United States asserts that this Court lacks jurisdiction over Plaintiffs' Twelfth, Thirteenth, and Fourteenth Causes of Action because they fall within the discretionary function and independent contractor exceptions to the FTCA's waiver of sovereign immunity.  After careful consideration, the Court grants the motion.

**I. Background**

Plaintiffs are eleven young men born in Central America who were detained in the United States by federal agents as undocumented and placed in federal custody pending their immigration court proceedings.  Each of the Plaintiffs was a minor at the time of his detention, and each was placed at a facility located in Nixon, Texas ("the Nixon facility") operated by Away From Home, Inc. ("AFH").[1]  AFH contracted with the federal government to house unaccompanied, undocumented minors while they awaited the final adjudication of their immigration status.

---

[1] Nixon, Texas is a small town located approximately 55 miles from San Antonio, Texas.  AFH also went by the name Southwest Initiatives Group and Texas Shelter Care.  For sake of convenience and consistency, the Court will refer to it as AFH.

Plaintiffs allege that they suffered "grave and repeated sexual, physical and emotional abuse" at the facility.[2]  Plaintiffs have sued a number of individuals and entities as a result of the abuse.  This Order deals with the claims asserted against the United States under the FTCA.

Under the doctrine of sovereign immunity, the federal government cannot be sued in its capacity as a sovereign unless it consents to be sued.  *See United States v. Mitchell*, 463 U.S. 206, 212 (1983).  For the federal government to consent to be sued, Congress must waive sovereign immunity by explicitly extending to federal courts subject-matter jurisdiction over a specified cause of action.  *Id.*  The FTCA waives sovereign immunity and allows private individuals to sue the federal government for the torts of its employees by granting federal courts exclusive subject-matter jurisdiction over

> civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  However, the FTCA contains a number of exceptions to this waiver of sovereign immunity, including the discretionary function and independent contractor exceptions at issue here.  In determining whether subject-matter jurisdiction exists, "[c]ourts must strictly construe all waivers of the federal government's sovereign immunity, [resolving] all ambiguities in favor of the sovereign."  *Linkous v. United States*, 142 F.3d 271, 275 (5th Cir. 1998).

The Twelfth Cause of Action, which will be referred to as the "negligent supervision" claim, alleges that certain federal defendants were negligent in carrying out their legal duties to ensure the

---

[2] On this same date, the Court entered an Order on certain federal individual defendants' motions for summary judgment on Plaintiffs' *Bivens* claims.  That Order sets out in detail a time line of events and Plaintiffs' allegations concerning abuse.

proper treatment, care, welfare, safety and protection of the minors detained at the Nixon facility. Sixth Am. Compl. ¶ 277. The United States asserts that the discretionary function exception to the waiver of sovereign immunity applies to this claim.

The Thirteenth Cause of Action, which will be referred to as the "negligent selection" claim, alleges that certain individual federal employees were negligent in investigating, selecting, screening and contracting with and/or awarding a grant to AFH to detain the unaccompanied minors, ¶ 284, and that certain federal employees were further negligent in training, supervising, monitoring, and controlling their employees, agents and/or contractors at the Nixon Facility, ¶ 285.[3] Defendant United States argues that the discretionary function exception also applies to this claim.

The Fourteenth Cause of Action alleges that the United States is liable for the negligence of AFH and its employees because AFH was performing an exclusive government function in detaining the unaccompanied minors on behalf of the government. Sixth Am. Compl. ¶ 292. The United States asserts that the independent contractor exception to the waiver of sovereign immunity applies to this claim.

The Court previously ordered that Plaintiffs were entitled to discovery pertaining to the United States' asserted exceptions. That discovery has been completed, and thus these issues are ripe for disposition.

## II. Factual Summary

On March 1, 2003, the Homeland Security Act of 2002 transferred functions under the U.S. immigration laws regarding the care and placement of "unaccompanied alien children" (sometimes

---

[3] The Court has previously noted that the negligent supervision/training aspects of the Thirteenth Cause of Action overlap with the claims in the Twelfth Cause of Action. *See* docket no. 115 at 4 n.1. This aspect of the Thirteenth Cause of Action will be analyzed with the Twelfth Cause of Action.

referred to as "UAC"[4]) from the INS to the Director of the Office of Refugee Resettlement ("ORR"). 6 U.S.C. § 279.  ORR is an agency within the Administration for Children and Families ("ACF") operating division of the Department of Health and Human Services ("DHS" or "DHHS").  ORR created a new office called the Division of Unaccompanied Children's Services ("DUCS") to carry out these responsibilities. DUCS has developed a network of care options for unaccompanied minors, including shelter care, staff secure, foster care, and residential treatment care.

Although INS had existing facilities in place, most of these were detention facilities, and ORR/DUCS wanted to use alternatives such as shelter care facilities (like Nixon) in order to better comply with the *Flores* Settlement Agreement.  Tota depo. at 24.   The 1997 *Flores* Settlement Agreement was the result of the *Flores v. Reno* lawsuit brought by unaccompanied minors detained on suspicion of being deportable challenging the constitutionality of the INS's policies, practices, and regulations regarding the detention and release of such minors.  The settlement agreement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of INS." The INS agreed not to place a minor in a secure facility if there were less restrictive alternatives available and appropriate in the circumstances.  The *Flores* Agreement also includes a list of "minimum standards for licensed programs," which requires that facilities comply with all applicable state child welfare laws and regulations and provide certain enumerated services, such as counseling and education, for the minors.

Shortly after the March 2003 transfer to ORR of responsibilities relating to unaccompanied

---

[4] The Court will use the terms "unaccompanied alien children" and "UAC" because that is the term used and defined in the statute and by the parties.  *See* 6 U.S.C. § 279(g)(2) (the term "unaccompanied alien child" means a child who--(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom--(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody).

alien children, Don Rains of AFH called Ken Tota at ORR about providing shelter care services. On April 16, 2003, Ken Tota mailed Don Rains a letter stating, "Due to exigent circumstances, the Office of Refugee Resettlement (ORR), Department of Health and Human Services (HHS) would like to request your submission of an application for the provision of shelter care services for the period May 1, 2003 - April 30, 2004."  Pl. Ex. 2;Docket no. 192 Ex. 1.  AFH submitted an application.

On May 6, Deborah Kellaher, the Director of the Division of Grants Policy ("DGP"), forwarded the urgent "unsolicited proposal" to Nguyen Van Hanh, the Director of ORR, stating that it appeared to qualify as an unsolicited application under the definitions set forth in the ACF Grants Administration Manual ("GAM") sections 2.02.407H and 2.11.404A. Pl. Ex. 3. The letter noted that most grant awards result from a competitive review process in response to a program announcement published in the *Federal Register*, but "on rare occasions, if an unsolicited application is determined to be of outstanding merit, it may receive consideration for funding without competition."  Kellaher asked Van Hanh to "review the application to determine whether or not it is within the scope of any program announcement issued or expected to be issued within ORR.  If not, and you determine that the application is of such outstanding and unique merit that it should be considered for funding, follow the procedures set forth in the ACF GAM Section 2.11 to convene a panel."

Kellaher noted that, if ORR decided to fund the application, the award required "the written approval of the Assistant Secretary for Children and Families and the Assistant Secretary for Administration and Management (ASAM) through the Grant Review Process."  Further, she wrote, "In accordance with Departmental Grants Policy Directive (GPD) 2.04, urgent and unsolicited grant applications must be published in the *Federal Register* simultaneously with the award of grants and

must include at minimum: 1. Recipient name; 2. Amount of Award; 3 Project period; 4. Reason(s) for no competition; and 5. Name and address of the official to be contacted for more information on the award." "The grant award package, including the *Federal Register* notice, must be submitted to the Division of Grants Policy for review and clearance by the Chief Grants Management Officer prior to submission to the Assistant Secretary for Children and Families."[5]

On May 7, 2003, Van Hanh, Director of ORR, sent a letter to the Director of Office of Planning, Research and Evaluation ("OPRE"), to inform him that ORR "would like to award an urgent application from [AFH] due to compelling circumstances." Pl. Ex. 4; Docket no. 192 Ex. 2. The letter noted that, as a result of the transfer of responsibility for unaccompanied minors from the INS to ORR, ORR was "now faced with the urgent need to locate appropriate shelter care facilities as an alternative to secure detention" or risk violating the *Flores* settlement agreement.

The letter stated that DUCS was "facing an impending crisis" because the number of apprehensions had increased significantly during the past few weeks and the number of children in custody had risen to 650 per day.  This increase was attributed to an increase in apprehensions in spring and summer, a reduction in transport flights to return children to their country of origin, and chicken pox outbreaks in three facilities restricting all releases.  The letter noted that the influx was straining current facilities and risked violating *Flores* by not having an appropriate number of shelter beds to ensure that no minor inappropriately remained in secure custody for more than 72 hours. To "alleviate this crisis," Van Hanh wrote, DUCS identified the Nixon facility, which was fully licensed, was in excellent condition, had expansion possibility, had a strategic location in the San Antonio area, and was "truly a one of a kind find."  *Id.* (ORR000618).  Van Hanh wrote that

---

[5] The Assistant Secretary for Children and Families is the agency head of the Administration for Children and Families.  45 C.F.R. § 2.2(3).

bringing Nixon online would allow ORR to reduce its reliance on three secure detention facilities in the area.  Van Hanh attached AFH's proposal for the provision of shelter care to sixteen children, noting that the cost per day in the proposed budget was below the national average, and that the proposal was thorough and well within the scope of activities supported by ORR.  Van Hanh therefore asked that a panel be convened to review the application for its suitability under the Catalog of Federal Domestic Assistance number 93-676 and to send a copy of the letter convening the panel to the DGP.

On May 22, 2003, the Director of the OPRE notified Van Hanh that it had paneled the unsolicited proposal submitted by AFH.  All of the panelists found the proposal technically acceptable and provided comments on the strengths and weaknesses of the proposal.  Docket no. 192, Ex. 6.  The letter also stated, "If your office wishes to fund this application, you should prepare a decision memorandum package for the Assistant Secretary for the Administration for Children and Families recommending funding, attaching the panel reviews' scores and comments, the memorandum from your office requesting the review, the memorandum from OPRE summarizing the panel results, a copy of the application and any other appropriate documents or evaluation materials."  *Id.*

Van Hanh then submitted a decision memorandum package to the Assistant Secretary for Children and Families on May 29, 2003.  Pl. Ex. 5.  In his letter, Van Hanh repeated his assertions that DUCS was "facing an impending crisis," noting that the number of children in custody exceeded the number of available beds and additional placement capacity was "especially critical in the San Antonio area."   The memo further states that the ORR Director "forwarded this application to the Division of Grants Policy (DGP) via the ORR transmittal memorandum," DGP

determined that the application qualified "as an urgent application in accordance with the ACF GAM," OPRE conducted the required panel review, and all of the panelists found the proposal technically acceptable.  ORR recommended that the application be funded in the amount of $797,152.  According to the letter, the package included AFH's application, the ORR memo to DGP, the DGP memo to ORR, the ORR memo to OPRE, and the OPRE Memo with panelists' comments.[6] The Assistant Secretary approved the recommendation on June 1, 2003.

On July 16, 2003, Van Hanh sent a letter to Rains "to advise [him] that [his] proposal for the provision of shelter care services [had] been accepted."  Pl. Ex. 6.  The Financial Assistance Award ("FAA") document, displaying an award #90XR0006, was signed July 16, 2003, in the amount of $797,152.  Pl. Ex. 6.  It shows a project period of July 1, 2003 to June 30, 2006, with a budget period of July 1, 2003 to June 30, 2004.  Pl. Ex. 6.  Ken Tota testified that the FAA signals the beginning of the grant and is the funding document.  Tota depo. at 68.[7]

ORR chose to use a cooperative agreement as the structure for the award to AFH.  A cooperative agreement is an instrument contemplated by and awarded in accordance with the Federal Grant and Cooperative Agreement Act, 31 U.S.C. §§6301-6308.  An executive agency uses a cooperative agreement as the legal instrument reflecting a relationship between the United States Government and a recipient when "(1) the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support

---

[6] The attachments were not included with this document in the record.  Thus, it is unclear whether some of them, such as the ORR transmittal memo to DGP and the DGP memo to ORR, are different from the documents discussed.

[7] On September 10, 2003, AFH requested supplemental funding in the amount of $765,988, and a new FAA was issued on September 12, 2003 for a total budget amount of $1,563,140.  Docket no. 192, Def. Ex. 7.

or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and (2) substantial involvement is expected between the executive agency and the . . . recipient when carrying out the activity contemplated in the agreement."  31 U.S.C. § 6305.

Tota testified that, after the FAA was issued, the parties began negotiating the Cooperative Agreement.  Tota depo. at 69-70.  Because this type of agreement and ORR's responsibilities were new, negotiations took a long time.  Tota depo. 94-98.  Tota signed the Cooperative Agreement on behalf of ORR on March 3, 2006.  The Cooperative Agreement states it is for the term July 1, 2005 to June 30, 2006. Docket no. 64 (Tota Decl. Ex. 4).  Under the Cooperative Agreement, AFH agreed to provide shelter care and other child welfare related services in a state-licensed shelter care program to unaccompanied alien children in the least restrictive setting possible, in accordance with state licensing provisions, ORR/DUCS policies and procedures, and the *Flores* Agreement.

As noted, the original award to AFH was for a three-year project period from July 1, 2003 to June 30, 2006.  Pl. Ex. 6.  Annual renewals were required during that project period, but they were on a non-competitive basis.  The original project award expired on June 30, 2006.  AFH received an extension for the period of July 1, 2006 to September 30, 2006.  Docket no. 192, Def. Ex. 37.

In August 2006, ORR became aware that a child recently transferred from Nixon reported that he was sexually abused at Nixon.  The child did not identify the alleged perpetrator and then recanted.  Pl. Ex. 41.  In September 2006, ORR learned from the Texas Department of Family and Protective Services ("TDFPS"), which is responsible for child care licensing in Texas, that it had investigated an incident of sexual abuse at Nixon in April 2006.  Pl. Ex. 42.  One of the female staff was caught in the restroom with a male resident engaging in sexual activity.  AFH did not report this

incident to ORR.  The staff member immediately resigned, and the child was no longer at the facility when ORR learned of the incident.  AFH was cited by TDFPS for abuse and for failure to report the incident to TDFPS.  Pl. Ex. 43.  The United States asserts that, because this was the first reported incident of its kind at Nixon, and the employee was no longer on staff, ORR concluded that it could work with AFH to prevent this sort of failure in the future.[8]

As noted, in 2006, the award became competitive.  Tota dep. at 108.  ORR prepared a program funding announcement for a sixty-month project with five, 12-month budget periods, beginning October 1, 2006.  AFH and four or five other facilities applied.  Docket no. 192, Def. Ex 31 (AFH application); Tota depo. at 145. The applications were reviewed by a panel, and AFH received the highest score.  Docket no. 64, Tota Decl.  ORR awarded the cooperative agreement to AFH.[9]  Docket no. 192, Def. Ex. 38 (letter from Martha Newton, ORR Director, to Rains that his FY 2007 application had been approved for funding, and including the FAA for the project period of October 1, 2006 to September 30, 2011, and a budget period of October 1, 2006 to September 30,

---

[8] The United States cites Exhibit 25 in support of the various actions that ORR took in response to learning of the incident.  However, Exhibit 25 is a budget worksheet.  It appears that the United States intended to cite Exhibit 24, which is a "Timeline for Nixon, TX Facility" and outlines various events and actions taken by ORR.  However, there is no indication who prepared this document or from what source or sources the information in the timeline table is taken.

[9] The Declaration of Ken Tota states, "Although the ORR Director at the time had the option of awarding the cooperative agreement to an entity other than that recommended by the review panel, the Director accepted the consensus of the panel and awarded the cooperative agreement to Away from Home, Inc., on March 3, 2006. The cooperative agreement entered into by ORR and Away from Home, Inc., is attached to this declaration as Exhibit 4."  However, the Cooperative Agreement attached as Exhibit 4 was signed on March 3, 2006 and states that it is for the period July 1, 2005 to June 30, 2006.  It is for the original award #90XR006.  The program funding announcement for the second project period indicated a project period of October 1, 2006 to September 30, 2011.  The award number for that project award was #90ZU0040, and the award was apparently made on November 1, 2006. Def. Ex. 38. Therefore, the United States' Statement of Undisputed Facts (docket no. 64) and Tota's declaration appear to be incorrect.

2007.)  The FAA was executed on November 1, 2006 for award #90ZU0040.  Def. Ex. 38.[10]

On November 5, 2006, several residents escaped from Nixon.  Off-duty staff who had been drinking were called to the facility to assist.  The residents were gathered together, and problems ensued.  Staff members inappropriately restrained and injured two residents, including Plaintiff J.M.R.  The local sheriff was called to investigate, and criminal charges were brought against one of the staff involved in the improper restraint.

On February 10, 2007, ORR became aware of allegations of sexual abuse of several minor residents at Nixon by AFH direct care worker Belinda Leal.  Docket no. 192, Def. Ex. 24.  On February 14, 2007, ORR suspended placements at the facility.  *Id.*  ORR increased its monitoring and had its Federal Field Specialist ("FFS") make unannounced visits.  *Id.*  On February 28, the ORR Director notified AFH that it would remove all children from the facility.  *Id.*; Pl. Ex. 158.  FFS De La Cruz was designated as the functional administrator of the facility and supervisor beginning March 2, 2007.  Pl. Ex. 146; Pl. Ex. 154.  By March 7, 2007, all children were transferred out of Nixon.

On March 7, 2007, Maureen Dunn, the Director of DUCS, sent a letter to Rains stating, "This letter is to inform you that, at this time, the Office of Refugee Resettlement has decided to continue the grant award to Away From Home, Inc. for the placement and care of unaccompanied alien children (UAC).  We now ask that you prepare a revised budget with an appropriate staffing plan to accommodate 48 beds."  Pl. Ex. 22.  However, as ORR reviewed AFH's files and learned of more issues, by April it did not think it would continue the grant award to Nixon.  On June 25, 2007, ORR terminated the grant, stating that AFH failed to protect the children in its care from physical and

---

[10] On January 11, 2007, a supplemental FAA was issued.  Docket no. 192, Def. Ex. 39.

sexual abuse and failed to report findings of abuse to ORR in a timely manner.  Docket no. 64 (Tota

Decl. Ex. 6); Pl. Ex. 158.

### III. Analysis - Discretionary Function Exception

The United States contends that the discretionary function exception applies to Plaintiffs'

claims for negligent selection and negligent supervision.  The discretionary function exception

provides that liability under the FTCA does not apply to claims "based upon the exercise or

performance or the failure to exercise or perform a discretionary function or duty on the part of a

federal agency or an employee of the Government, whether or not the discretion involved be

abused."  28 U.S.C. § 2680(a).  The Supreme Court discussed the discretionary function exception

in *United States v. Gaubert*, 499 U.S. 315 (1991):

> The exception covers only acts that are discretionary in nature, acts that "involv[e]
> an element of judgment or choice," and "it is the nature of the conduct, rather than
> the status of the actor" that governs whether the exception applies. The requirement
> of judgment or choice is not satisfied if a "federal statute, regulation, or policy
> specifically prescribes a course of action for an employee to follow," because "the
> employee has no rightful option but to adhere to the directive."
>
> Furthermore, even "assuming the challenged conduct involves an element of
> judgment," it remains to be decided "whether that judgment is of the kind that the
> discretionary function exception was designed to shield."  Because the purpose of
> the exception is to "prevent judicial 'second-guessing' of legislative and
> administrative decisions grounded in social, economic, and political policy through
> the medium of an action in tort," when properly construed, the exception "protects
> only governmental actions and decisions based on considerations of public policy."

*Id.* at 322-23 (citations omitted).  With regard to the violation of regulations, the *Gaubert* court

stated:

> if a regulation mandates particular conduct, and the employee obeys the direction,
> the Government will be protected because the action will be deemed in furtherance
> of the policies which led to the promulgation of the regulation.  If the employee
> violates the mandatory regulation, there will be no shelter from liability because
> there is no room for choice and the action will be contrary to policy. On the other

12

> hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

*Id.* at 324.  "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."  *Id.* at 325.

Applying these principles, the Supreme Court has developed a two-step test to determine whether the discretionary-function exception applies.  *St. Tammany Parish v. FEMA*, 556 F.3d 307, 323 (5th Cir. 2009).  First, the court inquires whether the challenged actions were discretionary, or whether they were instead controlled by mandatory statutes or regulations – in other words, whether the conduct is a "matter of choice for the acting employee."  *Id.*  Second, if the conduct involves such discretion, the court must determine whether it is the kind of judgment that the discretionary function exception was designed to shield.  *Id.*  The exception was designed to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy and thus protects only governmental actions and decisions based on considerations of public policy.  *Id.*

**A. Applicable Standard**

The United States moved for summary judgment on Plaintiffs' Twelfth and Thirteenth Causes of Action, based on the discretionary function exception.  However, relying primarily on *Hix v. U.S. Army Corps. of Eng'rs*, 155 F. App'x 121, 128 n.8 (5th Cir. 2005), this Court previously held that this motion should be decided under the standard applicable to motions under Rule 12(b)(1) rather than motions for summary judgment because the jurisdictional question is not intertwined with the merits.  *See* docket no. 115 at 6-7; docket no. 127 at 3.

13

In their Response to the United States' motion, Plaintiffs argue that the applicable standard should be 12(b)(6) or Rule 56.  The Fifth Circuit has indicated that the factors in § 1346(b)(1) and questions of duty going to the underlying tort claim are merits-type issues that must be decided under a 12(b)(6) or Rule 56 standard.  *See Montez v. Dept. of the Navy*, 392 F.3d 147 (5th Cir. 2004); *Tindall v. United States*, 901 F.2d 53 (5th Cir. 1990).  However, it has also held that the merits and the jurisdictional issue under § 2680(a), the discretionary function exception, are not so intertwined as to prevent separate consideration and decision of the jurisdictional issue.  *Hix v. U.S. Army Corps of Eng'rs*, 155 Fed. App'x 121, 128 n.8 (5th Cir. 2005); *Ford v. Am. Motors Corp.*, 770 F.2d 465, 468 (5th Cir. 1985) ("The merits and the jurisdictional issue were not so intermeshed as to prevent the separate consideration and decision of the jurisdiction question, albeit that decision is based in large measure on facts relevant to the merits.").

Since the Court's prior orders, there have been no intervening controlling decisions of the Fifth Circuit or Supreme Court that would change the Court's conclusion.  Rather, intervening cases support the conclusion that evaluation of the discretionary function exception should be conducted under the 12(b)(1) standard as long as it does not require resolving disputed facts that overlap with the merits.  *E.g.*, *Lopez v. United States Immigration & Customs Enforcement*, 455 F. App'x 427, at *3 (5th Cir. 2011) (noting that district court converted United States' motion for summary judgment to a Rule 12(b)(1) motion); *Patel v. United States*, 398 F. App'x 22, at *5 (5th Cir. 2010) (in reviewing discretionary function exception dismissal, stating that "only Patel's complaint, as supplemented by undisputed facts and resolved disputed facts, may be considered in a dismissal of a complaint for lack of subject matter jurisdiction.").[11]

---

[11] Plaintiffs, citing a Title VII case, *Clark v. Tarrant County*, 798 F.2d 736, 741-42 (5th Cir. 1986), argue that subject matter jurisdiction and the merits are intertwined if the same statute provides the basis for

In ruling on a motion under Rule 12(b)(1), the Court "has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *United States v. Freeman*, 556 F.3d 326, 334 (5th Cir. 2009). "Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction – its very power to hear the case – there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* at 412-13. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. *Id.* at 413. Further, materials such as affidavits and regulations can be considered when relevant to the issue of jurisdiction. *Poindexter v. United States*, 777 F.2d 231 (5th Cir. 1985).

It remains an open question which party retains the ultimate burden of proof on the applicability of the discretionary function exception. *St. Tammany Parish v. FEMA*, 556 F.3d 307, 315 n.3 (5th Cir. 2009). Regardless of which party bears the ultimate burden of proof, at the pleading stage, the plaintiff must allege a claim that is facially outside the exception. *Id.* At the summary judgment stage, the plaintiff must submit evidence that the claim is facially outside the exception. *Morales v. United States*, 371 F. App'x 528, 532 (5th Cir. 2010).

---

jurisdiction and the cause of action. Because the FTCA provides the basis for both, they argue, the challenge to jurisdiction must be resolved using a summary-judgment standard. But Plaintiffs overlook the fact that the provision that creates jurisdiction and allows an FTCA cause of action is § 1346(b)(1), while the discretionary function exception is found in § 2680. Moreover, other cases make clear that the relevant standard is whether the factual issues relevant to jurisdiction and the merits can be analyzed discretely, or whether factual issues determinative of jurisdiction are intertwined with or identical to factual issues determinative of the merits. *See, e.g.*, *MCG, Inc. v. Great W. Energy Co.*, 896 F.2d 170, 176 & n.6 (5th Cir. 1990).

**B. Thirteenth Cause of Action – Negligent Selection**

Plaintiff's Thirteenth Cause of Action for negligent selection alleges that federal employees Martha Newton, Maureen Dunn, Susana Ortiz-Ang, James De La Cruz, Jose Gonzalez, Jose Mungia, Marc Moore, and Tsegaye Wolde have "the legal duty to select appropriate detention facilities," and that "Newton, Dunn, and Ortiz-Ang were negligent in investigating, selecting, screening and contracting and/or awarding a grant to Away From Home, Inc. to detain the unaccompanied minors." Sixth Am. Compl. ¶¶ 282, 284.

1. Negligent Investigating, Selecting, and Screening of AFH

By statute, ORR is responsible for "identifying a sufficient number of qualified individuals, entities, and facilities to house unaccompanied alien children." 6 U.S.C. § 279(b)(1)(F).[12] However, other than requiring facilities to be licensed by the state, no statute, regulation, or agency policy specifically defines the term "qualified." Therefore, section 279 leaves the determination of whether an individual, entity, or facility is "qualified" to ORR's discretion.

The United States asserts that, to meet its obligation to provide shelter care services with the resources provided, ORR enters into contractual arrangements with non-governmental organizations in key areas of the United States where the largest numbers of these children are found. The United States asserts that ORR has not promulgated regulations regarding the advertising and award of cooperative agreements, but instead uses the DHHS's Awarding Agency Grants Administration

---

[12] This statute also provides that ORR shall be responsible for coordinating and implementing the care and placement of unaccompanied alien children who are in federal custody by reason of their immigration status; ensuring that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child; making placement determinations for all unaccompanied alien children who are in federal custody by reason of their immigration status; implementing the placement determinations; implementing policies with respect to the care and placement of unaccompanied alien children; and overseeing the infrastructure and personnel of facilities in which unaccompanied alien children reside. 6 U.S.C. § 279(b)(1).

Manual ("AAGAM" or "GAM") and the regulations at 45 C.F.R. Part 74 ("Uniform Administrative Requirements for Awards and Subawards to Institutions of Higher Education, Hospitals, Other Nonprofit Organizations, and Commercial Organizations") for general guidance.[13]

The United States argues that the decision to enter into a cooperative agreement with a non-governmental entity and the selection of AFH as the recipient of the contract were products of the exercise of ORR's discretion and did not violate any identifiable statutes, regulations, policies, or directives. Further, the United States argues that the decision to enter into the cooperative agreement was both susceptible to and grounded in policy considerations because ORR makes a determination concerning how best to use limited economic resources to meet its mandate. The United States contends that courts repeatedly recognize that awarding a government contract to a non-governmental entity is inherently discretionary and is thus protected by the discretionary function exception. Further, the United States argues, a decision that ORR should not have entered into the cooperative agreement would be the type of judicial second-guessing of decisions grounded in policy that the exception is designed to prevent. The Court agrees.

In this case, it is clear that the ultimate choice of facility for housing unaccompanied alien children is a decision vested with policy considerations. The operative statute gives ORR discretion to identify qualified facilities to house the children, make placement determinations, and implement the placement determinations. 6 U.S.C. § 279. It also gives ORR authority to implement policies

---

[13] 45 C.F.R. § 74.1 states that Part 74 establishes uniform administrative requirements governing DHHS grants and agreements awarded to institutions of higher education, hospitals, other nonprofit organizations and only to commercial organizations in instances other than those involving procedures to make data available under the Freedom of Information Act provision set forth in § 74.36(d)(1). The FAA document issued to AFH states that it is subject to 45 C.F.R. Part 74. Pl. Ex. 6.

with respect to the placement of the children.  6 U.S.C. § 279(b)(1)(E).   ORR employees are given discretion in choosing an award recipient and imposing conditions on awards.  *See, e.g.*, 45 C.F.R. § 74.14 (awarding agency may impose additional requirements if applicant or recipient has a history of poor performance, has a management system that does not meet the standards prescribed, has not conformed to the terms and conditions of a previous award, or is not otherwise responsible).   In addition, such decisions necessarily involve the sorts of policy choices protected by the discretionary function exception.

In their brief, Plaintiffs complain that "ORR failed to investigate alternative sources when it knew, from documentation submitted by AFH, that (1) AFH was a for-profit company; (2) other than operating the Hays County Secure Juvenile Detention Facility for one year (it is not known when), the company had no history of caring for children, much less vulnerable children with unique needs like UACs; (3) other than the Director, the company had no staff – experienced or otherwise – hired and capable of caring for UACs at the time of its application; and (5) [*sic*] the facility was first licensed in May 12, 2003, *after* negotiations began with ORR, one month *after* ORR invited AFH to submit a proposal, and just two months prior to the grant award."  Docket no. 190 at 14.

However, Plaintiffs cite no mandatory policy or regulation that would have limited ORR's discretion to award the grant to AFH in spite of any of those factors.   The only mandatory requirement for selection named by any witness was the requirement that AFH receive its State license.  But it is undisputed that AFH received its license before being awarded the grant and before housing any children.   The other concerns raised by Plaintiffs are of the type that ORR had discretion to evaluate in determining whether AFH was an appropriate facility.

Based on the case law and the record, the Court must conclude that ORR's decision to enter

into a cooperative agreement, its investigation, selection of, and contracting with AFH, and its placement of the minors at AFH were the types of discretionary decisions that involve policy judgments as contemplated by the discretionary function exception. *Guile v. United States*, 422 F.3d 221, 231 (5th Cir. 2005) ("[A] decision to hire a contractor and the choice of contractor are policy-based discretionary decisions.") (citing *Williams v. United States*, 50 F.3d 299, 310 (4th Cir. 1995)). *Cf. Ashford v. United States*, 463 F. App'x 387, 395 (5th Cir. 2012) (citing *Cohen v. United States*, 151 F.3d 1338, 1344 (11th Cir. 1998) ("Deciding how to classify prisoners and choosing the institution in which to place them are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nations' prisons.").

### 2. Negligent Contracting or Awarding of the Grant and Grant Administration

Recognizing that ORR had discretion to make the decision that AFH was an appropriate facility, Plaintiffs focus primarily on specific regulations on government contracting and grant administration. Plaintiffs contend that ORR violated mandatory acquisition regulations designed to foster open competition in contracting with AFH, and violated grant administration regulations throughout its relationship with AFH.

#### a. Violation of Acquisition Regulations

Plaintiffs point to the general policy of full and open competition in government contracting, and note that ORR's award to AFH in 2003 was on a non-competitive basis.[14] They contend that

---

[14] Plaintiffs cite 45 C.F.R. § 74.43, which states that "All procurement transactions shall be conducted in a manner to provide, to the maximum extent practical, open and free competition." However, § 74.43 is within the section governing procurement standards for grant recipients; it does not govern ORR's behavior. *See* 45 C.F.R. § 74.40 ("Sections 74.41 through 74.48 set forth standards for use by recipients in establishing procedures for the procurement of supplies and other expendable property, equipment, real property and other services with Federal funds."). Plaintiffs also cite FAR § 6.101, which states that contracting officers shall promote and provide for full and open competition in soliciting offers and awarding Government contracts. 48 C.F.R. § 6.101. As will be discussed, the general FAR do not apply to this cooperative agreement.

ORR violated federal acquisition regulations ("FAR") by commencing negotiations with AFH before developing its written justification for a non-competitive award in violation of FAR § 6.303-1(a) and failing to meet the requirements for the justification once it developed the justification, in violation of FAR 6.303-2.[15]   Plaintiffs argue that the justification and decision "either patently omitted required information or provided less than truthful statements about ORR's efforts to find competitive options" and failed to meet the specific regulatory requirements.[16]

Plaintiffs further assert that ORR failed to publish the notice of the award to AFH in the *Federal Register* in a timely manner, in violation of AAGAM § 2.04.104A-5(c).[17]   Plaintiffs argue that policies favoring competition and requiring justification for non-competitive awards exist to prevent "precisely the type of rushed, uninformed award that happened in this case."   Docket no. 190 at 14.   Plaintiffs contend that, discretion as to the substance of the ultimate decision does not

However, the record does indicate that, in awarding grants and cooperative agreements, DHHS does have a policy to maximize competition unless an exception is warranted.   *See* Docket 192, ex. 5 (DHHS AAGAM).

[15] Plaintiffs contend that it is unclear if ORR made the 2003 award on an "unsolicited" or "urgent" basis, but in either case it was non-competitive and the procedural requirements apply to both.   Docket no. 190 at 12.

[16] Specifically, Plaintiffs contend, the justification failed to (1) demonstrate "the proposed contractor's unique qualifications," (2) include a determination that the anticipated cost will be fair and reasonable, (3) cite a market study, (4) include information regarding efforts made to ensure that offers were solicited from as many potential sources as is practicable, (5) reference statutory authority allowing the non-competitive award; and (6) include a certification by a DHHS official as to the accuracy and completeness of the justification, all in violation of FAR § 6.303-2(b).

[17] GAM § 2.04.104A-5A.f(5) states: "The awarding office must publish in the *Federal Register* a notice of its intent to make a single-source urgent award prior to or simultaneous with the award unless a press release is issued in relation to a Presidential declaration indicating the intent to make the specific award. The intent to limit competition in an urgent situation may be announced through a published funding opportunity notice . . . or, if each eligible applicant is contacted by mail or other means, by publishing a single notice in the *Federal Register* prior to or simultaneous with the awards."   The publication of notice in the *Federal Register* is required prior to or simultaneous with the award.   GAM Attachment 1.   A *Federal Register* notice must include: (a) intended recipient's name; (b) purpose of the award; (c) amount of award; (d) project period; (e) justification for the exception to competition; and (f) name and address of awarding office official to be contacted for further information.   GAM § 2.04.104A-5B.

confer discretion to ignore the required procedures of decisionmaking, and that ORR's failure to comply with the mandatory acquisition requirements renders its actions non-discretionary.

As an initial matter, the Court notes that the regulations that Plaintiffs claim were violated speak to the duties of the "contracting officer," but it does not appear that any of the named individuals in Count Thirteen was a contracting officer with regard to the award of the grant to AFH in 2003.  Nor have Plaintiffs shown that any of these individuals was directly involved in the initial decision to contract with AFH in 2003.  However, the United States has not raised this issue.

The United States contends that the requirements cited by Plaintiffs were either not mandatory or were not violated, or both, and that even if any regulations were violated, such violations were not causally related to the Plaintiffs' injuries.  The United States argues that "full and open competition" is not required if "the agency's need for the supplies or services is of such an unusual and compelling urgency that the Government would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals."  FAR § 6.302-2(a)(2).  The United States contends that the record clearly shows that ORR's relationship arose due to an unusual and compelling urgency, and that the cooperative agreement was based on this exception to competition.

The Court agrees with the United States that the 2003 award was made on the basis of unusual and compelling urgency.  The letter from ORR Director Van Hanh to the Assistant Secretary seeking approval of the AFH grant states that the ORR Director forwarded the application to the DGP, and the application was determined by the DGP to qualify as an urgent application in accordance with the GAM.  Pl. Ex. 5; Def. Ex. 3.  The Assistant Secretary approved the recommendation to fund the application as an urgent application, in the amount of $797,152, on June

1, 2003.  And the *Federal Register* notice states that "notice is hereby given that a urgent grant

award is being made to [AFH] in the amount of $797,152 in FY03, to provide shelter care and child

welfare services to alien minors transferred into the custody of" ORR.  68 Fed. Reg. 51292-02.

Further, the United States is correct, and Plaintiffs do not dispute, that FAR § 6.302-2 and the GAM

recognize urgent awards as an exception to the requirement of maximum competition.  Def. Ex. 5

GAM § 2.04.104A-3.

 Although it primarily argues that ORR complied with the FAR,[18] the United States also

---

[18]The FAR "broadly outline procurement policies and procedures for the acquisition of goods and services by the government on behalf of the American taxpayer." *Wood v. United States*, 290 F.3d 29, 34 (1st Cir. 2002).  The FAR also grant contracting officers discretion in carrying out their duties.  FAR § 1.602-2 states: "Contracting officers are responsible for ensuring performance of all necessary actions for effective contracting, ensuring compliance with the terms of the contract, and safeguarding the interests of the United States in its contractual relationships.  In order to perform these responsibilities, contracting officers should be allowed wide latitude to exercise business judgment."  Section 1.102-4(a) of the FAR states that "Government members of the Team must be empowered to make acquisition decisions within their areas of responsibility, including selection, negotiation, and administration of contracts consistent with the Guiding Principles.  In particular, the contracting officer must have the authority to the maximum extent practicable and consistent with law, to determine the application of rules, regulations, and policies, on a specific contract."  Thus, although its provisions are couched in terms of seemingly mandatory language (such as "shall"), they are nevertheless imbued with policy considerations and discretion.
 The United States notes that the FAR expressly allow the final written justification to post-date the award, and thus ORR did not violate the requirement in § 6.303-1(a) that it not commence negotiations before developing a written justification.  The United States also argues that the justification complied with the FAR.  Although it is not clear to the Court that the letter from Van Hanh to the Assistant Secretary seeking approval of the grant is in fact the required "justification," the parties treat it as such.  The United States asserts that the justification sufficiently complies with the criteria because it sufficiently demonstrates "the proposed contractor's unique qualifications."  Further, the justification attached AFH's proposal, the DGP memo that it qualified as an urgent application, as well as the OPRE memo and panel review results, which demonstrate a determination that the anticipated cost will be fair and reasonable and refer to the statutory authority allowing the non-competitive award.  *See* Def. Ex. 6 ("The cost of providing shelter care on the basis of per day/per child seems to be reasonable given the level of care.").  The letter also states that "[e]xhaustive efforts to identify a shelter facility in this region in the past have produced less than positive results" and that this facility was "truly a one of a kind find."  Given that agencies are "encouraged to conduct market research to the maximum extent practicable, consistent with the urgency, complexity, and dollar value of a proposed acquisition, as well as their past experience with the same or similar requirements," 48 C.F.R. § 310.001, this adequately addresses the market study requirement and a description of efforts made to ensure that offers were solicited from as many potential sources as possible.  However, the United States does not address the FAR requirement that the justification include a certification by a DHHS official as to the accuracy and completeness of the justification.

contends that the FAR do not apply to the Cooperative Agreement.[19]  Plaintiffs contend that the FAR

applies, asserting generally that "ORR must also comply with the Federal Acquisition Regulations"

and citing the deposition of Ken Tota.  Although Plaintiffs correctly cite to provisions in the FAR

that make it applicable to executive agencies, *see* FAR §§ 1.101, 1.301, Plaintiffs overlook the fact

that the FAR do not apply to all kinds of contracts.  Rather, the FAR apply to only acquisitions of

goods and services.

Numerous statutes and regulations, including the FAR and DHHS's own acquisition policies

and procedures that conform to the FAR, distinguish between *acquisition* and *assistance* through

grants and cooperative agreements.  *See, e.g.*, 48 C.F.R. § 307.7001 (distinction between acquisition

and assistance); 31 U.S.C. § 6301-6308; *see also Chem Serv. v. Env't'l Monitoring Sys. Lab.*, 12 F.3d

1256, 1259 n.5 (3d Cir. 1993) ("The Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 1, et seq.

(1992), governs the acquisition of supplies or services by all executive agencies.  The FAR covers

procurement contracts, but does not cover grants or cooperative agreements as defined by 31 U.S.C.

§ 6301 *et seq.*").

FAR § 1.104 states that "[t]he FAR applies to *all acquisitions* as defined in Part 2 of the

FAR, except where expressly excluded." (Emphasis added).  Acquisitions are defined in Part 2:

---

[19] The United States asserts that the FAR do apply to a Blanket Purchase Agreement ("BPA") used to fund operations at Nixon in May and June 2003, while the application for funding the cooperative agreement was pending.  *See* 48 C.F.R. § 13.303 (regulations concerning BPAs).  Plaintiffs do not appear to challenge ORR's decision to use the BPA or the procedures it followed in using the BPA.  Rather, the "challenged conduct" for purposes of the FTCA claim appears to be ORR's awarding of the grant/cooperative agreement beginning July 1, 2003.  Even if Plaintiffs do make such a challenge to the BPA, however, the Court finds that the decision to use the BPA and any alleged violations of mandatory duties associated with the use of the BPA as a temporary funding mechanism in May and June 2003 could not be causally related to any of Plaintiffs' injuries in this case, which are alleged to have occurred in 2006 and 2007.  *See Lopez v. United States Immigration & Customs Enforcement*, 455 F. App'x 427, 433 n.1 (5th Cir. 2011) (noting that even if USMS breached duty to inspect facility at inception of award in 2003, it would be difficult to conceive of how such a failure plausibly led to a death in 2006 from specific failures of medical care by facility's designees).

Acquisition means the *acquiring by contract* with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease, whether the supplies or services are already in existence or must be created, developed, demonstrated, and evaluated.  FAR § 2.101(b)(2).  *Contract* means "a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them. It includes all types of commitments that obligate the Government to an expenditure of appropriated funds and that, except as otherwise authorized, are in writing. . . . . *Contracts do not include grants and cooperative agreements covered by 31 U.S.C. 6301, et seq*." *Id.* (emphasis added).  It is undisputed that the agreement here is a cooperative agreement, and that it meets the definition in § 6305.  Accordingly, it is not governed by the general FAR provisions cited by Plaintiffs.

Ken Tota's deposition testimony, cited by Plaintiffs, is not to the contrary.  Plaintiffs cite his deposition at page 169, where he agreed that DHHS/ORR is required to comply with the FAR. However, that fact is not in dispute.  The question is whether the FAR provisions cited by Plaintiffs apply to this particular cooperative agreement, and they do not.  Therefore, Plaintiffs' arguments that ORR violated various requirements of the FAR with regard to the Cooperative Agreement must fail.[20]

---

[20]  The United States agrees with Plaintiffs that the cooperative agreement is governed by the HHS AAGAM.  *See* Tota depo. at 89-92.  The AAGAM states that single-source awards "must be supported by a justification approved by [illegible].  Justifications generally originate in the program office and are signed by the head of the cognizant program office or designee.  The justification must be reviewed by the awarding office GMO and the Chief Grants Management Officer (CGMO) before it may be forwarded to [illegible] for final action." Def. Ex. 5.  At a minimum, the justification must: (1) define the urgency, including its scope and duration; (2) specify any required deviations from the pre-award process; (3) indicate if awards are expected to be made on a single-source or limited competition basis; (4) name the intended recipient or class of intended recipients; and (5) indicate if there will be a need for additional related awards on either an urgent or non-urgent basis.  *Id.*  These requirements are summarized as "define urgency, scope, duration."  GAM Attachment 1. Plaintiffs do not allege that ORR violated these provisions of the GAM; they argue only that

With regard to publishing the notice in the *Federal Register*, the United States does not dispute that the AAGAM applies.[21]  The AAGAM states that "[a] *Federal Register* notice may be required as a means of notifying the public of the decision to make a single-source award."  Pl. Ex. 7; Docket no. 192, Ex. 5.  The AAGAM also states that the notice should be published as much in advance of the award as possible, but "must be published no later than the date of the award."  Pl. Ex. 7.  The parties do not provide the Court with the entire Manual, but nothing in the submitted portion states that the award may not be granted until the notice is published, nor does it state that failure to publish the notice invalidates an award.

The United States argues that it complied with the AAGAM requirement to publish notice in the *Federal Register*.  It states that the FAA was signed on September 12, 2003, while the notice appeared in the *Federal Register* on August 25, 2003.  68 Fed. Reg. 51292-02.  However, the FAA cited by the United States is for a $1.5 million award, which was awarded to AFH after it requested additional funding in September.  Def. Ex. 7.  The *Federal Register* notice refers to the original award of $797,152.  The FAA for that award amount is dated July 16, 2003.  Pl. Ex. 6.  Thus, the *Federal Register* notice was published after the initial award but before the revised award.  To the extent that the original award of $797,152 was superseded by the revised $1.5 million award, any

_____

ORR violated the FAR and violated the GAM requirement to publish notice in the *Federal Register*.

    Not all documents involved in this grant award have been produced to the Court, and Plaintiffs' exhibit 3 indicates that a "grant award package, including a Federal Register notice" should have been submitted to the Division of Grants Policy for review before the "decision memorandum package" was submitted to the Assistant Secretary.  The May 29 decision memorandum from Van Hanh to the Assistant Secretary references and attaches an "ORR transmittal memorandum" to the DGP, but that attachment was not produced.  The parties treat the decision memorandum letter from Van Hanh to the Assistant Secretary as the "justification."  If it is, the Court finds that it satisfies the requirements of the GAM.  However, there may be another document that is in fact the justification.

    [21] The United States asserts that DHHS uses the AAGAM for "general guidance."  Plaintiffs have not provided evidence that the AAGAM is in fact considered mandatory as opposed to "general guidance."

defects in publishing the notice after the award were rendered moot and could not have caused any harm to Plaintiffs. Although the August 25 *Federal Register* notice contained the lesser dollar amount, it nevertheless sufficiently fulfilled the purpose of notifying the public of the decision to make a single-source award. Therefore, as noted by the United States, any defects in the notice could not have caused any harm to Plaintiffs.

Even if ORR violated the GAM by failing to publish the notice of the award in the *Federal Register* before or simultaneously with the original award and even if it was mandatory, the violation of such a procedural requirement that does not inform or otherwise affect the agency's exercise of discretion does not negate application of the discretionary function exception. In *Berkovitz v. United States*, 486 U.S. 531 (1988), the Supreme Court held that issuing a product license without first receiving data that the manufacturer must submit showing how the product matched against safety regulations, which was required as a precondition to licensing, was not discretionary. Thus, proof that the product complied with safety standards was required before the agency could license the vaccine. But Plaintiffs point to nothing about the requirement to publish the notice of award in the *Federal Register*, which may be done at the same time the decision is made, that would affect the validity of the decision to make the award. The Fifth Circuit has noted that the statutory or regulatory violation complained of may be evidence of negligence in the performance of a duty. *Freeman v. United States*, 556 F.3d 326, 335 (5th Cir. 2009). Along those lines, in *Berkovitz*, the challenged act was licensing an unsafe vaccine, and the violation of the requirement of receiving safety compliance data was directly relevant to that action. The failure to meet the precondition constrained the agency's exercise of discretion. In contrast, the injury complained of by Plaintiffs here is the decision to award the contract to AFH, and the Plaintiffs have failed to show that the

failure to publish the notice of the award in any way constrained ORR's discretion in choosing to make the award, that it in any way rendered the decision negligent, or that, as a result of the failure, ORR's decision to award the grant to AFH otherwise exceeded the scope of ORR's authority. *See Spotts v. United States*, 613 F.3d 559, 569 (5th Cir. 2010) (indicating that the nondiscretionary duties that the government is alleged to have violated must constrain the agency's discretion).

Plaintiffs cite no FTCA case that states that violations of such procedures designed to ensure competition, efficiency, or uniformity in government contracting, but that would not have prohibited the ultimate decision made or otherwise constrained the employee's discretion in making that decision, vitiates the discretionary function exception. Violations of such procedures could be an abuse of discretion, but such abuses would not render the ultimate decision non-discretionary. *See In re Katrina Canal Breaches Litigation*, 696 F.3d 436, 450 (5th Cir. 2012) (noting that NEPA is a procedural, not a substantive, statute that does not mandate particular results but simply prescribes the necessary process and mandates that the agency gather information concerning a project's environmental consequences to inform its discretion in decisionmaking, such that undisputed violation of NEPA did not affect substantive decision making power and was at most an abuse of discretion); *see also Freeman v. United States*, 556 U.S. 326 (5th Cir. 2009) (plaintiffs alleged that Secretary Chertoff failed to comply with requirement that he identify and establish procedures for the rapid deployment of appropriate assets within 120 days, and the Fifth Circuit concluded that "despite the delay, this agency time line created no judicially enforceable duty on the part of Secretary Chertoff"); *Rosas v. Brock*, 826 F.2d 1004, 1010 (11th Cir. 1987) ("[I]f a discretionary decision is made without following mandated procedures, it is an abuse of discretion and, as such, protected from judicial review under section 5148.") (citing *Jayvee Brand, Inc. v. United States*, 721

F.2d 385 (D.C. Cir.1983) (failure of government to follow required notice and comment procedures is an abuse of discretion and within discretionary function exception to FTCA)).

Moreover, the project period for the original award of the grant/Cooperative Agreement ended June 30, 2006.  None of the Plaintiffs allege that they suffered any harm before that date.[22] Therefore, although Plaintiffs complain of alleged nondiscretionary violations with regard to the 2003 award, they fail to show how that award or any alleged violations connected to that award are relevant to their injuries.  Rather, Plaintiffs must point to nondiscretionary acts by ORR in awarding the extension for July 1, 2006 to September 30, 2006, or in awarding the grant to AFH for the project period beginning October 1, 2006.  Plaintiffs do not specifically challenge these decisions. To the extent Plaintiffs would argue that these decisions were nondiscretionary because ORR was on notice in 2006 of allegedly dangerous conditions at Nixon, the Court finds that these decisions were within the discretionary function exception because Plaintiffs point to no mandatory requirement that was violated and ORR's decision to continue working with AFH, like its decision to initially award the grant to AFH, involves the types of policy choices protected by the discretionary function exception.

### b. Grant Administration Violations

Plaintiffs also complain that ORR violated grant administration regulations during its administration of the Cooperative Agreement.  The United States contends that it is unclear whether

---

[22] Plaintiffs have not provided the Court with the specific dates that they were housed at Nixon. However, evidence submitted in connection with the motions for summary judgment on the deliberate indifference claim indicates that O.B. arrived at Nixon on July 31, 2006; J.C.C.B. on November 16, 2006; P.A.S.G. on November 21, 2006; J.A.A.L. on November 29, 2006; E.R.J. on December 14, 2006; D.A.E.F. on December 18, 2006; E.H.C. on January 2, 2007; and E.A.F.F. on January 11, 2007.  ORR027745-27746. The Sixth Amended Complaint states that W.O.G. was apprehended in August 2006, and then housed at a facility for adults before being placed at Nixon.  Sixth Am. Compl. ¶ 109.  The Court has been unable to determine when O.E.F. or J.M.R. arrived at Nixon.

Plaintiffs "believe this pertains to their 'negligent selection' or 'negligent supervision' claim." However, it appears that Plaintiffs are asserting that these violations affected ORR's discretion to maintain the grant relationship with AFH and continue funding.  *See* Docket no. 190 at 9.  This argument therefore appears to relate more to the negligent contracting/negligent selection claim than the negligent supervision claim.

Plaintiffs argue that ORR violated post-award requirements in 45 C.F.R. Part 74. Specifically, Plaintiffs argue that ORR failed to comply with 45 C.F.R. § 74.27, which regulates "allowable costs."[23]  Plaintiffs argue that ORR was aware of AFH's misrepresentation of work performed by CEO Don Rains and President Jack Eben and knew that they did not work full time at Nixon, yet continued to include full-time salaries in the budget.  Pl. Ex. 16 at ORR003935. Plaintiffs argue that these were not allowable costs because FAR § 31.205-6 "require[s] that payment be limited to work actually performed."  Docket no. 190 at 15.[24]  In addition, "Compensation for each employee or job class of employees must be reasonable for the work performed. Compensation is reasonable if the aggregate of each measurable and allowable element sums to a reasonable total."  *Id.*

Ken Tota testified that the budget was the product of negotiation.  As can be seen from the regulations, the reasonableness of compensation is not a fixed measure.  As the United States points

---

[23] Section 74.27 states, "For each kind of recipient, there is a particular set of Federal principles that applies in determining allowable costs. Allowability of costs shall be determined in accordance with the cost principles applicable to the entity incurring the costs. . . .  The allowability of costs incurred by commercial organizations and those nonprofit organizations listed in Attachment C to Circular A–122 is determined in accordance with the provisions of the Federal Acquisition Regulation (FAR) at 48 CFR part 31, except that independent research and development costs are unallowable."

[24] Section 31.205-6 actually states that "[c]ompensation for personal services must be for work performed by the employee in the current year and must not represent a retroactive adjustment of prior years' salaries or wages . . . ."

out, ORR took reasonable steps to sort out the issues with the salaries, and expressed frustration that the issue had not been resolved and ordered an audit of Nixon.  Pl. Ex. 8. The United States asserts that "Plaintiffs have not identified any mandated action that was not taken by ORR with respect to this non-issue, nor can they connect it in any way to alleged failures in awarding the grant to AFH."

The Court agrees.  The relevant inquiry is whether the policy specifically addresses how an official must confront a given situation.  *Lopez*, 455 F. App'x at 433 (citing *Freeman v. United States*, 556 F.3d 326, 339-40 (5th Cir. 2009)).  A policy may direct general policy goals, such as determining compliance with certain guidelines, but when the policy fails to prescribe 'specific direction' as to what course of action an employee must follow, it generally fails to establish a nondiscretionary duty.  *Id.*  In addition, the plaintiff must establish a plausible causal relationship between the breach of the nondiscretionary duty and the plaintiff's injury.  *Lopez*, 455 F. App'x at 433 n.1.  Plaintiffs point to no regulation setting a mandatory course of action that ORR violated, nor do Plaintiffs demonstrate that any irregularity with regard to these salaries would have required ORR to terminate the grant.  Accordingly, Plaintiffs demonstrate no violation of a mandatory requirement and no link between the payment of salaries to Rains and Ebens and Plaintiffs' injuries.

Plaintiffs further contend that ORR impermissibly failed to correct known disallowed costs regarding lease and mortgage payments on AFH's real property.  Plaintiffs argue that, "despite much wringing of hands, . . . ORR never took any action to correct these unallowable costs."  Docket no. 190 at 17.  The United States contends that Plaintiffs' claim is conclusory and identifies no specific payments made for disallowed costs, and does not identify any policy or regulation that was violated.  The United States argues that Plaintiffs cite no mandatory policy or regulation prescribing a course of action that ORR failed to pursue.  In any event, the United States contends, ORR did not

30

ignore alleged financial improprieties but instead investigated and took steps to remedy the improprieties.

The Court agrees that Plaintiffs do not point to the violation of a mandatory duty associated with ORR's decision to continue the grant award to AFH in spite of the irregularities with the lease and mortgage. Plaintiffs point to no mandatory course of conduct that would govern ORR's conduct after learning of potential irregularities with the lease or would require ORR to take a specific action or to terminate the grant. At most, Plaintiffs demonstrate an abuse of discretion in administering the grant, but that does not remove ORR's decisions to contract with AFH or to continue the grant from the discretionary function exception.

Plaintiffs contend that, upon termination of the grant, ORR was required to take certain actions regarding the real property pursuant to 45 C.F.R. § 74.32(c). However, as noted by the United States, Plaintiffs fail to demonstrate how any such failure to take those actions is causally related to any harm suffered by Plaintiffs since the grant was terminated well after all of the alleged abuse occurred. *See Lopez v. United States*, 455 F. App'x 427, 433 n.1 (5th Cir. 2011) (plaintiffs "had to allege facts that, if true, would demonstrate a plausible causal relationship between the nondiscretionary duty" and the harm).

## C. Negligent Supervision/Oversight (Twelfth and Thirteenth Causes of Action)

In the Twelfth Cause of Action, Plaintiffs argue that Defendants Newton, Dunn, Ortiz-Ang, De La Cruz, Gonzalez, Mungia, Moore, and Wolde were negligent in carrying out their legal duties to ensure the proper treatment, care, welfare, safety, and protection of the minors detained at the facility. Sixth Am. Compl. ¶ 277. In the Thirteenth Cause of Action, Plaintiffs allege that Newton, Dunn, Ortiz-Ang, De La Cruz, Mungia, Gonzalez, Moore, and Wolde were negligent in training,

supervising, monitoring, and controlling their employees, agents, and/or contractors at the Nixon facility.  *Id.* ¶ 285.  Thus, Plaintiffs allege that these Defendants negligently supervised Nixon employees and the care of the minors at Nixon.

### 1. Negligent Supervision/Oversight in General

The United States asserts that ORR had discretion to decide how to monitor Nixon and followed its own policies governing the oversight of such facilities.  Under 6 U.S.C. § 279, ORR is responsible for overseeing the infrastructure and personnel of facilities in which unaccompanied alien children reside and conducting investigations and inspections of facilities in which unaccompanied children reside, including regular follow-up visits to such facilities to assess the continued suitability of such placements.  6 U.S.C. § 279(b)(1)(G),(L).  The United States argues that § 279 does not specify the type, frequency, or degree of ORR's oversight, thus leaving these decisions to ORR's discretion.  The United States contends that the statute also leaves to ORR's discretion the specific parameters of its investigations and inspections of the facilities in which unaccompanied alien children reside.

The United States asserts that ORR has not promulgated any regulations pursuant to 6 U.S.C. § 279, but has developed an internal Policies and Procedures Manual ("ORR Manual") that provides guidance on the placement and monitoring of unaccompanied alien children.  The *Flores* Agreement also requires the monitoring of a care provider's compliance with the terms of the Agreement. *Flores* Agreement at ¶ 28A ("An INS Juvenile Coordinator . . . shall monitor compliance with the terms of this Agreement and shall maintain an up-to-date record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours.").

The ORR Manual provides that the ORR Project Officer charged with supervising a

particular cooperative agreement is required to conduct on-site monitoring of the facility at least once a year and more frequently if necessary, but neither the ORR Manual nor the *Flores* Agreement specifies the conditions precedent to enhanced monitoring nor the frequency of such monitoring. According to the "stipulation of undisputed facts" submitted by the United States and the evidence in the record, the ORR Project Officer responsible for the Nixon Facility met the annual monitoring requirement, and also conducted more frequent monitoring of quarterly program progress reports and weekly statistical data submitted by AFH. This is not disputed by Plaintiffs.

Further, according to the statement of undisputed facts, before September 2006, ORR oversaw the Nixon facility primarily through reports to the Project Officer and periodic visits by a federal field specialist, and ORR staff reviewed reports by the facility to monitor compliance with the cooperative agreement and followed up with facility management as needed. In September 2006, after ORR received information about the unreported incident of child sexual abuse that had occurred in April 2006, ORR concluded it could work with the program to prevent this sort of failure in the future. On October 18, 2006, ORR provided to AFH staff at the Nixon facility technical assistance on reporting child abuse, including a review of Significant Incident Reports and the ORR Manual. After ORR became aware of the November 2006 restraint incident in which a Nixon facility employee was found to have abused a resident, ORR conducted a series of conference calls and instructed AFH management to provide training to their staff on ORR policies and procedures, state requirements, and the shelter policy on abuse and neglect. ORR also conducted a site visit in late November and provided three days of intensive technical assistance to AFH staff and management.

After learning of Leal's sexual abuse of several residents in February 2007, ORR suspended

new placements at the Nixon Facility, increased oversight, and conducted unannounced visits.  ORR field personnel and management interviewed staff, administrators, and residents and reviewed staffing patterns.  Between February 27 and March 7, ORR transferred all residents out of the facility.  ORR ultimately determined it would not be safe to return children to the facility and terminated its cooperative agreement by letter dated June 25, 2007.

The United States argues that determining the extent and manner of its oversight of the facilities for unaccompanied minors was within ORR's discretion, and to the extent it developed policies that applied to the monitoring of the Nixon Facility, those policies were followed.  The United States further argues that ORR's response to the information it received from Nixon, including incidents of abuse, was within its discretion.  Thus, the United States argues, the first element of the discretionary function test is satisfied.

With regard to the second element, the United States argues that ORR's oversight was susceptible to and actually involved policy considerations insofar as political and economic policy considerations are inherent in decisions made by federal agencies such as ORR concerning staffing levels.  The United States asserts that ORR had approximately 1100 minors in its custody residing in 33 facilities in eight states, and exercised its discretion in allocating its limited resources in an economically feasible manner that would maximize the agency's ability to accomplish its objectives.  The United States contends that ORR officials made discretionary determinations concerning the amount of resources to devote to monitoring each of the facilities for unaccompanied alien children, including Nixon, in an attempt to ensure that sufficient oversight of all of the facilities was accomplished within the constraints of the resources allocated to the agency.  The United States argues that courts have repeatedly found that the degree of the government's oversight of a

contractor, such as ORR's oversight of AFH, is the type of decision the discretionary function exception was intended to protect.

The United States is correct that government decisions regarding oversight of its contractors are generally held to be of the type protected by the discretionary function exception.  In *Guile v. United States*, 422 F.3d 221, 231 (5th Cir. 2005), the Fifth Circuit held that "[s]upervision of a contractor's work, including the degree of oversight to exercise, is inherently a discretionary function."  Courts have also generally held that decisions relating to hiring, training, and supervision of employees usually involve policy judgment of the type Congress intended the discretionary function exception to shield.  *See Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) (listing cases).  Further, the discretionary function exception protects agency decisions concerning the scope and manner in which it conducts investigations as long as the agency does not violate a mandatory directive.  *Id.*

In *Lopez*, the plaintiff argued that the United States Marshals Service breached its own nondiscretionary policies in failing to inspect a contract facility housing those in federal custody and failing to oversee the facility's medical care.  *Lopez*, 455 Fed. App'x at 432.  The USMS directives stated that an institution needed to be inspected before the award of an intergovernmental agreement and annually thereafter.   Another directive required the agency to conduct an initial on-site inspection to determine the facility's level of compliance with USMS inspection guidelines.  The Court noted that the directives "provided no guidance, or even mention, on a variety of topics relating to this inspection obligation."  *Id.* at 433.  "Such issues include whether the grant of an IGA was to be contingent on a specific level of compliance, what minimum 'level of compliance' (implying a continuum of potential compliance, and thus discretion vested in the USMS) a facility

had to meet, and what remedial actions to take (if any) in the event of insufficient compliance with USMS guidelines." *Id.* The Court concluded that the decisions on how to conduct an inspection and whether to rely on annual state inspections "were imbued with policy and discretionary factors" and the USMS inspection directive did not impose a nondiscretionary duty to inspect the facility as opposed to merely mandating best practices before and after the award of an IGA. *Id*. In addition, the Court held that directives providing that the USMS would ensure that all USMS prisoners receive medically necessary health care services, that emergency services would be provided immediately, and that facilities must meet minimum conditions of confinement presented only discretionary duties, noting that supervision of a contractor's work, including the degree of oversight to exercise, is inherently a discretionary function. *Id.* (citing *Guile*, 422 F.3d at 231).

Here, ORR was given authority to supervise the facilities and personnel of the facilities in which unaccompanied children were housed, and to develop policies and regulations concerning that oversight. Like in *Varig Airlines*, ORR had to make policy decisions concerning how to allocate its resources to oversee the facilities and personnel. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984) (government had discretion to establish and implement mechanism for enforcing compliance with minimum safety standards and its decision to use spot check program and application of that program to the particular aircraft involved protected policy decisions). The Supreme Court in *Varig Airlines* stated, "When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind. Decisions as to the manner of enforcing regulations directly affect the feasibility and practicality of the Government's regulatory program; such decisions require the agency to establish priorities for the accomplishment of its policy

objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding." *Id.* at 819-20.

The only specific requirement implemented by ORR regarding monitoring was contained in the ORR Manual and Cooperative Agreement, which required that program monitoring be conducted "at least once annually and more frequently if ORR/DUCS deems it is necessary." Coop. Agrmt. 3.2a.; ORR Manual at 4.01 ("The PO will conduct on-site monitoring of care providers at least once a year and desk monitoring more frequently through telephone calls and monthly statistical data and program progress reports.").  Plaintiffs complain that, despite knowing that AFH's only experience caring for children was operating a secure juvenile detention facility for one year, knowing that the director was unqualified, and knowing that Nixon was located in an area that would make it difficult to hire sufficient qualified staff, ORR relied almost exclusively on AFH's self-reporting to ensure the safety of the children.  Docket no. 190 at 19.  However, ORR's decisions to require only annual onsite monitoring and unspecified amounts of desk monitoring, and its decisions to rely heavily on self-reporting is protected by the discretionary function exception.

 Further, employees' decisions regarding implementation of the monitoring program are also discretionary and protected by the discretionary function exception.  Plaintiffs complain that ORR knew of abuse and mismanagement and knew that AFH could not be relied upon to report incidents, yet failed to take appropriate action.  However, ORR's decisions in this regard are also protected by the discretionary function exception.  The Project Officer was given discretion and specifically empowered to make policy judgments concerning how to respond to information obtained during monitoring.  *See* Cooperative Agreement at 3.2a ("After a monitoring, the PO will follow up to ensure the timely resolution of issues that need corrective actions or to confirm the implementation

of recommendations made during the monitoring."); ORR Manual at 4.01 ("If the PO identifies areas of concern that need improvement, then those areas of concern shall become part of the program's evaluation. If issues arise, regarding noncompliance, the PO shall communicate his/her concerns in writing to the Program Director within 30 days of the monitoring visit or receipt of information related to the area of concern or noncompliance. The PO will then request a Corrective Action Plan from the Program Director and determine a time frame for resolution. The PO is responsible for follow up of the implementation of the corrective actions and recommendations.").

The provisions of 45 C.F.R. Part 74 also demonstrate that ORR and its employees had discretion regarding how to supervise the grant. 45 C.F.R. § 74.61 provides that awards *may* be terminated by the HHS awarding agency if a recipient materially fails to comply with the terms and conditions of an award. 45 C.F.R. § 74.62 provides that, if a recipient materially fails to comply with the terms and conditions of an award, the HHS awarding agency may, in addition to imposing any of the special conditions outlined in § 74.14, take one or more of the following actions, as appropriate in the circumstances: (1) temporarily withhold cash payments pending correction of the deficiency by the recipient or more severe enforcement action by the HHS awarding agency; (2) disallow all or part of the cost of the activity or action not in compliance; (3) wholly or partly suspend or terminate the current award; (4) withhold further awards for the project or program; or (5) take any other remedies that may be legally available. The regulations demonstrate that ORR employees were given individual discretion in supervising AFH and determining how to deal with noncompliance issues.

Similarly, the Cooperative Agreement gave ORR discretion in determining the appropriate response to noncompliance. The Cooperative Agreement states that it is a performance-based

agreement, and satisfactory performance includes, but is not limited to: effective rate of release including family reunifications based on the type of UAC population served, quality of services, quality of personnel, effective staff training, and effective program management. Coop. Agrmt. Art. III.  It states, "Appropriate corrective measures shall be recommended by ORR and implemented by the Recipient within a reasonable period of time before ORR takes corrective action.  Corrective action includes: freezing of funds, suspension, and termination (in ascending order)." Coop. Agrmt. Art. III.  Thus, ORR employees were given discretion to evaluate performance and determine appropriate corrective measures.  Although Plaintiffs do not agree with the decisions made by ORR in supervising AFH, ORR's decisions are protected by the discretionary function exception.

Plaintiffs nevertheless argue that ORR's negligent supervision of AFH is not protected by the discretionary function exception because ORR violated several mandates, including the Constitution.  Plaintiffs contend that ORR employees violated mandatory requirements by approving unqualified people for key AFH positions, by violating state child welfare laws regarding abuse, by failing to comply with their mandatory job duties, and by being deliberately indifferent to the risk of abuse in violation of the Due Process Clause.

## 2. Approval of Key Personnel

Plaintiffs argue that the ORR Manual requires that ORR approve the hiring of key personnel, and that ORR did not have discretion to approve an individual who lacked the minimum qualifications.  Therefore, Plaintiffs argue, ORR violated its policy by allowing Maggie Gaytan to serve as the facility's director because she held only a bachelor's degree in criminal justice rather than the required bachelor's degree in education, psychology, sociology, or other relevant behavioral science.  Plaintiffs argue that this fails to meet the requirement and raises "obvious concerns about

her approach to caring for ORR's children and her ability to create a safe, rather than punitive, environment." Docket no. 190 at 26. Plaintiffs further assert that Gaytan was unqualified because she had no experience directing a youth program, did not have an administrator's license, and had limited managerial experience. Plaintiffs assert that ORR eventually determined that AFH could not safely care for the children with Gaytan as director. Plaintiffs thus contend that "[h]iring Gaytan in 2003 in violation of ORR's own policy predictably brought about the precise result the policy was arguably designed to prevent: severe harm to children." Docket no. 190 at 27.

Plaintiffs also argue that ORR violated its policy by approving the Lead Case Manager, insofar as the ORR Manual required the candidate to hold either a Master's degree in the behavior sciences, human services, or social services plus at least three years of progressive employment that demonstrates supervisory and case management experience, or a minimum of a bachelor's degree plus five years progressive employment that demonstrates supervisory and case management experience. Pl. Ex. 71. Plaintiffs assert that the candidate approved by ORR did not even have a bachelor's degree. Pl. Ex. 77.[25] Plaintiffs contend that this person was in the position through March 2007, and most of the documented incidents of abuse at AFH occurred while he was Lead Case Manager. Plaintiffs assert that, after all the abuse occurred, ORR decided that he should be terminated. The record indicates that he was terminated for knowing about some of the allegations of sexual abuse but never raising a concern. Pl. Ex .76.

The Court notes initially that Plaintiffs do not provide evidence that the ORR Manual, including its provisions requiring personnel hiring approval, was in existence at the time Gaytan or the Lead Case Manager were approved and hired in 2003. The record indicates that it was not

---

[25] The record indicates that this person was hired in 2003. Pl. Ex. 78.

written until later.  Tota depo. at 194 ("Q: But there was no ORR policy manual in place in 2003 when you entered into the agreement with Nixon; is that correct? A: Not in 2003.").  Therefore, ORR personnel could not have violated policies that did not yet exist.  In addition, Plaintiffs have not shown that any of the individuals who were allegedly negligent and were named in the Complaint were involved in hiring or approving the hiring of these individuals in 2003.

Even if the Manual applied insofar as Plaintiffs allege that ORR "allowed" these individuals to continue to be employed after 2003 or in connection with the 2006 grant award, the Court agrees with the United States that, while the Manual states that key personnel shall have certain qualifications, the Manual imposes no mandatory duty on ORR personnel.  The Manual imposes only a mandatory obligation on AFH to obtain approval from ORR.

The Manual section on "Staffing Requirements" for the shelter states, "A care provider must submit to the ORR Project Officer a request for approval of the job description, resume, cover letter, application and any other applicable documents of any key personnel prior to their hire."   In the "Policy" section, it states "[K]ey personnel positions must be filled. Approval from the ORR is required prior to filling each of these key positions."  ORR Manual 1.01.  There is no mandatory directive to ORR to not approve candidates who fail to meet the criteria, and nothing in the Manual expressly limits ORR's discretion to approve of key personnel unable to meet the qualifications. In fact, the 2006 program announcement supports the conclusion that ORR had discretion to approve individuals who did not meet the minimum job requirements. *See* Docket no. 64-6 ("ORR approval is required for each of these positions prior to hire.  Exceptions to the required minimum qualifications listed below require ORR approval.").  Thus, Plaintiffs fail to establish that ORR violated any mandatory, nondiscretionary duty with regard to approving key personnel.

### 3. State Child Welfare Laws

Plaintiffs further contend that ORR violated Texas child welfare laws protecting children. Plaintiffs argue that ORR violated abuse laws, citing the Texas Family Code § 261.001, which defines abuse as (1) permitting the child to be in a situation in which the child sustains a mental or emotional injury that results in an observable and material impairment in the child's growth, development, or psychological functioning, and (2) failure to make a reasonable effort to prevent an action by another person that results in physical injury that results in substantial harm to the child. Plaintiffs also cite Texas Penal Code § 22.04(a)[26], stating that it "criminalizes knowingly or recklessly by omission causing bodily injury to a child." Plaintiffs state that they have not been able to locate any FTCA cases directly on point, but argue that when the federal government subjects itself to state law, violation of those laws is not discretionary. Plaintiffs argue that ORR cannot make itself the children's conservator and then refuse to comply with state law governing that relationship.

The United States argues that a generalized allegation that Defendants violated these statutes is insufficient to support Plaintiff's claim. The Court agrees. These criminal laws do not include mandatory, specific direction as to what course of action an employee must follow. Rather, they are written at a level of generality such that they fail to prescribe a nondiscretionary course of action and necessarily require the agency to exercise judgment and choice to comply. *See Freeman*, 556 F.3d at 339 ("Statements made at this level of generality do not satisfy [the] specific prescription requirement."). They fail to establish a nondiscretionary duty. *Lopez*, 455 F. App'x at 433 ("As this

---

[26] "A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual: (1) serious bodily injury; (2) serious mental deficiency, impairment, or injury; or (3) bodily injury."

court has found, many policy statements couched in seemingly mandatory language ultimately present only 'generalized, precatory, or aspirational language that is too general to prescribe a specific course of action for an agency or employee to follow.'"); *Guile*, 422 F.3d at 230-32 (when the policy fails to prescribe "specific direction" as to what course of action an employee must follow, it generally fails to establish a nondiscretionary duty).

### 4. Compliance with "Mandatory" Job Duties

Plaintiffs further argue that ORR personnel failed to comply with mandatory job duties. Plaintiffs allege that De La Cruz, the FFS Supervisor, failed to communicate with TDFPS until September 2006, after being promoted to supervisor.  In support of an alleged mandatory duty to liaise with TDFPS, Plaintiffs cite documents that include descriptions of FFS job duties.  Plaintiffs recognize that De La Cruz had some discretion in determining how frequently to communicate with TDFPS, but they argue that "failing to communicate at all with the state agency enforcing basic standards in the AFH facility for several months – several months during which children were abused and the state agency was investigating those allegations – was not a matter of choice." Similarly, Plaintiffs argue that De La Cruz had a duty to communicate with AFH staff, including directors, case managers, and mental health professionals, but he failed to have any meaningful contact with facility workers from May to September 2006.

Plaintiffs argue that once De La Cruz had contact with TDFPS and Nixon staff, he learned of the serious, widespread problems, and that once De La Cruz complied with his mandatory responsibilities with regard to Nixon, ORR learned of problems that contributed to the abuse, such as that the Lead Clinician was not at the facility full-time.  Plaintiffs argue that the failure to communicate was outside De La Cruz's discretion.

43

The United States contends that these duties were discretionary, and that no policy, regulation, or statute prescribes the frequency with which ORR federal field specialists were required to be in contact with TDFPS.  Accordingly, the job description lacks the specificity necessary to qualify as a mandatory directive for purposes of the discretionary function analysis. With regard to communications with Nixon staff, the United States argues that De La Cruz did in fact communicate with Nixon during the May to September 2006 time frame.  The United States points to evidence of contacts on May 25, June 2006, August 23, and September 13.  Thus, the United States argues, Plaintiffs fail to show a violation of a specific, mandatory policy or directive, and instead complain of the quality of the contacts.

Plaintiffs fail to establish when these job duties and descriptions were written or established, whether they applied to De La Cruz (a supervisor) as opposed to a local FFS such as Gonzalez, or that they were in fact mandatory and non-discretionary.  *See* Pl. Ex. 83, Pl. Ex. 84.  Further, Plaintiffs fail to allege or demonstrate that any of them suffered injury during the time in which De La Cruz allegedly failed to liaise with TDFPS.  The record shows that he was in contact with TDFPS by September 2006, and Plaintiffs have not demonstrated that they themselves were abused before that time.  In addition, the Court agrees with the United States and finds that De La Cruz's performance of his general job duties falls within the discretionary function exception because the job descriptions do not qualify as specific, mandatory duties and/or were not violated.

### 5. Constitutional Violation – Deliberate Indifference

Plaintiffs also argue that ORR officials acted with deliberate indifference, in violation of the Due Process Clause, and they did not have discretion to violate the Constitution.  Specifically, Plaintiffs argue that Defendants Tsegaye Wolde, Jose Gonzalez, James De La Cruz, and Susanna

Ortiz-Ang were deliberately indifferent to a significant risk of abuse to residents at Nixon.

It is clear that the FTCA does not waive immunity for constitutional torts. *FDIC v. Meyer*, 510 U.S. 471, 486 (1994).  But whether violation of a constitutional provision such as the Due Process Clause can establish a lack of discretion in relation to a state-law based tort claim under the FTCA is currently an open question in the Fifth Circuit.  *Lopez v. United States Immigration & Customs Enforcement*, 455 F. App'x 427, *5 (5th Cir. 2011).[27]  *But see Patel v. United States*, 398 F. App'x 22 (5th Cir. 2010) (the discretionary function exception does not apply if the challenged act exceeds the scope of the actor's authority as designated by statute or the Constitution) (citing *Sutton v. United States*, 819 F.2d 1289, 1293 (5th Cir. 1987)).

The Court concludes that it need not decide whether the claim that ORR employees violated Plaintiffs' due process rights brings their claims outside the discretionary function exception because Plaintiffs have failed to demonstrate that ORR employees acted with deliberate indifference. The Court has decided, by separate opinion, that Defendants Wolde, Gonzalez, and De La Cruz are entitled to qualified immunity on Plaintiffs' *Bivens* claims alleging deliberate indifference.  The Court concluded that these Defendants were not deliberately indifferent as a matter of law. Therefore, these Defendants did not act outside their discretion by violating the Constitution, as alleged by Plaintiffs.

Plaintiffs did not allege a *Bivens* claim against Ortiz-Ang, but they argue that De La Cruz and Gonzalez were required to tell Ortiz-Ang about patterns of abuse and failures to report.  They contend that either "Ortiz-Ang knew of the extensive abuses and management problems at the

---

[27] In an unpublished decision, the Fifth Circuit has held that the Eighth Amendment's prohibition on cruel and unusual punishment does not define a non-discretionary course of action specific enough to render the discretionary function exception inapplicable.  *Garza v. United States*, 161 F. App'x 341, 343 (5th Cir. 2005) (citing cases from other circuits).

facility from the Field Specialists' report, or De La Cruz and Gonzalez failed to tell her what they knew of AFH abuse."  Docket no. 190 at 35.  However, Plaintiffs have not demonstrated that Ortiz-Ang knew any more than De La Cruz or Gonzalez, who the Court has already found were not deliberately indifferent.  Therefore, Plaintiffs fail to plead a claim that is facially outside the exception.

### 6. Policy Judgment

The Court agrees with ORR that "[s]upervision of a contractor's work, including the degree of oversight to exercise, is inherently a discretionary function."  *Guile*, 422 F.3d at 230.  The United States has shown that ORR was given statutory responsibility to oversee the facilities housing unaccompanied minors.  To the extent it was given discretion in determining how to carry out that responsibility, its planning level decisions in this regard would involve social, economic, and political policy.  *Gaubert*, 499 U.S. at 324.  Further, its agents' discretionary decisions in implementing ORR's policies, even if an abuse of discretion, are presumptively protected.  *Id.* ("When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion."); *Freeman*, 556 F.3d at 337-38 ("We therefore hold that the government's conduct under the NRP – even its failure to provide food, water, shelter, medical assistance, and transport to the Convention Center and to the Cloverleaf – qualifies under the . . . discretionary function exception.").  Plaintiffs do not allege facts that would indicate that ORR's or ORR's agents' decisions were not grounded in policy.

Plaintiffs argue that knowingly exposing children to a substantial risk of abuse and failure to respond to a clear safety crisis are not permissible policy choices.  They contend that Defendants'

46

decisions were not based upon the purposes that 6 U.S.C. § 279 seeks to accomplish, and therefore the discretionary function exception fails the second prong of the *Gaubert* test.  Plaintiffs rely on *Whisnant v. United States*, 400 F3d 1177, 1183 (9th Cir. 2005) and *Andrulonis v. United States*, 924 F.2d 1210, 1219 (2d Cir.), opinion reinstated by 952 F.2d 652 (2d Cir. 1991).  In *Whisnant*, the plaintiff claimed that the Navy negligently failed to maintain safe and healthy premises at a naval base commissary because it allowed toxic mold to accumulate and persist.  The Court held that removal of toxic mold, an obvious hazard, is not a matter of safety or policy, but of professional and scientific judgment.

In *Andrulonis*, the court held that the government's decisions to encourage rabies research, provide funding for the research, and provide NYSDOH with the virus were protected by the discretionary function exception, but a scientist's failure to warn another scientist of the extreme dangers presented by the particular circumstances of a specific experiment that the scientist observed but failed to interrupt was not protected because "the situation simply did not lend itself to policy balancing."  924 F.2d at 1219.  The Court concluded that, once he became aware of the risks, the scientist was obligated to give a warning.  *Id.*

However, in *Spotts*, the Fifth Circuit expressly noted that *Whisnant* is not binding precedent in our circuit and was readily distinguishable from the claims at issue in *Spotts*.  *Spotts*, 613 F.3d at 573 n.11.  In *Spotts*, the Fifth Circuit considered whether the government's decision not to evacuate a penitentiary in the aftermath of Hurricane Rita was the type of public policy consideration that the discretionary function exception shields from scrutiny.  The Court held that "it is clear that the health, safety, financial, and other feasibility concerns implicated by the evacuation decision render that decision susceptible to policy analysis."  *Id.* at 573.

The facts in this case are much more analogous to *Spotts* than to *Whisnant* or *Adrulonis*. Defendants were faced with a situation where they learned that AFH had failed in certain instances to prevent and report abuse, which indicated a possible risk of future abuse, but not an immediate risk to a known victim, and they had to decide what steps to take in response, including whether to continue working with the facility and, if so, under what conditions. Plaintiffs argue that ORR had many possible measures available to address the threat to children at Nixon, such as moving all children out while key changes were implemented. However, choosing among the many possible measures to respond to possible risks was susceptible to and did involve policy considerations of the type protected by the discretionary function exception. ORR's responses involved weighing the past performance of Nixon, individual assessments of whether Nixon could be trusted to perform up to standards, evaluating the viability and the consequences of closing Nixon or relocating the residents, and myriad other economic and policy-based decisions. *See, e.g.*, Pl. Ex. 134, Pl. Ex. 138, Pl. Ex. 144.

**D. Conclusion**

The Court concludes that the discretionary function exception applies and requires that Plaintiff's Twelfth and Thirteenth Causes of Action be dismissed in their entirety without prejudice for lack of jurisdiction. This includes Plaintiffs' claims related to physical and sexual abuse and denial of medical care, for which this Court permitted discovery, as well as those aspects of the claims related to general care and welfare of the children and alleged violations of the *Flores* Agreement. Although the Court denied Plaintiffs' discovery on the general welfare and *Flores* violations aspects of these claims because Plaintiffs had not yet established that they amounted to underlying state torts even if the conduct was nondiscretionary, the Court finds that Plaintiffs have

not alleged facts bringing these claims outside the discretionary function exception and that Plaintiffs are not entitled to additional discovery.

### IV. Analysis – Independent Contractor Exception

In their Fourteenth Cause of Action, Plaintiffs assert a negligence claim based on the conduct of Defendants AFH and AFH employees Maggie Gaytan, Don Rains, Lesvia Monreal, Hector Amaya, Robert Garza, and Ruben Velasquez, who Plaintiffs allege were acting as federal employees within the scope of their employment and under color of federal law.  Specifically, Plaintiffs allege that Defendant AFH and its employees were performing an exclusive government function in detaining the minors on behalf of the United States, and that ICE and DUCS supervised and controlled all aspects of the conditions and operations at the Nixon Facility and treatment of the minors detained there.  Plaintiffs allege that AFH, Gaytan, Rains, Monreal, Garza, Amaya, and Velasquez had the legal duty to ensure the health and safety of the minors detained at Nixon, and negligently failed to screen, monitor, train, and supervise their employees, and were negligent in failing to enact and enforce policies and practices to protect the youth at the facility.  The United States moves to dismiss, contending that this claim is barred by the FTCA's independent contractor exception because Plaintiffs can assert no facts establishing that AFH was a federal entity or that employees were acting as federal employees.

**A. Applicable Standard**

The United States moves to dismiss Plaintiffs' Fourteenth Cause of Action under Rule 12(b)(1).  The Fourteenth Cause of Action alleges that AFH and its employees were negligent in supervising their employees and in failing to enact and enforce policies and practices to protect the residents.  Sixth Am. Compl. ¶ 296-97.  The Court requested briefing from the parties whether this

motion was properly analyzed under 12(b)(1), Rule 12(b)(6), or Rule 56.  *See* docket no. 127.

Plaintiffs argue that the determination of independent contractor status is intertwined with the merits, requiring application of Rule 12(b)(6) or Rule 56.  The United States argues that "the applicability of the independent contractor exception depends upon facts showing the federal government's alleged supervision and control over [AFH and its employees], while the merits of the Fourteenth Cause of Action depend upon facts showing whether [AFH and its employees] were negligent in their actions" in ensuring the health and safety of the Plaintiffs.  Docket no. 140 at 5. The United States correctly argues that the independent contractor exception focuses on the extent of supervision and control exercised by the United States and its employees – an inquiry that focuses on federal actors and is controlled by federal law – and is a separate question from the merits of the FTCA claim, which focuses on the Nixon actors and is generally governed by state law.  *See Linn v. United States*, 281 F. App'x 339, 345-46 (5th Cir. 2008).

Plaintiffs essentially argue that the issue of the government's supervision and control over AFH and its employees for purposes of the independent contractor exception is intertwined with the merits of *other* causes of action – Plaintiffs' negligent supervision and oversight claims alleged in Counts Twelve and Thirteen.  However, analysis of the independent contractor exception looks primarily at the extent of supervision, while the negligent supervision claim looks at the quality of that supervision.  Although the extent and quality of supervision are interrelated issues, the Court need not decide the motion under Rule 12(b)(6) or Rule 56 because the Court has found that the negligent supervision claim is barred by sovereign immunity under the discretionary function exception.  Thus, there is no overlap with an existing, viable claim.

**B. The Independent Contractor Exception**

As noted, the FTCA waives immunity for claims based on the negligent or wrongful act or omission of any employee of the Government, while acting within the scope of his employment, under circumstances where the United States, if a private person, would be liable under state law. 28 U.S.C. § 1346(b).   The FTCA's definition of "employee of the government" includes "officers or employees of any federal agency" and the term "federal agency" excludes "any contractor with the United States." 28 U.S.C. § 2671.[28]  Thus, the United States is not generally liable for the torts of government contractors or their employees.  *Alexander v. United States*, 605 F.2d 828, 833 (5th Cir. 1979).  Since the United States can be sued only to the extent that it has waived its immunity, due regard must be given to the exceptions, including the independent contractor exception, to such waiver.  *See Dalehite v. United States*, 346 U.S. 15, 30-31 (1953).

In this case, Count Fourteen alleges that AFH employees were federal employees acting within the scope of their employment, and that they negligently failed to ensure the health and safety of the minors detained at the Nixon facility. For the United States to be liable for the torts of the employees of AFH, those employees must be shown to be "employee[s] of the Government" as that term is used in the FTCA.  *See Logue v. United States*, 412 U.S. 521, 526 (1973).

A critical element in distinguishing an agency from a contractor is the power of the federal government "to control the detailed physical performance of the contractor." *Orleans v. United*

---

[28] The definition of employee also includes "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation."  28 U.S.C. § 2671.  Although Plaintiffs cite to this portion of the definition to support their position, it has generally been construed to apply to special situations such as the "dollar a year" man who is in the service of the Government without pay, or an employee of another employer who is placed under direct supervision of a federal agency pursuant to contract or other arrangement. *Logue v. United States*, 412 U.S. 521, 531 (1973).

*States*, 425 U.S. 807, 814 (1976) (quoting *Logue v. United States*, 412 U.S. 521, 528 (1973)).  In

*Orleans*, the Supreme Court discussed its prior decision in *Logue*:

> In *Logue* this Court held that employees of a county jail that housed federal prisoners pursuant to a contract with the Federal Bureau of Prisons were not federal employees or employees of a federal agency; thus, the United States was not liable for their torts. Although the contract required the county jail to comply with Bureau of Prisons' rules and regulations prescribing standards of treatment, and although the United States reserved rights of inspection to enter the jail to determine its compliance with the contract, the contract did not authorize the United States to physically supervise the jail's employees. In short it could take action to compel compliance with federal standards, but it did not supervise operations.

*Id.* at 814-15.  Thus, the Court stated, the question is not whether the contracting agency receives

federal money and must comply with federal standards and regulations, but whether its day-to-day

operations are supervised by the Federal Government.  *Id.* at 815; *Logue*, 412 U.S. at 526 (noting

that the distinction between servant and agent relationship turns on authority of principal to control

the physical conduct of the contractor in performance of the contract).  The Fifth Circuit has referred

to the guiding test as the "daily-detailed-control" test.  *Cavazos v. United States*, 776 F.2d 1263,

1264 (5th Cir. 1985).   The Court added that the applicability of regulations that "fix specific and

precise conditions to implement federal objectives ... [does] not convert the acts of ... state

governmental bodies into federal governmental acts." *Orleans*, 425 U.S. at 816 (footnote omitted).

Further, the ability to compel compliance with detailed federal regulations does not change a

contractor's personnel into a federal employee.  *Autery v. United States*, 424 F.3d 944, 957 (9th Cir.

2005).

In *Linkous v. United States*, 142 F.3d 271, 275 (5th Cir. 1998), the Fifth Circuit instructed

that, in addition to control, we should also consider a number of other factors that the *Restatement*

*(Second) of Agency* § 220 identifies as relevant.  *See also Creel v. United States*, 598 F.3d 210, 213

52

(5th Cir. 2010) (noting that *Linkous* considered *Restatement* factors in addition to control factor).

The *Restatement* factors include:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
> (b) whether or not the one employed is engaged in a distinct occupation or business;
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
> (d) the skill required in the particular occupation;
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
> (f) the length of time for which the person is employed;
> (g) the method of payment, whether by the time or by the job;
> (h) whether or not the work is a part of the regular business of the employer;
> (i) whether or not the parties believe they are creating the relation of master and servant; and
> (j) whether the principal is or is not in business.

*Id.* at 213-14 (citing RESTATEMENT (SECOND) OF AGENCY § 220 (1958)).

## C. Daily Detailed Control

Plaintiffs contend that ORR exercised daily control over AFH, and that AFH was entirely financially, managerially, and programmatically dependent on ORR. Plaintiffs argue that ORR granted federal funds to AFH under a set of rules so detailed that they sharply circumscribed any discretion AFH might have exercised.  In addition, Plaintiffs argue, the federal role was visible, physically present, and supervisory on a daily basis, such that AFH is a servant, not independent.

### 1. Governing Statutes

Plaintiffs point to the statutory language and legislative history to reflect congressional intent to assign responsibility for the care of UAC at the federal level.  Plaintiffs note that ORR had a statutory duty to coordinate and implement care for unaccompanied minors, and had a corresponding right and duty to oversee infrastructure and personnel of the facilities in which the minors were

housed.  6 U.S.C. § 279.  Plaintiffs contend that Congress "specifically identified UAC as a vulnerable population facing unique problems whose needs were best addressed at the federal level, by an agency with substantial authority."  Docket no. 190 at 47.  Plaintiffs argue that "the purpose of vesting responsibility in an agency like ORR with UAC-specific expertise and authority was to create, at the federal level, a system of custody and detention designed for undocumented children, rather than adults."  *Id.* at 48.

However, as pointed out by the United States, there are many possible levels of oversight, and nothing in the statute or the legislative history describes the type of relationship contemplated between AFH and ORR.  A directive that ORR would oversee facilities and personnel does not indicate an intention that ORR would exercise daily detailed control over the facility and its employees.  In fact, as noted above, ORR was given discretion in determining the type of relationship it would establish.  In carrying out its statutory duty to oversee Nixon, ORR chose a cooperative agreement and established its own policies regarding monitoring and oversight.  Nothing in the legislative history or statute establishes Congress's intent that day-to-day operations of the contractor's facilities were to be in the hands of ORR.  In fact, the statutory directive that ORR was to conduct inspections of facilities and make "regular follow-up visits to such facilities . . .to assess the continued suitability of such placements" is inconsistent with a conclusion that Congress intended such day-to-day control over operations.  6 U.S.C. § 279(L).

### 2. Cooperative Agreement and ORR Manual

The Plaintiffs further argue that the Cooperative Agreement[29] and the ORR Manual vested

_____

[29] As noted, the first Cooperative Agreement was not signed until March 2006 and was valid from July 1, 2005 to June 30, 2006.  Although another Cooperative Agreement was not signed, Plaintiffs state that "ORR's own position was that although the Cooperative Agreement for [the later grant period] had not yet been executed, the parties operated 'with the understanding that AFH, while receiving funding from ORR,

controlling authority in ORR. Through the Cooperative Agreement, AFH agreed to operate the Nixon facility in compliance with all applicable state licensing requirements, ORR policies and procedures, federal regulations, and the minimum standards for licensing programs established by the *Flores* Agreement.[30]

---

was bound by the terms of the cooperative agreement.'" Docket no. 190 at 48 n.20.  Plaintiffs have provided an unsigned Cooperative Agreement for the period October 1, 2006 to September 30, 2011.  Pl. Ex. 94. Plaintiffs assert that it is identical to the 2005-2006 Cooperative Agreement.

[30] Ken Tota testified that the parties operated under a Statement of Work ("SOW") before the Cooperative Agreement was signed.  The SOW states that AFH "is responsible for maintaining compliance with the standards set forth by the *Flores v. Reno Settlement* Agreement and ORR which include the Secure and/or Shelter Juvenile Standards Checklist."  Pl. Ex. 101.  It further provides that AFH "shall provide shelter care and/or secured detention for UACs with safekeeping, housing, subsistence, medical and other services in accordance with this Agreement."  *Id.*

The SOW included minimum service standards, which stated that AFH would; (1) house UAC in a facility that complies with all applicable fire and safety codes; (2) provide guard personnel to ensure that there is a 24-hour visual inspection of UACs when housed in a dormitory type setting, and shall visually and physically check UACs individually at least hourly; (3) provide comprehensive orientation; (4) provide individual counseling at least once per week; (5) develop, implement, and coordinate individual service plans for each UAC and have a policy and procedure in place for shift briefings; (6) provide a program that includes, but is not limited to, information regarding personal health and hygiene, human sexuality, and the development of social and interpersonal skills that contribute to those abilities necessary to live independently and responsibly; (7) provide appropriate educational opportunities by certified teachers; (8) provide recreation and leisure time; (9) provide library services; (10) develop written procedures regarding chores or vocational assignment and schedules; (11) encourage visitation and family contact (visitation plans and procedures require prior approval of the Project Officer); (12) permit residents to make two to three personal telephone calls per week to relatives or sponsors; (13) provide information regarding available legal services; (14) provide access to religious services whenever possible; (15) provide a written policy and procedure for grievance resolution; (16) provide written rules and procedures for discipline (subject to ORR approval); (17) provide meals in accordance with state licensing standards and taking into account cultural, religious, or health concerns (35-day menu cycle submitted for ORR approval); (18) provide interpretive services; (19) distribute adequate clothing, linens, bedding, and mattresses; (20) have written policies regarding mail and baggage; (21) develop weekly schedule of program activities; (22) develop uniform admission procedures; (23) develop, maintain, and safeguard individual UAC case records containing specified information; (24) follow procedures to maintain accountability of each minor's cash and other valuables; and (25) provide a reasonable right to privacy.  *Id.*

The SOW also required AFH to provide transport and escort services (policy and procedure to be approved by the Project Officer) and medical services.  *Id.*  The SOW provides ORR with a right of inspection: "The Service Provider shall allow ORR to conduct inspections of the facility, as required, to ensure an acceptable level of services and acceptable conditions of confinement as determined by the ORR." *Id.*  No notice was required, and ORR would conduct inspections in accordance with the Jail Agreement Inspection Report, which stipulates "minimum requirements for fire/safety code compliance, supervision, segregation, sleeping utensils, meals, medical care, confidential communication, telephone access, legal

In *Logue*, the Supreme Court held that, though Nueces County contracted with the Government to house federal prisoners in accordance with Bureau of Prison rules and regulations governing the care and custody of persons committed under the contract, and the rules in turn specified standards of treatment for federal prisoners, including methods of discipline, rules for communicating with attorneys, visitation privileges, mail, medical services, and employment, Nueces County was an independent contractor because the agreement gave the United States "no authority to physically supervise the conduct of the jail's employees" and "reserve[d] to the United States only 'the right to enter the institution . . at reasonable hours for the purpose of inspecting the same and determining the conditions under which federal offenders are housed.'" 412 U.S. at 529-30.

In *United States v. Orleans*, 425 U.S. 807 (1976), a federal agency entered into a grant relationship with a community action agency to further a federal objective. Because the community action agency received federal funding, it had to comply "with extensive regulations which include employment policies and procedures, lobbying limitations, accounting and inspection procedures, expenditure limitations, and programmatic limitations and application procedures." *Id.* at 817-18. In addition, the federal contracting agency also issued "numerous guidelines" that "attempt[ed] to assure that the federal money [was] spent for the benefit of the poor." *Id.* at 818. However, the

---

counsel, legal library, visitation, and recreation." ORR would "share findings of the inspection with the Service Provider's facility administrator to promote improvements to facility operation, conditions of confinement, and level of service." ORR would also pay AFH at a UAC day rate. AFH was required to send a daily count and UAC list, as well as monthly program progress reports providing information regarding adjustments, progress made toward meeting the specific goals and objective of the contract, as well as "information describing a chronological listing of all UACs which includes name, alien control number, date of admission, end of month status, and date of discharge." AFH also had to report any change in the status or condition of any UAC via a Significant Incident Report. *Id.* AFH was also required to provide suitable support, office, and administrative space for use by ORR. *Id.*

regulations did not give the federal agency the power to supervise the daily operation of a community action agency. *Id.* The Supreme Court concluded that it was plain that Congress intended the local entities to have complete control over operations of their programs with the Federal Government supplying financial aid, advice, and oversight only to assure that federal funds not be diverted to unauthorized purposes. *Id.*

Although this case is not as clear cut as *Logue* or *Orleans*, the Court finds that the Cooperative Agreement and the ORR Manual reflect an independent contractor relationship because ORR's authority to monitor and compel compliance does not create liability and ORR was not granted daily detailed supervisory control. *Battaglia v. United States*, 495 F. App'x 440, *1 (5th Cir. 2012) (government authority to monitor compliance does not itself create liability for the United States) (citing *Alexander v. United States*, 605 F.2d 828, 833 (5th Cir. 1979)). Before a right to inspect and compel compliance can create liability for the United States, ORR must perform day-to-day supervision. *Battaglia*, 495 F. App'x at *2 (citing *United States v. Orelans*, 425 U.S. 807, 815 (1976)); *Guile v. United States*, 422 F.2d 221, 229 n.10 (5th Cir. 2005) ("A retained right of inspection does not defeat the independent contractor exception unless the government actually supervises the contractor's day-to-day activities.").

The purpose of the Cooperative Agreement was "to outline the roles and responsibilities of both the Recipient and ORR in providing temporary shelter care and other child welfare related services to UAC in the custody of ORR whom ORR refers to the Recipient." Coop. Agrmt. at 4-5. The specific project goal "is the provision of State licensed shelter care and other child welfare related services, including family reunification and foster care placement (when applicable), to UAC who have been approved for such services by ORR." *Id.* at 5. Because it is a Cooperative

Agreement, "[t]here is substantial involvement anticipated between the Government and the Recipient during performance of the activity, establishing ORR and the Recipient as partners during performance as outlined in the ensuing sections of this Cooperative Agreement." Coop. Agrmt. § 1.5(b). The Agreement states that the "[t]he Project Officer (PO) oversees day-to-day operations of grant and cooperative agreements including but not limited to program design, budget negotiation, conducting desk monitoring and site visits, review of key staff credentials, and review of job descriptions for key staff." *Id.* § 1.5(d).

"Responsibilities of the Recipient," set out in Article II of the Agreement, include: arrange services for UAC, placed by ORR, who are eligible for services; provide shelter care and other child welfare related services in a state licensed residential shelter care program to UAC in the least restrictive setting possible; design and administration of the program will be in accordance with all applicable State licensing provisions, ORR/DUCS policies and procedures and the minimum standards for licensed programs established by the *Flores* Agreement; be able to admit and discharge children on a 24-hour per day, seven-days-per-week basis; ensure that the children follow an integrated and structured daily routine, which should encourage the development of individual and social responsibility on the part of each child; program rules and disciplinary procedures must be written and translated into the child's language, and ensure that all UAC and program staff understand them; serve and provide program content for children in various developmental stages and with specialized needs; design the program to provide a combination of short-term and long-term care as its State licensing permits; implement and administer a case management system that tracks and monitors on a regular basis each child's progress to ensure that he receives the full range of program services in an integrated and comprehensive manner; maintain a comprehensive case file

on each child in its care, which should include information that conforms to state and county licensing requirements and confidentiality laws, as well as pertinent medical and mental health information, services provided, and detailed case notes that explain the progress and status of the case as well as immigration documents (refer to ORR/DUCS Policies and Procedures manual for additional information on case file content and maintenance); provide shelter care in accordance with applicable State child welfare statutes and licensing requirements, ORR/DUCS policies and procedures, and generally accepted child welfare standards, practices, principles, and procedures; staff must be trained and be competent in the use of behavior management techniques and other alternatives to physical restraints, which should only be used as a last resort.

It also listed "direct or core program services" that were AFH's responsibility, including: (1) proper physical care and maintenance; (2) access to appropriate routine and emergency medical/dental care; (3) access to community-based auxiliary mental health services; (4) individual service plan based on initial intake, assessments and psychosocial summary; (5) comprehensive orientation; (6) individual counseling; (7) group counseling; (8) case management; (9) acculturation/adaptation; (10) education services appropriate to the minor's level of development including ESL; (11) scheduled recreational and leisure activities; (12) recreational reading/viewing of books and educational materials; (13) religious services (as applicable); (14) food services; (15) transportation; (16) family/friends visitation and phone calls; (17) access to legal services; and (18) family reunification and release.

Additional "supplemental services/program design" for which AFH was responsible included: (1) grievance procedures; (2) rules and discipline procedures; (3) mail and baggage service/ORR inspections; (4) daily program activity schedule; (5) admissions procedures; (6) client

case records; (7) cash procedures/stipends; (8) internal program evaluation and monitoring systems; and (9) community support. *Id.* § 2.2(c). Further, AFH was to develop a comprehensive and realistic individual service plan for the care of each child in accordance with the child's needs, and the plans were to be implemented and closely coordinated through an operative case management system. *Id.* AFH was also required to establish performance measures for the core and direct program services, including base lines and performance goals, and to structure programs and implement strategies designed to discourage children from running away. *Id.*

AFH was required to provide escorted transportation to local services and appointments. *Id.* § 2.2(i). AFH was required to implement security measures, including (1) employing trained staff responsible for the overall security of the facility, including inspecting the facility and security systems; (2) establishing a control-log book with a written record of all activities during each shift; (3) maintaining an alarm system; (4) ensuring that video cameras monitor hallways, exits, and common areas; (5) documenting resident's phone calls; (6) conducting background investigations on all staff; (7) providing gun lockers for law enforcement and ICE personnel; and (8) providing access to pro bono attorneys. AFH could not provide information from a child's case file to others without ORR's approval. ORR also retained authority to approve family reunifications (reunification packets are prepared by AFH staff and submitted to the DUCS Field Coordinator, and final release decisions are made by ORR). AFH would also ensure that medical services required by ORR were provided for all residents, but ORR would assume the costs of routine and emergency medical care. AFH would locate and identify medical and mental health providers, and could obtain emergency care without pre-approval. AFH would also maintain all medical records according to ORR policies and procedures.

The United States points out that the Agreement required AFH to ensure that minors "follow an integrated and structured daily routine" including eighteen core program services and nine supplemental services, but left the design and implementation of these services to AFH. Further, the United States asserts, AFH staff were required to conduct proper background investigations on its staff in compliance with state licensing requirements and ORR/DUCS policies and procedures, and ORR had no right under the cooperative agreement to terminate, direct, or interfere with the employment of any AFH staff. The United States argues that nothing in the Cooperative Agreement gives ORR the power to control the details and means by which the goals of the agreement were accomplished.

ORR's responsibilities are set forth in Article III, and include: (1) be substantially involved in the programmatic development and ongoing activities proposed and agreed upon in this Cooperative Agreement; monitor and evaluate the provision of service; establish mechanisms to facilitate the referral and assignment of children to the Recipient for purposes of shelter care services; promote and coordinate family reunification and other child welfare related services; and provide consultation and guidance regarding programmatic issues or concerns as well as technical assistance on ORR's policies and procedures; (2) provide AFH with an authorization to enable AFH to secure routine and emergency medical/mental health care and treatment, as well as emergency dental care, for each child in care; (3) prior to placement, ensure that AFH receives applicable client documentation; (4) as appropriate and in consultation with the DUCS Field Coordinator, make final decisions on family reunification; (5) as necessary, provide AFH with a mechanism to conduct background checks on potential sponsors, where applicable; (6) provide AFH general information concerning criminal, smuggling, and gang activity of potential sponsors; (7) ensure constant access

to ORR/DUCS hotline; (8) upon request of AFH, make decisions regarding additional services not specifically stated in the Agreement; (9) apprise AFH of any current or future compliance issues relating to court orders, legal settlements, ORR policy, or changes in federal grant regulations; (10) apprise AFH of ongoing operational policy developments, which may impact programmatic operations; and (11) all decisions regarding requests for financial or programmatic deviations shall be communicated to AFH by the Grants Officer or Project Officer, as applicable.

Section 3.2 of the Agreement governs "Program Monitoring and Site Visits" and states that "ORR shall conduct program monitoring (including desk monitoring) and on-site visits. The purpose of reviewing and evaluating program progress is to ensure that the Recipient's performance under this Agreement is in accordance with the program requirements and the special conditions and general provisions of this Agreement. Such monitoring shall permit specific types of technical assistance to be provided to the Recipient, if needed. Program monitoring of the Recipient shall be conducted at least once annually and more frequently if ORR/DUCS deems it is necessary. After a monitoring, the PO will follow up to ensure the timely resolution of issues that need corrective actions or confirm the implementation of recommendations made during the monitoring. The PO will also review all Quarterly Program Progress Reports and other information submitted by [AFH]." Coop. Agrmt. § 3.2(a). All "liaisons between [AFH] and ORR with regard to the implementation and administration of the programmatic specifications" of the Agreement shall be with the designated PO, Tsegaye Wolde, and the PO shall be responsible for the technical aspects of the program and serve as technical liaison with AFH. *Id.* § 3.2(b).

AFH was to provide an annual budget, which would be approved by ORR. ORR would also conduct financial monitoring through the designated grants officer. In addition, AFH was required

to submit quarterly financial status reports and program progress reports.  The program progress reports would describe progress toward attaining program goals, program achievements, program problems and actions taken, program needs, program strengths and weaknesses, coordination efforts, and plans for the next reporting period; anticipating budgetary or programmatic modifications that would be requested during the next quarter; and a chronological listing of all clients with relevant information.  AFH also had to submit monthly statistical reports with information concerning arrivals, departures, and immigration case disposition of the residents.  AFH was also required to submit a final/annual program report after the end of each budget year, including information regarding adjustments and progress made toward meeting the specific goals and objectives of the Agreement.

AFH would also maintain daily statistical information by entering the information in the ORR internet-based database.  AFH was required to notify ORR of any changes in the status or condition of any child in its care, including such things as unauthorized absence, medical or mental health emergency, threats, pregnancy, hospitalization, death, arrest or incarceration, commission of a major program offense, abuse or neglect incident handled under State law, and certain behavior incidents.  AFH's financial records were subject to audit.

Satisfactory performance by AFH included but was not limited to: effective rate of releases including family reunifications based on the type of UAC population served; quality of services; quality of personnel; effective staff training; and effective program management.  Coop. Agrmt. at 32.  Appropriate corrective measures "shall be recommended by ORR and implemented by the Recipient within a reasonable period of time before ORR undertakes corrective action" and "corrective action" includes freezing of funds, suspension, and termination (in ascending order)."

*Id.*[31]

Thus, although the terms of the Cooperative Agreement state that substantial ORR involvement was anticipated during performance and that ORR and AFH would be viewed as "partners," it generally assigns separate roles and responsibilities to AFH and to ORR and does not vest daily detailed supervisory control over AFH to ORR or expressly contemplate an employment relationship as opposed to an independent contractor arrangement.  The Cooperative Agreement shows that the parties envisioned primarily "coordination and consultation" between AFH and ORR rather than control over AFH's operations by ORR.  Coop. Agrmt. § 3.1 (entitled "Coordination and Consultation").

Further, in describing the Project Officer's role as "oversees day-to-day operations," the Agreement does not say "day-to-day operations of the facility," but "day-to-day operations of grant and cooperative agreements."  The fact that this does not contemplate daily detailed supervision of the Nixon facility is made clear by the fact that ORR was to "conduct program monitoring (including desk monitoring) and on-site visits" through the Project Officer, who was located in Washington D.C., and who oversaw multiple grants and cooperative agreements at one time.  *Id.* §

---

[31] Plaintiffs argue that the Cooperative Agreement gave ORR "a significantly greater proportion of authority than AFH," noting that ORR could terminate the agreement and the grant at any time for non-compliance and that factual disputes would be decided by the Grants Officer, with appeals decided by the ORR Director. Coop. Agrmt. § 7.3.  Plaintiffs also contend that ORR reserved a unilateral power to amend the Cooperative Agreement at any time to "reflect actual program activities" and possessed unilateral authority to impose changed or additional terms and conditions on AFH.  § 4.1(b), 5.2(k).  In contrast, Plaintiffs argue, AFH could only submit requests for amendments to the work or financial program in writing. § 2.3(e). However, ORR's power to amend the Agreement to reflect actual program activities is in the section on "Funding" and is related to ORR's authority to adjust the budget to reflect actual program activities, which is in accord with ORR's role of ensuring that grant monies are spent on allowed costs and that Nixon did not make a profit from the grant, which was prohibited.  *Id.* § 4.1.  In addition, either party was permitted to request changes or additions to the Cooperative Agreement. *Id.* § 7.3(a) ("Either party may request, in writing, changes or additions to this Agreement.  The Recipient's written request shall be directed to the GO.").

3.2(a).[32]  As described above, several portions of the Cooperative Agreement demonstrate that ORR supervised primarily through required reporting and desk monitoring.  Plaintiffs themselves complain that ORR relied too heavily on reporting as a means of overseeing operations at Nixon, as opposed to daily physical supervision.[33]

The purpose of monitoring was not to supervise daily operations or vest daily detailed control in ORR, but "to ensure that [AFH's] performance under this Agreement is in accordance with the program requirements and the special conditions and general provisions of" the Cooperative Agreement and to "permit specific types of technical assistance to be provided to the Recipient, if needed."  *Id.*  Though ORR would "monitor and evaluate the provision of service," this monitoring was to ensure compliance and safety, to "provide consultation and guidance regarding programmatic issues or concerns as well as technical assistance on ORR's policies and procedures," and to keep AFH informed of policy changes and developments.  ORR agreed to "notify the Recipient of planned site visits or monitoring of both program and financial components of the project prior to such trips."  Coop. Agrmt. at 4. In addition, reports from the on-site monitoring demonstrate that "monitoring" as used in the Cooperative Agreement and ORR Manual was not in the form of supervising and controlling the work of AFH employees as it was performed, but was to ensure performance and safety and to provide technical assistance. Pl. Ex. 89 ("The purpose of the site visit was to conduct a review of programmatic compliance" of the program."); Pl. Ex. 93 (noting that the

---

[32] Similarly, the ORR Manual states that the Project Officer "will conduct on-site monitoring of care providers at least once a year and desk monitoring more frequently through telephone calls and monthly statistical data and program progress reports."  Def. Ex. 16 (ORR Manual) § 4.01.

[33] Plaintiffs were permitted discovery into ORR's telephone contacts with AFH and have not submitted any evidence of daily or even frequent telephone calls between Wolde or anyone at ORR and AFH. This further demonstrates a lack of daily detailed control or supervision.

purpose of the site visit was "to monitor programmatic and financial compliance and provide technical assistance").

When ORR took actions in response to a monitoring, it was to address deficiencies and ensure compliance. *See, e.g.*, Pl. Ex. 45 ("it is in our best interest that we impose the following measures to address these findings and deficiencies"); Pl. Ex. 47 (requesting corrective actions to deal with deficiencies). In addition, ORR generally requested a plan of action from AFH rather than dictating the method of achieving compliance, or would provide technical assistance and training on ORR policies. *See, e.g.*, Pl. Ex. 61 ("We have responded to every SIR with requests for plans of action and with follow up by Jose on monitoring them, and more training programs on site, etc."); Pl. Ex. 52 (letter from AFH to ORR noting that Gonzalez met with AFH Director of Operations and Training Coordinator to discuss deficiencies and requesting technical assistance).

The various responsibilities allocated to AFH in the Cooperative Agreement indicate that AFH was responsible for arranging for and providing services to the UAC, providing shelter care, ensuring that children followed an integrated and structured daily routine, creating and enforcing program rules and disciplinary procedures, designing and providing program content, counseling, education, recreation, and services, implementing and administering a case management system, and maintaining files. In addition, the record indicates that AFH created its own written program design, and its manual covered education and vocational programs, library services, counseling, health screening, dietary allowances, recreation, religious services, volunteer program, mail and correspondence, visitation, and residential community meetings. Pl. Ex. 27. There is no indication that ORR retained a right to daily detailed supervision of the physical performance of these activities.

AFH hired and fired its staff, including all of the employees about whom Plaintiffs complain, and the only express authority given to ORR was the requirement that ORR approve the job description and hiring of key personnel (Program Director, Assistant Program Director, Lead Case Manager, Clinicians, and Lead Clinician).[34]  AFH also paid its staff.[35]  In addition, AFH supervised its own staff, and trained its staff, even employing a Training Coordinator.  *See* Def. Ex. 31 ("The Training Coordinator implements the training, makes sure all staff training is current, and enters all training data into staff personnel file.").[36]  All of these facts demonstrate that the parties did not contemplate or contract for ORR to have a right or duty of daily detailed supervision.

Plaintiffs contend, however, that ORR's lengthy ORR Manual controlled the details of AFH's work and that AFH was not free to select the means of implementing its contractual responsibilities.  AFH was required to follow the policies and procedures outlined in the ORR

---

[34] Plaintiffs point out that, after the allegations against Leal were made known, Wolde told Gaytan on February 12, 2007 that Gaytan was not doing her job and that Leal should be formally suspended immediately.  Gaytan then suspended Leal.  However, Wolde directing that an alleged child abuser be suspended pending an investigation, which directly affected resident safety, does not show that Wolde or ORR exercised general control over hiring and firing.

Plaintiffs also note that ORR personnel discussed who should be terminated and directed that Amaya be terminated, but those events took place after ORR had effectively taken over AFH.  *See* Pl. Ex. 75 (April 4, 2007 ORR email inquiring whether Amaya was terminated "per my directive").  As will be discussed, ORR's actions in responding to the Leal abuse, and especially those actions taken after De La Cruz was appointed as temporary administrator, do not establish that ORR had control before that time and before the Plaintiffs were harmed.

[35] Plaintiffs assert that ORR paid the staff, but that is not accurate.  The record indicates that paychecks were from AFH to individual AFH employees.  Although ORR played an indirect role in approving salaries for the budget, AFH generally determined the salaries and paid the employees.  *See* Pl. Ex. 15 (Wolde stated, "We don't pay for individuals but we budget for positions."); Pl. Ex. 107 (Wolde asks Gaytan how much they intend to pay for a clinician position); Pl. Ex. 131 (when Gaytan asked to keep the same number of case managers, Wolde stated that the budget would not support keeping the same number of case managers when the number of beds had been reduced).  As noted, ORR had a duty to ensure that grant funds were being appropriately expended.

[36] ORR did provide training to AFH management but not AFH staff.  If ORR did train staff directly at some point, which is unclear, it was only in response to known deficiencies and violations in reporting and restraints.

Manual.  Pl. Ex. 71.  The ORR Manual specified that "the Program Director shall be responsible for the entire program and its outcomes."  The Program Director was the primary liaison with ORR and "shall coordinate both programmatic and financial elements of the services to the UAC in care," shall "be responsible for creating an internal manual for each programmatic function based on State licensing requirements, the ORR policies and procedures, the Cooperative Agreement or Statement of Work and the agency's internal policies and procedures; and shall be responsible for all reporting requirements, and shall bring any issues or concerns to the designated grants or project officer.  ORR required AFH to have "key personnel," including a Program Director, Lead Case Manager, Clinicians and a Lead Clinician.  ORR specified the qualifications required for these key personnel, and AFH was required to obtain approval from the PO for hiring key personnel.  ORR also provided policies for general staffing conditions, handling staff incidents, staff training and development, internal monitoring and evaluation, and external working relationships.

Plaintiffs contend the ORR Manual was 366 pages and left "almost no aspect of shelter operations untouched."  Docket no. 190 at 52.  The Court notes that the entire Manual has not been submitted, only approximately 42 pages of it.  Pl. Ex. 71.  Plaintiffs argue that the ORR Manual gave ORR the following control: (1) complete authority and control over all UAC placements, transfers, and releases, as well as control over the number of beds, which directly affected AFH's staffing levels because it was required to maintain certain staff to resident ratios; (2) pre-approval for hiring of key personnel and requiring Program Director to ensure that minimum qualifications set by ORR were met for case managers, youth care workers, and teachers, (3) ownership and control of files, and detailed requirements for files (such as use of black ink and prohibition on using correction fluid), with unrestricted access to the UAC files at all times; (4) control over UAC contact with their

attorneys, including that AFH could not grant permission for the attorney to access the file without

prior ORR approval and requiring approval of ORR for attorney appearance at court; (5) AFH staff

were prohibited from discussing prospective or pending litigation against ORR with attorneys

representing parties to the litigation, showing the agency's insistence that shelter staff represent

ORR's interests; (6) requiring AFH staff involved in making and/or implementing UAC care

decisions to meet once per week; (7) ordering AFH to build and maintain working relationships with

external entities, including community organizations, state licensing agencies, the local FC, FFS,

and DHHS personnel; (8) dictating details of UAC telephone use, language interpretation, and

transportation service; (10) requiring AFH to provide three to seven changes of clothing to incoming

UAC, to change their bed linens at least weekly, to provide night lights to especially young UAC,

and barring AFH from cutting UACs' hair; and (11) controlling medical care.

However, the fact that an agency must comply with voluminous and detailed federal

regulations is not sufficient to convert a contractor into a federal employee. *Logue*, 412 U.S. at 530

(requirement that county comply with specific standards of treatment for federal prisoners, including

methods of discipline, rules for communicating with attorneys, visitation privileges, mail, medical

services, and employment insufficient to turn independent contractor into federal agency); *Autery

v. United States*, 424 F.3d 944, 957 (9th Cir. 2005) (contract provisions directing detailed

performance generally do not abrogate the contractor exception because the United States may fix

specific and precise conditions to implement federal objectives without becoming liable for an

independent contractor's negligence).  Even if the ORR Manual controlled the details of some

aspects of AFH's work, as listed by Plaintiffs, it left AFH control and discretion over numerous

other matters assigned to AFH with regard to caring for the residents, as noted by the United States,

and ORR did not supervise AFH's day-to-day operations.

### 3. Jose Gonzalez – August to November 5, 2006

Plaintiffs also assert that ORR supervised AFH through the Federal Field Specialist (FFS). Plaintiffs argue that the FFS served as a "government representative/administrator at the local level," and provided "oversight and guidance" to AFH staff on policies and procedures, made final release determinations, and ensured that AFH operated in compliance with the applicable regulations and agreements. Pl. Ex. 69.

It is undisputed that ORR hired Jose Gonzalez in August 2006, three years into the relationship between ORR and AFH and there was not another local FFS assigned to Nixon before that.[37] Gonzalez lived in San Antonio, and was assigned to Nixon and two other facilities in Seguin and Corpus Christi. Gonzalez had an office and phone at Nixon, and was present at the facility two to three days per week between August and November 5, 2006. Gonzalez depo. at 41; Pl. Ex. 116. Gonzalez held a weekly staff meeting to discuss the children, updates, and issues or problems at Nixon. Pl. Ex. 112, Gonzalez depo. at 24-25. The meetings were structured, and the case managers, attorneys, clinician, program director, and field coordinator attended and would provide updates and information. *Id.* at 26-27. Plaintiffs also note that Gonzalez spoke freely with Nixon residents and staff, without need to request access. *Id.* at 39-40. Plaintiffs state that he used this freedom to make constant queries about the program's operations, which "led him to frequent supervisory actions." They state that he gave direction directly to direct care staff, without having to go through management, and could also direct his supervisory comments straight to the AFH Program Director. *Id.* at 44-45. Plaintiffs also note that Gonzalez was the point of contact for CPS, and that the Sheriff

---

[37] James De La Cruz was assigned to Nixon before that, but he was located in Houston.

called him directly to inform him of the November 5, 2006 abuse incident.

The United States contends that Plaintiffs cannot establish the necessary daily detailed control when Gonzalez was not hired until three years into the relationship between ORR and no other ORR employee even arguably exercised daily detailed control over Nixon before August 2006. Although the United States does not dispute the evidence concerning Gonzalez's presence and activities at Nixon, it contends that ORR simply exercised, through Gonzalez, "a general right . . . . to inspect . . . progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, [and] to prescribe alterations and deviations," which are insufficient to defeat the independent contractor exception. *Ellison v. Conoco, Inc.*, 950 F.2d 1196, 1207 (5th Cir. 1982). The United States contends that Gonzalez was not exercising supervisory control over daily operations but rather ensuring AFH's future compliance with the contract.

Although Gonzalez did have some oversight responsibility and interacted directly with AFH staff, the record indicates that his supervision was not the requisite daily detailed supervision or physical supervision required to make AFH a federal agency and its employees federal employees. The record demonstrates that Gonzalez's role was intended to be collaborative as opposed to supervisory; he was to assist with program compliance, and to sign necessary documents related to care and placement given that the residents remained at all times in ORR custody. Pl. Ex. 69. The FFS role was described by ORR as: "visits facilities and provides oversight and guidance to facility staff regarding policies and procedures, works with the facilities on administrative issues, and provides follow-up information to the Project Officer"; staffs cases with facility staff and the DUCS Field Coordinator when further deliberation and/or information is needed; works with the Project Officer on facility related issues with the final determination by the Project Officer; ensures that

71

facilities are in compliance with the Cooperative Agreement, Statement of Work, the *Flores* Agreement, and DUCS policies and procedures; and builds collaborative efforts among the facilities in his/her region regarding best practices; provides technical assistance to facilities in coordination with the Project Officer, Program Director, and DUCS Field Coordinator. *Id.* The job description for the FFS states that FFS will "correct problems in the field regarding the care of UAC and other relevant UAC issues/matters" and the FFS "gathers, reviews, and analyzes information concerning UAC in care, advises DUCS-grantees field coordinators and shelter/facility staff of ways to correct problems" and "consults with DHS officials, other government officials, shelter/facility administrators, and non-profit groups or advocates as appropriate to improve facility programs." Pl. Ex. 84.

Although Gonzalez was present at Nixon two to three days per week, there is no evidence that a primary or even significant part of his time there was spent in a supervisory capacity. He testified that on a typical day he would check emails, and review reunification packets and discuss updates on residents with the DUCS Field Coordinator, and "that easily takes about ten hours a day." Gonzalez depo. at 24. He also testified that, at the weekly staff meeting he received updates on the children, and that he made himself available for staff or residents to talk to. *Id.* at 25. He said that staff would come in or he would go to their office and it would be "anything from: How are you doing, Good morning to, Oh, come outside and see the kids play soccer or We have these art exhibits, come out and see those." *Id.* at 40. He also stated that on some days he would close his computer and "walk around the program." *Id.* He testified that he did not have formal hours or a time clock. *Id.* at 38. He stated that he had access to the children's files, and would ask for them if there was questionable information in a reunification packet. *Id.* at 41-42. In his role of approving

reunifications, he might send a packet back to the AFH case manager for additional information or would notify the case manager, as well as his supervisor and the director, if information was missing. *Id.* at 42.  Gonzalez described his relationship with AFH staff as "cordial." *Id.* at 44.  He did state that, if he had concerns, he would bring them up directly with staff or the Program Director, but there is no testimony or other evidence that these incidents involved anything other than ensuring compliance with the contract and ORR Manual or enforcing safety requirements or that these were instructions that staff had to obey as opposed to suggestions.  And there was no testimony as to how often this might have occurred.  Taken as a whole, Plaintiffs' evidence fails to establish that Gonzalez was engaged in daily detailed supervision of AFH employees.

### 4. Increased ORR Role after November 5, 2006 Incident and February Abuse

Plaintiffs argue that Gonzalez became a "de facto facility director" after the November 5 incident because he interviewed staff and residents and observed program operations at length, reviewed state policies and procedures with regard to restraints with AFH, and required that AFH retrain employees on restraints.  Plaintiffs assert that Gonzalez's authority to require action was never in doubt.  Plaintiffs argue that Gonzalez's superiors at ORR also consistently acted on their authority to directly supervise AFH staff and control AFH's operations.  As examples, Plaintiffs note that FFS Supervisor James De La Cruz and Gonzalez met with TDFPS without AFH present in November 2006, and that Wolde admonished Gaytan for inadequate SIRs about a runaway attempt and asked that she "[p]lease resubmit the SIR including all the notifications per your cooperative agreement, ORR P&P and licensing requirements."  Pl. Ex. 123.  However, these incidents do not establish daily detailed control over AFH as opposed to enforcing compliance with the governing documents.

73

Plaintiffs also point out that ORR continued its investigation into the abuse incidents by conducting a site visit from November 27 to December 1, 2006. According to the record, Wolde, De La Cruz, and Gonzalez visited to (1) review the lease arrangement and property taxes for the buildings the agency uses to house UAC,[38] (2) evaluate the capability of the agency and its management team to run a program with 136 beds, and (3) to investigate numerous incidents and provide recommendations on the incidents, abuse, inappropriate restraints, and reporting violations. Pl. Ex. 125. Plaintiffs contend that these topics are all "germane to AFH staff and management's daily jobs." Further, Plaintiffs note that, while Wolde was there, he met with a deputy director candidate in person at Dunn's request. Pl. Ex. 127. However, the evidence shows that Wolde expressly noted that interviewing candidates was not ORR's role, and it should be considered a meeting and not an interview. *Id.* In addition, the fact that ORR conducted additional monitoring to resolve pending budget issues and to investigate abuse incidents, as well as to "provide recommendations" is not evidence of daily detailed control.

Plaintiffs further assert that, after the November site visit, ORR "ordered remedial actions" that affected nearly every aspect of AFH: improvements to inadequate personnel files; elimination and reconfiguring of administrative staff positions; remedies to improper financial procedures; mandatory staff training; and instruction to hold weekly case management staff meetings. Pl. Ex. 125. However, rather than "ordering remedial actions," as Plaintiffs assert, the report includes a number of "recommendations" and some required corrective actions. Because the number of staff had grown and files were not being adequately maintained, "[t]he agency [*i.e.*, AFH] recommended

---

[38] The record makes clear that ORR was looking into the lease and property taxes as part of the budget negotiation process and to ensure that past amounts for lease did not exceed allowable costs under the regulations. Pl. Ex. 125.

the Operations Manager position to be eliminated and the money to be used to hire a qualified HR person" and ORR approved this request.  ORR recommended that AFH "review the licensing and ORR requirements on hiring, training and personnel files and make sure that all the requirements are met."  Pl. Ex. 125.  ORR also wrote, "Under Section 5.2 of the Cooperative Agreement, AFH is expected to be familiar with OMB Circulars A-110 and A-122 and implement its program accordingly.  Therefore, it is imperative that AFH hire a qualified accountant and provide training to its existing financial team."  Pl. Ex. 125.

In the Team report,[39] ORR required the following corrective actions: (1) revise internal policies and procedures regrading significant and critical incidents in adherence with ORR DUCS and Texas Department of Family and Protective Regulatory Services, including required detailed verbal and written reporting and response procedures; (2) all staff should attend mandatory and regular training on significant and critical incident handling, reporting, and follow-up; (3) all critical incident reports and SIRS should be placed in one loose-leaf binder in a central location, accessible only to staff; each staff member should be required to read all critical and SIRS that have occurred since he or she last reported to work; (4) daily progress notes for each child should be developed and made available to all relevant staff for an appropriate plan of communication at the end of each shift and placed in the child's file; a written policy and procedure should be developed and implemented which requires each staff member working with the child to have read the child's file before starting the shift; (5) staff representatives from direct care staff, case management, and clinical team should contribute to the development of an appropriate reporting format for improving internal communication; (6) weekly meetings with clinical, case management, and DUCS Field Coordinator

---

[39] The Team Report appears to be a draft, and not a final report.

staff to review children's cases; (7) AFH should hire three individuals to fill open positions, and should include proof that it has made sufficient effort to hire individuals based solely on their previous work experience rather than previous relationships to AFH employees; (8) the Program Director is expected to execute strong leadership, to be able to delegate to qualified personnel, and to spearhead the development of clear policies and procedures implemented in a consistent manner to address communication among leadership staff; (9) all staff should be trained on ORR DUCS policies and procedures and TDFPS Minimum Standards on what constitutes an SIR; and (10) a master's level clinician should be on site full-time.  Pl. Ex. 125.  Much of these corrective actions are simply ensuring compliance with the existing documents and ensuring the safety of the residents. ORR's right to inspect AFH's performance and to compel compliance with the Cooperative Agreement and the rules and regulations incorporated therein (state licensing requirements, the *Flores* Agreement, and the ORR Manual), when not engaged in on a frequent or daily basis, does not amount to daily detailed control or convert the relationship to one of employer/employee.

Similarly, other actions by ORR that Plaintiffs describe, such as Wolde informing Rains and Gaytan that ORR would cut 32 beds as of January 1, 2007, and attaching a budget spreadsheet indicating "areas and line items from where you could cut the budget," Pl. Ex. 128, Dunn and Wolde maintaining regular contact with AFH management, instructing them to fill certain staff vacancies and closely following their progress, Pl. Ex. 121, 129, is not sufficient control as it was either a recommendation on how to cut the budget to reflect the reduction in beds or enforcing existing requirements that staff positions be filled and staff ratios be satisfied.

Plaintiffs contend that AFH accepted ORR's detailed instructions on its operations and requested technical assistance.  *See* Pl. Ex. 130 (memo from Gaytan to ORR team stating, "We are

76

willing to take all recommendations given to us by your team of experts" and requesting technical assistance in the following areas: creating a token/reward system for residents; improving communication between federal and internal office; expanding orientation of new residents; increasing recreational activities and expanding social skills; improving communication between direct care staff and case workers; and following recommendations given by the FFS).  However, the fact that AFH asked for and willingly accepted recommendations and technical assistance to improve its performance and avoid having its grant terminated does not convert the relationship to employer/employee.

Plaintiffs argue that, after the February 2007 sexual abuse allegations regarding Leal became known, ORR "simply continued its pattern of detailed, physical control" but "increased the intensity of its inspection, evaluation and monitoring – to the point of taking over the facility and ultimately putting AFH out of business by terminating its grant."  Docket no. 190 at 60.  Plaintiffs contend that each of these actions was a permissible exercise of ORR's authority as set out in the background documents.  On February 16, Dunn unilaterally suspended new UAC placements at AFH, which, Plaintiffs contend, immediately and directly affected AFH's daily operations and its sole source of revenue.  Plaintiffs argue that, by mid-February, "every representative in the ORR hierarchy was communicating directly and in a supervisory fashion with AFH."  Dunn requested a corrective action plan from Gaytan and for her to set up counseling sessions for the victims. Pl. Ex. 139. After Gaytan submitted a plan, Dunn wrote that the plan should be more complete and comprehensive, with a time line for implementation, and "should include major changes to the way you currently do business." Pl. Ex. 140.  Martha Newton, the Director of ORR made a trip to AFH on March 1, 2007.  Pl. Ex. 142.  Plaintiffs note that ORR had internal discussions regarding their power to terminate the grant.

ORR imposed a one-month shutdown after it removed all the children.  Plaintiffs contend that it made any funding of beds contingent upon AFH working closely with De La Cruz and Gonzalez on corrective actions that had been vetted and revised by ORR.  Pl. Ex. 148.  Plaintiffs assert that these steps "usurped . . . AFH's management authority, and all but erased AFH's identity as an agency independent from ORR."  De La Cruz essentially took over the program in a supervisory capacity on March 2, 2007.  Pl. Ex. 154.  Plaintiffs say he wrote the facility's reorganization plan, but that is not clear Pl. Ex. 150.  Plaintiffs argue that AFH never questioned ORR's authority to take control over the facility, but instead "welcomed" the decision.  Pl. Ex. 154.

However, the fact that ORR contemplated and discussed terminating the grant and imposed requirements that AFH rectify the noted deficiencies in order to prevent ORR from terminating the grant for cause as was its right under the Cooperative Agreement is not evidence that it was AFH's employer.  Further, although it is true that ORR placed James De La Cruz into the position of facility administrator, it is undisputed that, in order to do so, ORR invoked section 5.2(k) of the Cooperative Agreement, which provided that, "[a]s necessary, other special terms and conditions may be placed on the Recipient."  Pl. Ex. 146.  Thus, this special condition was imposed after all the alleged abuse occurred and was imposed in an effort to prevent any further harm to residents and to ensure that Nixon would be a safe place to return children if the grant were continued.  Although AFH did not oppose or question ORR's authority to take this step, it does not alter the fact that no provision expressly authorized or appointed De La Cruz as a facility administrator or supervisor before March 2, 2007.

Although the facts of this case are unique and the Court has been unable to locate any cases with similar facts, the Court finds that the contract and other documents and the actions of the parties

do not establish the kind of daily detailed control necessary to abrogate the independent contractor

exception.  Accordingly, the Court will consider the Restatement factors before deciding whether

AFH employees were employees of the United States.  *See Linkous v. United States*, 142 F.3d 271,

276 (5th Cir. 1998) ("If the government lacks the power to directly control an individual, then the

court must look at other factors before deciding the individual's status as employee or independent

contractor.").

**D.  Restatement Factors**

Section 220 lists the following factors as relevant in determining whether an individual is

an employee or an independent contractor:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
> (b) whether or not the one employed is engaged in a distinct occupation or business;
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
> (d) the skill required in the particular occupation;
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
> (f) the length of time for which the person is employed;
> (g) the method of payment, whether by the time or by the job;
> (h) whether or not the work is a part of the regular business of the employer;
> (i) whether or not the parties believe they are creating the relation of master and servant; and
> (j) whether the principal is or is not in business.

RESTATEMENT (SECOND) OF AGENCY § 220 (1958).  "Although such a determination does not

require mathematical precision, if the government lacks the power to control an individual, plus

several factors listed in § 220 weigh in favor of independent contractor status, then a court must

conclude that the individual is an independent contractor."  *Linkous*, 142 F.3d at 276.  These factors

do not apply precisely to this context, where the Court is considering whether the Government

exercised control over an agency as opposed to an individual.

Factor (a), the extent of control that ORR exercises over the details of the work, has already been addressed above.

Factor (b), whether or not AFH and AFH employees are engaged in a distinct occupation or business, weighs in favor of independent contractor status.  Plaintiffs contend that both ORR and AFH were in the business of caring for UAC.  However, the Court agrees with the United States that, in reality, ORR coordinated the care of UAC while AFH actually cared for UAC, which are distinct.  ORR did not own or operate any facilities for providing shelter care services in the San Antonio area at the time it contracted with AFH, was not a licensed childcare provider, and relied on AFH to provided services that ORR required.  In addition, coordinating the care of UAC was only one aspect of ORR's responsibilities.  Although both ORR and AFH played a role in the reunification of UAC with family, that is insufficient to render them in the same occupation or business.

Factor (c), the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision, and factor (d) the skill required in the particular occupation, appear to weigh in favor of independent contractor status.  Plaintiffs contend that ORR is the only entity authorized to provide for the care of UAC and thus no other organization could engage in this activity absent ORR involvement.  Plaintiffs also argue that AFH could not have performed UAC care without ORR's supervision and programmatic direction.  Plaintiffs' application of this factor is too narrow.  Rather than limiting the analysis to provision of child care to UAC, the Court considers the relevant occupation as the provision of child care in general.  Customarily, the custodian of the child who places the child into a child care setting is not an employer of the child care facility, but instead is a client.  In addition, many of the types

of services provided by AFH – child welfare, counseling, and teaching – are engaged in by specialists without supervision, and involve some degree of skill.  *See* Def. Ex. 31 (ORR proposal for 2006 funding) ("AFH takes great pride in our professional staff with extensive experience in education, business, juvenile detention, probation and shelter care.").

Factor (e), whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work, weighs in favor of independent contractor status. The fact that a worker supplies his own tools is some evidence that he is not a servant, whereas if the employer supplies the instrumentalities, the workman may be found to be a servant. RESTATEMENT (SECOND) AGENCY § 220 cmt. j, k.  Plaintiffs argue that ORR provided the instrumentalities, tools, and place of work because all of AFH's operating equipment and inventory and items distributed to UAC (clothing, deodorant, food) were purchased with federal funds and were therefore owned by ORR.  ORR also provided forms, operating procedures, and databases that AFH was required to use.

However, the United States correctly contends that ORR simply budgeted for certain items, while AFH purchased and provided the necessary items for caring for the UAC.  In addition, AFH supplied the actual building, which it already owned when it approached ORR.  Although ORR paid AFH for all items through budgeting, AFH used its own judgment to determine what items to purchase, and purchased and acquired all items necessary for its work.  The fact that AFH was required to use certain forms and to enter information into an ORR database for reporting purposes is not sufficient to render this factor in favor of a master-servant relationship.  In addition, the fact that AFH received all of its funding from ORR does not convert it into a federal agency.  *See Orleans*, 425 U.S. at 807, 819.

Factor (f), the length of time for which AFH was employed, weighs in favor of independent contractor status. In 2003, AFH received funding for a three-year project period that was composed of three one-year budget periods, which had to be renewed each year. In 2006, AFH received funding for a five-year project period composed of five one-year renewable budget periods. Plaintiffs contend that this is "a considerable period of time with regular hours." As the United States points out, however, ORR awarded a grant to AFH for a period of years, but entered into no relationships with any AFH employees for any term of employment. Further, the United States relies on *Peacock v. United States*, 597 F.3d 654, 660 (5th Cir. 2010), in which the Fifth Circuit held that a doctor's contract for one year, renewable at the end of each term, was a short term contract and the fact that the contract was renewed five times did not create an employment relationship. The *Peacock* Court cited *Linkous* for the proposition that the Court ultimately found independent-contractor status despite a working relationship spanning "several years." This factor therefore weighs in favor of an independent contractor relationship.

Factor (g), the method of payment, whether by the time or by the job, weighs in favor of independent contractor status. Plaintiffs argue that AFH was paid to receive and care for UAC year-round, 24 hours a day, and not by the number of UAC present at any given time, making the financial arrangement more akin to payment for time. However, the Court agrees with the United States that this does not mean that AFH was paid for its time rather than for performing a job. ORR negotiated its budget with AFH based on the number of beds it could provide, which is akin to being paid by the job. In addition, although AFH staff were paid by salary, the salary was paid by AFH, and ORR neither hired them nor directly paid their salary. *Peacock*, 597 F.3d at 660 (finding that doctor's salary weighed in favor of independent-contractor status because he was paid a fixed

82

amount by UTSWMC to provide cardiology services at a number of hospitals, and the Government neither hired him or directly paid his salary).

Factor (h), whether or not the work is a part of the regular business of the employer, weighs in favor of independent contractor status. Plaintiffs argue that UAC care and placement is part of ORR's regular business, and the ORR individuals were "heavily involved in the business of UAC care, placement, and reunification." However, ORR is not in the business of child care and providing child welfare services, which is AFH's business and the business it agreed to provide for ORR in the Cooperative Agreement.

Factor (i), whether or not the parties believe they are creating the relation of master and servant, also weighs in favor of independent contractor status. Plaintiffs contend that the record shows that ORR and AFH believed they were creating a master-servant relationship, as shown by ORR's exercise of control and AFH's submission to this balance of power. Plaintiffs cite ORR's requirement that ORR must pre-approve changes in AFH's top four positions, including the CEO. Plaintiffs also cite documents in which AFH personnel state that they will do whatever ORR requires and are willing to take all recommendations by ORR's team of experts, as well as an email from Rains stating "we work for ORR and . . . my experience has taught me to follow orders."[40] However, these statements do not show that the parties intended or believed they were operating under a master-servant relationship as opposed to an independent contractor relationship; even an

---

[40] Plaintiffs also cite an email from Rains to Wolde stating that Jim De La Cruz "must approve [the organizational chart] not me." Pl. Ex. 168. However, Wolde's response to that email demonstrates that he did not believe that ORR was AFH's master: "In general, I believe Jim is there to help but your email below and also the short conversation we had, you believe that you are not the decision maker. I believe you are there to make the decision on your program but you have someone there to assist and move in the right direction." In addition, this email exchange occurred in March 2007, after all of the alleged harms occurred, and after ORR had invoked the special conditions clause of the Cooperative Agreement to install De La Cruz as a facility administrator/supervisor.

independent contractor "works for" the principal and is generally willing to do what is required by the principal to retain the work.  Despite voluminous discovery, Plaintiffs do not point to any documents demonstrating that AFH or ORR believed they were entering into a master-servant relationship or that AFH employees would be federal employees.

Last, factor (j), whether the principal is or is not in business, also weighs in favor of independent contractor status.  As noted, ORR is not in the business of residential child care.  It is responsible for locating appropriate care facilities, and is in the business of awarding grants and other means of funding to other entities to provide child care.

Thus, the *Restatement* factors also weigh in favor of an independent contractor relationship, and the Court finds that AFH was not a federal agency and its employees were not federal employees.  Therefore, Count Fourteen is barred by the independent contractor exception.

### Conclusion

Plaintiffs' Twelfth and Thirteenth Causes of Action are barred by the discretionary function exception and are therefore DISMISSED WITHOUT PREJUDICE for lack of jurisdiction. Plaintiffs' Fourteenth Cause of Action is barred by the independent contractor exception and is therefore DISMISSED WITHOUT PREJUDICE for lack of jurisdiction.  The parties are to inform the Court within fourteen days of this Order whether any claims remain pending in this case.

SIGNED this 5th day of July, 2013.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE